IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
DUBLIN DIVISION

| | |
|---|---|
| VERNEISA JACKSON, | * |
| Plaintiff, | * |
| v. | * CIVIL ACTION NO: 3:11-CV-111-DHB-WLB |
| CORRECTIONS CORPORATION OF AMERICA, | * |
| Defendant. | * |

## PLAINTIFF'S STATEMENT OF MATERIAL FACTS IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

NOW COMES, Plaintiff and pursuant to Fed. R. Civ. P. 56 and Local Rule 56 files her Statement of Material Facts in Opposition to Defendant's Motion for Summary Judgment and shows:

1. Pursuant to CCA's Equal Opportunity policy, CCA must adhere to anti-discrimination laws and regulations and Executive Order 11246. [Exh. 1]

2. Under Executive Order 11246[1], an Affirmative Action Plan is mandatory under CCA's contract with the Federal Bureau of Prison.

3. CCA has a history violating its Affirmative Action Plan in violation of Executive Order 11246 in 2004-2005. [Exh. 5]

---

[1] Office of Federal Contract Compliance Program's primary responsibility is to implement and enforce an Executive Order and several statutes banning discrimination and establishing affirmative action requirements for federal contractors and subcontractors.

4. Pursuant to CCA's Job Posting policy and Executive Order 11246, CCA must adhere to mandatory listing requirements for positions.[2] [Exh. 2] Positions on CCA's Organizational chart and staffing pattern are positions and not post. [Exh. 3]

5. Jackson was employed by CCA as Librarian from August 25, 2003 to April 12, 2005. [Tab C: Jackson Dec. ¶¶ 2, 6, Tab C: Exh. C-1]. Jackson did not have a library science degree. [Tab C: Jackson Dec. ¶ 5, Tab C: Exh. C-1].

6. At the time of her hiring, Jackson notified CCA that she did not have a library science degree. [Tab C: Jackson Dec. ¶ 4, Tab C: Exh. C-1, C-2].

7. At the time of her hiring, Jackson was told that the library science degree requirement could be waived. [Tab C: Jackson Dec. ¶ 5].

8. Although Defendant disputes that it was aware that Jackson lacked a library science degree when she was hired, Defendant acknowledges that they became aware that Jackson lacked a library science degree on November 22, 2004, [Defendant's Tab A: Hartley Aff. ¶ 7] which contradicts CCA's ACA standard memorandum which shows Defendant's awareness that Jackson did not possess a library science degree. [Tab C: Exh. C-2]

---

[2] Contrary to Fran Hartley's Affidavit [Tab A: ¶10], CCA's Job Posting Policy 3-13 only has the exceptions listed on page 2 of 6, C.1 [Defendant's Tab A: A-2], which is in accordance with the Department of Labor, Office of Federal Contract Compliance Programs, 41 CFR Part 60-250, mandatory listing requirements within this contractor's (CCA's) and CCA policy 1-5. [Exh. 1] Positions that are filled internally are only excluded from state-wide advertising.

9. Once Defendant allegedly became aware that she lacked a library science degree, Defendant waived the requirement by allowing her to continue to work as librarian until April 12, 2005. [Defendant's Tab A: Hartley Aff. ¶ 7].

10. Warden Pugh told the Human Resources Director and James Hill that Jackson had been granted a waiver of the library science degree. (Tab D: ¶ 7].

11. From 2003 thru May 2005, Jackson completed the majority of the requirements as Librarian[3] for the Defendant with a certified Contract Librarian who only worked eight (8) hours per month as a consultant [Tab C: Jackson Dec. ¶7, Tab C: Exh. C-2, Defendant's Exh. 41].

12. Jackson worked as the Librarian until April 12, 2005, when she applied for and accepted a position as Case Manager with CCA. She took a pay cut in order to accept this position. [Tab C: Jackson Dec. ¶9, Tab C: Exh. C-3, Exh. 6].[4]

13. After reviewing the Defendant's Wage Determination, Jackson learned that the pay rate for Librarian was significantly higher and formally requested an increase in pay [Defendant's Exh. 14].

---

[3] During the Investigation in March, Shannon Pooler stated "during the initial accreditation process, the facility had the services of a contract librarian and no deficiencies applicable to the librarian position or library service were noted." Please note that I was the full-time Librarian during this timeframe.

[4] Contrary to CCA's Position Statement to the EEOC, which states, "However, on May 1, 2005, it was "discovered" that Ms. Jackson actually did not meet the minimum qualifications for the position because she did not have a library science degree."[Tab C: Exh. C-1, C-2, Exh. 6]. Please also note that I had already applied and accepted the Case Manager position when CCA claims to have discovered that I did not meet the minimum requirement. CCA's Position Statement also states in footnote 9, on page 2 of 5, (1.C.1b), "Subsequently, the pay rate for the Case Manager position was reduced from $34,163.25 to the actual rate for the position pursuant to the applicable area wage determination rate of $33,425.60." Please note that this is also not true, Case Manager pay was never reduced. [Tab C: C-3]

14. In 2004, CCA did not comply with 29 C.F.R. § 4.169[5], when my request for a pay increase was denied. [Defendant's Exh. 14, Exh. 9].

15. During 2004 and 2005, Jackson applied for Personnel Investigator[6], Unit Manager, Records Manager, and Case Manager and was not selected for either position [Defendant's Exh. 15-17, Tab C: Jackson Dec. ¶13].

16. Jackson applied for Records Manager after Pat Davis resigned in 2004 [Defendant's Exh. 15, Defendant's Exh. 41, Tab C: Jackson Dec. ¶15, Tab D: ¶8,]. Darryl Wooten, white male, was selected to act in that position until he could receive a waiver or meet the minimum requirement of five years experience working in the records department. [Defendant's Tab B: 150, Tab C: Jackson Dec. ¶15, Tab D: ¶¶ 7, 8, 10, Tab E: ¶16]. Jackson was not given the opportunity to act or train in this position. [Tab C: Jackson Dec. ¶15]

17. Since Jackson began employment at CCA in 2003, there has not been an African American[7] in a supervisory position in the Records or Quality Assurance department. [Tab C: Jackson Dec. ¶16]

---

[5] I was not aware at that time that CCA's contract required that they adhere to 29 C.F.R. § 4.169 that states, "If an employee works in different capacities in the performance of a covered contract, then the time spent the employee spends in work properly related to each classification should be segregated and paid according to the wage rate specified for each class of work. If the contractor cannot provide affirmative proof (employer records) of the hours spent in each class of work, then the contractor must pay the employee the highest of such rates in the applicable wage determination for all hours worked in the workweek."

[6] CCA claims that they have no documentation that I applied for this position in 2004-2005, which may also be the reason why CCA has no record of the waiver that I received in 2003.

[7] Contractors that adhere to Executive Order 11246 must implement 41 CFR §60-2.16 (c) Placement goals. Where, pursuant to §60-2.15, a contractor is required to establish a placement goal for a particular

18. In 2007, Jackson spoke with Pooler, Human Resource Manager (HRM), about the racial discrimination at the facility. Pooler, HRM, advised Jackson that she recognized the pattern of discrimination but felt powerless to stop it. Pooler said that she had just been documenting everything, calling Corporate, and "covering her tail." [Tab C: Jackson Dec. ¶17]

19. In November 2007, Darryl Wooten, white male, was given the Records Manager position that Jackson applied for in 2004, after being allowed to act as Records Manager for over two years under Contract Records Manager, Pat Davis. [Tab C: Jackson Dec. ¶18, Tab D: ¶¶8, 10].

20. Through 2008-2009, after conversations with Pooler, HRM, and Tamara Jordan about the unfair promotions, training opportunities, and disciplinary treatment of minorities, Jackson felt that it would be futile to continue to try to promote in the units. [Tab C: Jackson Dec. ¶19, Defendant's Tab B: pp. 132-133].

21. Beginning in 2007-2010, Jackson began to talk with black employees who had been disciplined unequally to white employees in similar situations which added to her frustration of working in a racially hostile work environment [Tab C: Jackson Dec. ¶20, Defendant's Tab B: p. 167, Tab D: ¶11, Tab E: ¶¶7-15].

22. In 2007, Fred Hewlett, white male, fired a gun in a hospital, while on duty; however, he was not terminated. This same Fred Hewlett, in 2010, brought a

---

job group, the contractor must establish a percentage annual placement goal at least equal to the availability figure derived for women or minorities, as appropriate, for that job group. CCA policy I-5 references adherence to Executive Order 11246. [Exh. 2]

vehicle on the back dock without following proper security procedures. Hewlett was suspended along with his supervisor, Captain Tim McNeil, white male, for this breach of security. However, Ms. Erika Moye allowed an inmate to enter an unsecured area within the facility, not outside the facility like Hewlett, but she was terminated for this similar incident which was a lesser breach of security. [Tab C: Jackson Dec. ¶21, Tab D: ¶11, Tab E: ¶¶ 11, 12, 13, Tab F[8]].

23. Jackson also spoke with Katie Cameron about her acting as Alternate DHO, at the time; Jackson did not know that she had received paid training from CCA or that this training was a prerequisite for qualifying for the DHO position. . Jackson was not given equal opportunity to receive this training for the DHO position. [Tab C: Jackson Dec. ¶24, Defendant's Tab B: pp. 131-132, Tab D: ¶¶9-10, Tab E: ¶17].

24. Jackson applied for Unit Manager again in January 2008; two (2) candidates were to be selected from that applicant pool [Exh. 19]. Tamara Jordon, African American female, was selected for one of the position. The other position was held for months until CCA selected Tim Wheaton, white male, in October 2008, to act and train as Unit Manager for months before placing him into the position without posting it in July 2009. [Tab C: Jackson Dec. ¶25, Tab D: ¶10, Tab E: ¶17, Exh. 19[9]].

---

[8] Captain McNeil and Fred Hewlett were both involved in this incident.
[9] Plaintiff contends that Defendant did not post this position by rather allowed Wheaton to put in an application and interview only Wheaton without posting the position. There is a credibility issue regarding whether or not Defendant actually posted this position.

25. Before accepting the position of Library Aide, Jackson checked with Shannon Pooler, HRM, to see if she would apply for a waiver for librarian if she applied for the library aide position. Pooler assured her that she would apply for the waiver. [Tab C: Jackson Dec. ¶26]

27. In April, 2008, Jackson began working as a library aide. [Tab C: Jackson Dec., ¶ 27].

28. From 2008 until Jackson's medical leave in February 2010, the tasks that were usually completed by a Contract Librarian, full-time Librarian, and a full-time Library Aide were never minimized or reduced. She completed the tasks of both positions as noted in her performance evaluations for 2008 and 2009. [Tab C: Jackson Dec. ¶28, Tab C: Defendant's Exh. 31].

29. For the first six or seven months that Jackson worked as library aide, she worked approximately 7.5 – 10 hours per week overtime for which she wasn't paid. In September 2009, Jackson began working 5 – 10 hours overtime per week for which she wasn't paid. [Tab C: Jackson Dec. ¶29, Defendant's Tab B: pp. 48-49, 60, Defendant's Exh. 28].

30. The only time Jackson was advised that she could use her accumulated overtime was in September 2009, when McLendon cautioned her about being two (2) or more hours short on a paycheck. Jackson complained that she didn't have much sick leave and that this was unfair because most weeks, as McLendon was

aware, Jackson was working overtime hours at home to complete the tasks of two positions and was not being compensated. McLendon talked to Pooler, HRM, about allowing Jackson to use some of these overtime hours to make up for the hours that she was short. Pooler, HRM, advised McLendon that Jackson could and McLendon emailed her the paperwork. [Defendant's Tab B: pp. 49-50, 57, Tab C: Jackson Dec. ¶30]

31.  Jackson complained about not being paid overtime to her Human Resources Manager, Mrs. Pooler, on approximately six (6) occasions between April 2008 and February 1, 2010. [Tab C: Jackson Dec. ¶31, Tab D: ¶12].

32.  Jackson complained about not being paid overtime to Assistant Warden Orsolits on two (2) occasions in the fall of 2009. [Tab C: Jackson Dec., ¶ 31].

33.  Jackson complained about not being paid overtime to Warden Wells on three (3) occasions during early summer of 2008 and early and mid 2009. [Tab C: Jackson Dec., ¶ 31].

34.  CCA refused to pay Jackson overtime, but never instructed her not to work overtime. [Tab C: Jackson Dec., ¶ 31].

35.  In addition, Jackson had remote access to CCA's Citrix network/portal[10]. On her off days at home and after normal work hours, her supervisor, Ms. McLendon,

---

[10] Please emails at Exh. C-9 –C-10 that have the following tag at the bottom of the pages: https://owa.correctionscorp.com/exchange/VerneisaJackson/Notes/Save%20This/FW. Jackson contends that she used this Citrix client application along with CCA's share drive to complete some of the library's task from home during 2008 and 2010.

would frequently request that she send her work from the share drive. [Tab C: Jackson Dec. ¶32, Tab C: Exh. C-7].

36. In January of 2009, Defendant issued a memorandum stating that the librarian position was vacant. [Tab C: Jackson Dec. ¶ 33; Tab C: Defendant's Exh. 31]. On February 19, 2009, Jackson applied for the position. When Jackson applied for the position, she was told that the degree requirement could be waived. [Tab C: Jackson Dec. ¶ 33]

37. Over the next six months Jackson was repeatedly told by the Human Resource Manager, her supervisor and the Assistant Warden that the degree requirement was waivable and they were processing her application. [Tab C: Jackson Dec., ¶ 34, Tab D: ¶ 12].

38. In the interim, Jackson was told that she was required to perform the requirements of the librarian and librarian aide positions. [Tab C: Jackson Dec., ¶ 35].

39. On or about April 2009, Mock was hired as Contract Librarian to only work four (4) hours per quarter as a consultant, which still provided little assistance with the Librarian tasks[11] [Tab C: Jackson Dec. ¶36, Tab C: Exh. C-4].

40. During 2009, Jackson talked to more black employees who had been harassed or disciplined unequally to white employees in similar situations which

---

[11] Please note the Librarian job description at Exh. 10, four (4) hours a quarter would not provide enough time for the Contract Librarian to complete these tasks.

added to my frustration of working in a racially hostile work environment. [Tab C: Jackson Dec. ¶37]

41. In 2009, Jackson spoke with Officer Kinsey, black male, who wrecked a CCA facility perimeter truck and was terminated even though he passed the drug test. In contrast, Mickey Best, white male, wrecked a CCA bus and employees' vehicles; he was not terminated or drug tested. [Tab C: Jackson Dec. ¶38, Tab D: ¶11].

42. In 2009, Jackson spoke with Leon Newsome, black male, after he allowed two weapons certified female officers to go on a Medical run and was demoted even though this was done frequently at CCA and was not a violation of a CCA policy. Newsome was suspended and demoted. Captain Ross, white male, sent two officers that were not weapons certified on a Medical run and Ross suspended or demoted. [Tab C: Jackson Dec. ¶39, Tab D: ¶11].

43. In 2009, Jackson was asked to write complaints for Tamika Coley and Pamela King because they felt they were being harassed by Tim Wheaton, white male, and not receiving any support from management. Due to management not supporting other black female's complaints, Jackson was very hesitant about complaining about all the issues that she was enduring under CCA's management and Warden Wells. [Tab C: Jackson Dec. ¶40, Tab D: ¶11, Tab E: ¶¶5-9].

44. In or about July 2009, Felecia Wilcox, black female, began to complain to Jackson that she had made complaints to Warden Wells and felt that she was being retaliated against due to these complaints. [Tab C: Jackson Dec. ¶41, Tab G: ¶¶ 5-14]. These incidents added to the stress of working in a racially hostile work environment.

45. In September 2009, Katie Cameron was chosen as Disciplinary Hearing Officer, because of company paid pre-training that she had received years prior. Neither this training nor position was not posted[12] or advertised to offer all employees equal opportunity for this training. [Tab C: Jackson Dec. ¶42, Defendant's Tab B: p. 133, Defendant's Exh. 86, Exh. 8, Tab D: ¶.9].

46. Finally, in September 2009, after Jackson had been complaining to Assistant Warden Orsolits for months about the lack of assistance, overtime, and prevailing wage, Orsolits came to her office to discuss her job duties because Orsolits felt that Jackson may be doing more than the contract required. [Tab C: Jackson Dec. ¶43, Defendant's Exh. 28].

47. During this meeting, the only thing that Orsolits found that he might be able to remove was some of the Inmate Requests to Staff[13]. [Tab C: Jackson Dec. ¶44, Defendant's Exh. 28].

---

[12] Please note that CCA didn't even allow current Assistant Shift Supervisors or Lieutenants to have an opportunity to apply for Disciplinary Hearing Officer.
[13] Immediately, Jackson complied with Orsolits' instructions not to answer certain Inmate Request to Staff. Within weeks of giving this instruction, an inmate complained to Orsolits. Orsolits advised

48.  After not being able to find any other job duties to remove and after Jackson's insistence that she could not continue to complete all these tasks without compensation, Orsolits became upset and vengefully told her that he and the Warden had already talked and that she was not going to be getting any assistance nor was she getting the Librarian position. Jackson was never told by anyone at CCA that she was not hired for Librarian because she lacked the library science degree. [Tab C: Jackson Dec. ¶45, Defendant's Exh. 28 and 31].

49.  After Jackson was told that she was not getting the Librarian position and being humiliated by Orsolits in front of staff and inmates, Jackson felt dizzy and nauseous so Daniel Martin suggested that Jackson walk over to medical to have her blood pressure checked. Because it was high, Daniel Martin drove me to Jackson to her doctor's office. [Tab C: Jackson Dec. ¶46, Tab D: ¶14].

50.  Jackson reported to the Defendant in her grievance that the stress she was under had that manifested itself as anxiety, depression, sleeplessness, irritable bowel syndrome, severe headaches, and nosebleeds. [Tab C: Jackson Dec. ¶48, Defendant's Exh. 28].

51.  From March 2008-February 24, 2010, I earned $6.77 less per hour than the Secretary of Labor, Department of Labor's Wage determination for the job that I was completing for over twenty (20) months. [Tab C: Jackson Dec. ¶49, Exh. 9].

---

Jackson's immediate supervisor, McLendon, that Jackson was required to answer these type requests. [Tab C: Jackson Dec. ¶44]

52. During this time Jackson also complained about CCA's job description for Library Aide contradicting the Service Contract Act's Library Aide[14] job description that CCA is obligated to follow in their policies. [Tab C: Jackson Dec. ¶50, Exh. 10]

53. On November 2009, Jackson filed a grievance citing Retaliation, Violations of the Service Contract Act/Wage Determination procedures, negligence in applying the Affirmative Action Plan, and negligence in actively seeking a remedy for compensating me for duties/workload. [Tab C: Jackson Dec. ¶51, Defendant's Exh. 28].

54. On December 4, 2009, even though CCA's grievance policy[15] process requires a meeting within seven (7) business days at Step One, this meeting never happen, nor did anyone do anything to alleviate the stress of these two jobs nor did CCA advise that Jackson stop working overtime from home. [Tab C: Jackson Dec. ¶52, Exh. 2].

55. In January 2010, Jackson was interview for Records Manager. Jackson was not selected for this position. After reading that CCA had an Affirmative Action Plan and policy 1-5 that states that CCA must comply with Executive Order 11246, Jackson believes that because Records and Quality Assurance departments have

---

[14] Please note that the Service Contract Act Library Aide position description only requires minimum clerical tasks.
[15] Policy 3-6-1, p. 3 of 8, 1.b.iii., states, "Within seven (7) calendar days of receipt of the grievance form, the grieving employee's supervisor will meet with the employee to discuss the grievance."

never had a minority in a supervisory position since she started in 2003, CCA may be in violation of their Affirmative Action Plan[16]. Jackson also believes that CCA's interviews are very subjective and that Assistant Warden, Marc Gunn, white male, purposely gave her low scores so that Stacey Bentson would get the position. [Tab C: Jackson Dec. ¶53, Exh. 7].

56.     From November through February 2010, after Jackson's grievances, Orsolits began to subject her to memorandums for infractions where none existed, rescinding accommodations afforded to her by her immediate supervisor, threatening to take the officer out of the library, instructing the officer not to assist her with any task which caused her further work related strain, threatening to take away her county issued notary seal, adding to her workload by requiring her to report to her supervisor to check documents before she notarized them. [Tab C: Jackson Dec. ¶54, Defendant's Exh. 38].

57.     CCA's non-compliance with the grievance procedure, and CCA's lack of effort to remedy any of Jackson's complaints caused her to be in constant fear of future retaliation by management. Jackson was also told by James Hill, Safety Manager, that Pooler, HRM, initially refused to take her grievance and that Pooler

---

[16] Contractors that adhere to Executive Order 11246 must implement 41 CFR §60-2.16 (c) Placement goals. Where, pursuant to §60-2.15, a contractor is required to establish a placement goal for a particular job group, the contractor must establish a percentage annual placement goal at least equal to the availability figure derived for women or minorities, as appropriate, for that job group. CCA policy 1-5 references adherence to Executive Order 11246. [Exh. 1]

advised Hill that he should also fear retaliation from associating with Jackson. [Tab C: Jackson Dec. ¶55, Tab D: ¶18].

58. In late February 2010, Jackson went on stress leave after Dr. Wright diagnosed her with symptoms consistent with depression, anxiety, and chronic fatigue syndrome and referred her to a psychologist. [Tab C: Jackson Dec. ¶56, Tab C: Exh. C-8]

58. In March 2010, while on medical leave, McLendon and/or Alberta Wilcox continued to call Jackson several times per week regarding tasks that needed to be completed in the Library. [Tab C: Jackson Dec. ¶57, Tab C: Exh. C-7].

59. During the investigation in March 2010, Shannon Pooler stated "during the initial accreditation process, the facility had the services of a contract librarian and no deficiencies applicable to the librarian position or library service were noted." Please note that Jackson was the full-time Librarian during this timeframe. [Defendant's Exh. 41]

60. On or about March 26, 2010, Jackson received a memorandum from Mr. Bird, Human Resource Manager, stating that her insurance would be cancelled if payment was not received within 15 days of his memorandum. [Tab C: Exh. C-9].

61. In April 2010, Jackson responded by e-mailed stating that MetLife had refused to pay and she did not have the funds. Mr. Bird was aware that MetLife

refused to pay because they felt that she should be compensated through Worker's Compensation. [Tab C: Exh. C-9].

62. On or about April 1, 2010, Jackson received a call from Warden Wells and Stephanie Parker, Ethics Investigation Manager, telling her that her claims had been unsubstantiated. Jackson asked for a copy of the investigation in order to get an understanding of how CCA arrived at this conclusion and to be able to appeal the decision in accordance with CCA's grievance procedure. [Tab C: Jackson Dec. ¶61, Exh. 2, Defendant's Tab B: p. 239].

63. On April 5, 2010, Jackson emailed a FOIA request for a copy of the investigation results and requested for information on how to appeal the unsubstantiated decision regarding her grievances to Stephanie Parker, Warden Wells, and Kenya Golden. [Tab C: Exh. C-10].

64. On April 28, 2010, Jackson emailed a FOIA request for the investigation results to Brian Collins and copied in Warden Wells, Stephanie Parker, Kenya Golden, and William Bird. In this email, Jackson asked for a copy of her investigation report, steps to appeal, and she requested that her situation be reviewed and remedied so that I could return to work. [Tab C: Exh. C-10]

65. On May 12, 2010, Jackson emailed Bird, white male, letting him know that due to CCA cancelling her insurance, she had to cancel much needed appointments with her psychiatrist and physician. She requested a remedy for this problem and

Bird never revealed that her insurance had not actually been cancelled[17]. [Tab C: Exh. C-9]

66. At the end of May, Bird responded to another email that if Jackson would like her insurance restored she would have to pay the arrears. [Tab C: Jackson Dec. ¶65, Tab C: Exh. C-9].

67. Throughout April and May 2010, Jackson's access to the internal grievance procedure was limited by CCA overtly ignoring her emails requesting to appeal and move to the next step of the grievance procedure. [Tab C: Jackson Dec. ¶66, Tab C: Exh. C-10]. As a result of CCA's refusal to answer Jackson's requests to appeal, Jackson was not afforded an opportunity to have her issues reviewed by the Managing Director like other employees that grieved like, Marc Gunn, white male. [Exh. F].

68. At this point, Jackson felt that CCA had incompletely investigated her complaints to cover up the race discrimination, hostile work environment, FLSA, and wage and hour violations. Jackson had also been given excerpts from CCA's false position statement to the EEOC[18]. Jackson believed that it would be

---

[17] Please note that when MetLife finally sent payment in August 2010, MetLife withheld premiums because Bird, white male, had not cancelled my insurance as he had stated which prevented me from seeking medical attention. (Tab C: Exh. C-10)

[18] CCA's Position Statement to the EEOC states, "Following the investigation and actions taken, Ms. Jackson has not complained of any further alleged illegal conduct." Please note that Jackson did not work at the facility after February 24, 2010. However, Jackson continued to complain in an effort to correct the violations before she was constructively discharged. [Tab C: C-9, C-10, Exh. 59] CCA's Position Statement to the EEOC also states, "Although there was no objective support for Ms. Jackson's allegation that she worked from home and not been paid, as a result of the investigation, the Facility paid

impossible for her to continue to complete the task of two positions without additional help, she didn't want to continue to work from home without compensation to complete the tasks, she feared for her health and emotional well-being, she felt that she would be retaliated against due to her other complaints to other federal agencies and she knew that nothing had been done about CCA's racially hostile work environment. [Tab C: Jackson Dec. ¶67]

69.  On May 28, 2010, Jackson resign only after CCA willfully failed to promote her, failed to pay her overtime and prevailing wages, refused to provide assistance, provided false statements to the EEOC in their Position Statement, retaliated against her by not adhering to the grievance procedure and continued to deny her repetitive attempts to obtain a copy of CCA's investigation in order to appeal their grievance decisions. [Tab C: Jackson Dec. ¶68]

70.  On or about June 2010, Jackson applied for unemployment and was denied because CCA insisted that they had not violated any labor laws. [Exh. 9]. Jackson believes that because management knew they were in violation of FLSA and other labor laws, they should not have deliberately blocked her from receiving unemployment benefits. [Tab C: Jackson Dec. ¶69]

---

Ms. Jackson for hours she allegedly worked at home without permission." Please note that after the investigation was concluded on or about March 25, 2010, Jackson did not receive any additional pay for the hours that she worked at home. Additionally, there is no indication that Golden investigated the additional hours that Jackson worked and complained of in her grievance. [Exh. 41, Exh. 9]

71. On or about August 2012, Jackson received the determination from the Department of Labor (DOL) whereby it could be inferred that the DOL agreed that Jackson was performing the duties of Librarian and not being paid the prevailing wage. [Tab C: Jackson Dec. ¶75, Exh. 9].

Respectfully Submitted,

This 28th day of December, 2013.

_____
Verneisa Jackson, Pro-Se

17

## CERTIFICATE OF SERVICE

I do hereby certify that I have this day served the foregoing upon all parties to this case by electronically filing same with the Court.

This 30th day of December, 2013.

/s/ *Ainsworth G. Dudley*

Ainsworth G. Dudley