# EXHIBIT C

## Declaration of Verneisa Jackson

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
DUBLIN DIVISION

VERNEISA JACKSON,

        Plaintiffs,

v.

CORRECTIONS CORPORATION OF
AMERICA,

        Defendant.

CIVIL ACTION NO:
3:11-cv-111-DHB-WLB

## DECLARATION OF VERNEISA JACKSON

The undersigned, Verneisa Jackson, hereby declares pursuant to 28 U.S.C. § 1746, the following:

1. I have personal knowledge of the facts set forth herein and can provide competent testimony regarding these matters. I am over 18 years of age and reside in Conyers, Georgia.

2. From August 25, 2003, until May 28, 2010, I was employed with the Defendant in this case, Corrections Corporation of America ("CCA"), in McRae, Georgia. CCA is a minimum security federal detention facility, which operates as a contractor for the U.S. Bureau of Prisons.

3. I began my employment with CCA as the Librarian[1].

4. I affirm that the Defendant was aware that I did not possess a library science degree prior to hiring me as Librarian. I submitted a cover letter detailing my credentials on April 20, 2003 and *a true and correct copy of the letter is attached hereto as exhibit C-1.* A true and accurate copy of ACA Standard 4-4506 memorandum dated 1-

---

[1] The qualifications for Librarian have not changed since I was hired as Librarian in 2003.

1

29-2004 *is attached hereto as exhibit C-* 2. [Tab D: ¶7].

5.    When I interviewed for the Librarian position, I was told by my interviewers, Robert Herndon and Galey Gates, that the position required a library science degree which I did not possess, but that the degree was waivable. They told me that they would seek a waiver of the degree requirement.

6.    I was subsequently hired for the position even though I didn't have a library science degree. At no time did anyone at CCA tell me that the library science degree had not been waived.

7.    From 2003 thru May 2005, I completed the majority of the requirements as Librarian for the Defendant with a certified Contract Librarian[2] who only worked eight (8) hours per month as a consultant. A true and accurate copy of ACA Standard 4-4506 memorandum dated 1-29-2004 *is attached hereto as exhibit C-* 2.

8.    As Librarian, I also had a full-time Library Assistant to help with the tasks of managing the library. [Defendant's Tab B: p. 174].

9.    I worked as the Librarian until April 12, 2005, when I applied for and accepted a position as Case Manager with CCA. Which is contrary to CCA's Position Statement to the EEOC, which states, *"However, on May 1, 2005, it was "discovered" that Ms. Jackson actually did not meet the minimum qualifications for the position because she did not have a library science degree." A true and correct copy of CCA's position statement is attached hereto as Exhibit 6. A true and correct copy of CCA's Payroll Status Form is attached as Exhibit C-3.* Please also note that I had already applied and accepted the Case Manager position when CCA claims to have "discovered" that I did not meet the minimum requirement.

10.    I took a pay cut in order to make this move because I felt that the units

---

[2]During the Investigation in March 2010, Shannon Pooler stated "during the initial accreditation process, the facility had the services of a contract librarian and no deficiencies applicable to the librarian position or library service were noted." *A true and accurate copy of this investigation is attached as Exhibit 41.* Please note that I was the full-time Librarian during this timeframe.

2

would give me additional experience which would align me for future promotions. This is contrary to CCA's Position Statement to the EEOC (footnote 9, on page 2 of 5, (1.C.1b), which states, "Subsequently, the pay rate for the Case Manager position was reduced from $34,163.25 to the actual rate for the position pursuant to the applicable area wage determination rate of $33,425.60." Please note that this is also not true, Case Manager's pay was never reduced. *A true and correct copy of CCA's position statement is attached hereto as Exhibit 6.*

11.    After reviewing the Defendant's Wage Determination, I learned that the pay rate for Librarian was significantly higher and formally requested an increase in pay. *A true and accurate copy of the Defendant's Wage Determination is attached hereto as Exhibit 9.* [Defendant's Exhibit 14]

12.    I was not aware at that time that CCA's contract required that they adhere to 29 C.F.R. § 4.169 that states, "If an employee works in different capacities in the performance of a covered contract, then the time spent the employee spends in work properly related to each classification should be segregated and paid according to the wage rate specified for each class of work. If the contractor cannot provide affirmative proof (employer records) of the hours spent in each class of work, then the contractor must pay the employee the highest of such rates in the applicable wage determination for all hours worked in the workweek." I believe that, CCA did not comply with 29 C.F.R. § 4.169, by denying my request.

13.    During 2004 and 2005, I applied for Personnel Investigator, Unit Manager, Records Manager, and Case Manager and was not selected for either position. [Defendant's Exh. 15-17].

14.    I was told by Shirley Ellis, former Human Resource Manager, that I was not selected for the Personnel Investigator position[3] because I did not have a bachelor's degree in social services. I later found out that the candidate selected, Fran Hartley, did

---

[3] CCA claims that they have no documentation that I applied for this position in 2004-2005, which may also be the reason why CCA has no record of the waiver that I received in 2003.

not possess a bachelor's social service degree or any other bachelor's degree.

15.   I also applied for Records Manager after Pat Davis resigned in 2004 [Defendant's Exh. 15, Defendant's Exh. 41, Tab D: ¶8,]. *A true and correct copy of Hill's Affidavit is attached hereto as Exhibit Tab D.* Darryl Wooten, white male, was selected to act in that position until he could receive a waiver or meet the minimum requirement of five years experience working in the records department. [Defendant's Tab B: 150, Tab D: ¶¶ 7, 8, 10, Tab E: ¶16]. *A true and correct copies of Hill's Affidavit is attached hereto as Exhibit Tab D. A true and correct copy of Moyes' Affidavit is attached hereto as Exhibit Tab E.* I believe that I was more qualified than Wooten; however, I was not given the opportunity to act or train in this position.

16.   Since I began my employment at CCA in 2003, there has not been an African American in a supervisory position in the Records or Quality Assurance department[4].

17.   In 2007, I spoke with Pooler, Human Resource Manager (HRM), about the racial discrimination at the facility. Pooler, HRM, advised me that she recognized the pattern of discrimination but felt powerless to stop it. She said she had just been documenting everything, calling Corporate, and "covering her tail."

18.   In November 2007, Darryl Wooten, white male, was given the Records Manager position that I had applied for in 2004, after being allowed to act as Records Manager for over two years under Contract Records Manager, Pat Davis. [Tab D: ¶¶8, 10]. *A true and correct copy of Hill's Affidavit is attached hereto as Exhibit Tab D.*

19.   Through 2008-2009, after conversations with Pooler, HRM, and Tamara Jordan about the unfair promotions, training opportunities, and disciplinary treatment of minorities, I felt that it would be futile to continue to try to promote in the units.

---

[4] Contractors that adhere to Executive Order 11246 must implement 41 CFR §60-2.16 (c) Placement goals. Where, pursuant to §60-2.15, a contractor is required to establish a placement goal for a particular job group, the contractor must establish a percentage annual placement goal at least equal to the availability figure derived for women or minorities, as appropriate, for that job group. CCA policy 1-5 references adherence to Executive Order 11246. A true and accurate copy of CCA's policy 1-5 is attached hereto as Exh. 1.

[Defendant's Tab B: pp. 132-133].

20.   Beginning in 2007-2010, I began to talk with black employees who had been disciplined unequally to white employees in similar situations which added to my frustration of working in a racially hostile work environment [Defendant's Tab B: p. 167, Tab D: ¶11, Tab E: ¶¶7-15]. *A true and correct copies of Hill's Affidavit is attached hereto as Exhibit Tab D. A true and correct copy of Moyes' Affidavit is attached hereto as Exhibit Tab E.*

21.   In 2007, Fred Hewlett, white male, fired a gun in a hospital, while on duty; however, he was not terminated. [Exh. D ¶11]. *A true and correct copy of Hill's Affidavit is attached hereto as Exhibit Tab D.* This same Fred Hewlett, in 2010, brought a vehicle on the back dock without following proper security procedures. Hewlett was suspended along with his supervisor, Captain Tim McNeil, white male, for this breach of security. A true and accurate copy of McNeil's P.S.N. is attached as exhibit F. [Exh. E¶¶12-13, Exh. D ¶11]. However, Ms. Erika Moye allowed an inmate to enter an unsecured area within the facility, not outside the facility like Hewlett, but she was terminated for this similar incident which was a lesser breach of security. [Exh. D ¶11, Exh. E ¶¶ 11, 12, 13]. *A true and correct copies of Hill's Affidavit is attached hereto as Exhibit Tab D. A true and correct copy of Moyes' Affidavit is attached hereto as Exhibit Tab E.*

22.   In 2007, Darryl Wooten, white male, who had been acting as Records Manager since 2005 was given the position of Records Manager. I had applied in 2004 and had not been given this same opportunity to act for years in order to receive the needed years of experience required to hold the position [Tab D: ¶8, Tab E: ¶16]. *A true and correct copies of Hill's Affidavit is attached hereto as Exhibit Tab D. A true and correct copy of Moyes' Affidavit is attached hereto as Exhibit Tab E.*

23.   While in the units, in 2007, I began to have severe headaches. After a CAT scan revealed nothing and the headaches continued to get more severe, I asked my dentist to remove my teeth with root canals in an effort to stop my migraines. After my teeth were removed, the headaches did not subside.

5

24.     Throughout 2008, I spoke to Bobbie Thompson, my supervisor, about CCA not posting training or giving equal opportunities for positions like the Disciplinary Hearing Officer training received by Katie Cameron, white female, and Troy Carey, white male. I also spoke with Katie Cameron about her acting as Alternate DHO, at the time; I did not know that she had received paid training from CCA or that this training was a prerequisite for qualifying for the DHO position. I was not given equal opportunity to this training. [Defendant's Tab B: pp. 131-132, Tab D: ¶¶9-10, Tab E: ¶17]. *A true and correct copies of Hill's Affidavit is attached hereto as Exhibit Tab D. A true and correct copy of Moyes' Affidavit is attached hereto as Exhibit Tab E.*

25.     I applied for Unit Manager again in January 2008; two (2) candidates were to be selected from that applicant pool. Tamara Jordon, African American female, was selected for one of the position. The other position was held for months until CCA selected Tim Wheaton, white male, in October 2008, to act and train as Unit Manager for months before placing him into the position without posting it in July 2009. *A true and accurate copy of Unit Manager position memorandum and Tim Wheaton's application[5] is attached hereto as Exhibit 19. [Tab D: ¶10, Tab E: ¶17].  A true and correct copies of Hill's Affidavit is attached hereto as Exhibit Tab D. A true and correct copy of Moyes' Affidavit is attached hereto as Exhibit Tab E.*

26.     Before accepting the position of Library Aide in 2008, I checked with Shannon Pooler, HRM, to see if she would apply for a waiver for librarian if I applied for the aide position. Pooler assured me that she would apply for the waiver. 27.        In April 2008, I began working as a library aide.

28.     From 2008 until my medical leave in February 2010, the tasks that were usually completed by a Contract Librarian, full-time Librarian, and a full-time Library Aide were never minimized or reduced. I completed the tasks of both positions. [Defendant's Exh. 31].

---

[5] I also maintain that the Unit Manager position was not reposted in July 2009 and that the Defendant only took an application and only interviewed Tim Wheaton for documentation purposes.

29.   For the first six or seven months that I worked as library aid I worked approximately 7.5 – 10 hours per week overtime for which I wasn't paid. In September 2009, I began working 5 – 10 hours overtime per week for which I wasn't paid. [Defendant's Tab B: pp. 48-49, 60, Defendant's Exh. 28].

30.   The only time I was allowed to use my accumulated overtime was in September 2009, when McLendon cautioned me about being two (2) or hours short on a paycheck. I complained that I didn't have much sick leave and that this was unfair because most weeks, as she was aware, I was working overtime hours at home to complete the tasks of two positions and that I was not being compensated. McLendon talked to Pooler, HRM, about allowing me to use some of these overtime hours to make up for the hours that I was short. Pooler, HRM, advised McLendon that I could and McLendon emailed me the paperwork. A true and correct copy of email date September 25, 2009, is attached hereto as exhibit C-5. [Defendant's Tab B: pp. 49-50]

31.   During the period of time I worked as library aide, Defendant was aware that I was working overtime. I complained about not being paid overtime to Human Resources Manager, Ms. Pooler, on approximately six (6) occasions between April 2008 and February 1, 2010. [Tab D: ¶12] *A true and correct copy of Hill's Affidavit is attached hereto as Exhibit Tab D.* I complained about not being paid overtime to Assistant Warden Orsolits on two (2) occasions in the fall of 2009. I complained about not being paid overtime to Warden Wells on three (3) occasions during early summer of 2008 and early and mid 2009. In response to my complaints they told me that I would not be paid overtime, but they never instructed me not to work overtime.

32.   In addition, I had remote access to CCA's Citrix network/portal[6]. On my off days and after normal work hours, my supervisor, Ms. McLendon, would frequently

---

[6] Please see *a true and accurate copy of emails at attached hereto as Exhibits C-9 – C-10* that have the following tag at the bottom of the pages: https://owa.correctionscorp.com/exchange/VerneisaJackson/Notes/Save%20This/FW. Jackson contends that she used this Citrix client application along with CCA's share drive to complete some of the library's task from home during 2008 and 2010.

request that I send her work from the share drive that I performed at home. *A true and accurate copy of an email from Ms. McLendon dated 3-1-2010 is attached hereto as Exhibit C-7[7]*.

33.   In January of 2009, CCA issued a memorandum stating that the librarian position was vacant. [Defendant's Exh. 31].  On February 19, 2009, I applied for the position. [Defendant's Exh. 31].  When I applied for the position, I was told that the degree requirement was subject to waiver.

34.   Over the next six months I was repeatedly told by the Human Resource Manager, my supervisor and the Assistant Warden that the degree requirement was waivable and they were processing my application.

35.   In the interim, I was told that I was required to perform the requirements of the librarian and librarian aide positions.

36.   On or about April 2009, Mock was hired as Contract Librarian to work four (4) hours per quarter as a consultant, which still provided little assistance with the Librarian tasks. *A true and accurate copy of Mock's contract is attached hereto as Exhibit C-4.*

37.   During 2009, I talked to more black employees who had been harassed or disciplined unequally to white employees in similar situations which added to my frustration of working in a racially hostile work environment.

38.   In 2009, I spoke with Officer Kinsey, black male, who wrecked a CCA facility perimeter truck and was terminated even though he passed the drug test. In contrast, Mickey Best, white male, wrecked a CCA bus and employees' vehicles; he was not terminated or drug tested. [Tab D: ¶11]. *A true and correct copy of Hill's Affidavit is attached hereto as Exhibit Tab D.*

39.   In 2009, I spoke with Leon Newsome, black male, after he allowed two weapons certified female officers to go on a Medical run and was demoted even though

---

[7] Email from McLendon asking that I complete some tasks from home while I was out on medical leave.

this was done frequently at CCA and was not a violation of a CCA policy. Newsome was suspended and demoted. Captain Ross, white male, sent two officers that were not weapons certified on a Medical run and Ross suspended or demoted. [Tab D: ¶11]. *A true and correct copy of Hill's Affidavit is attached hereto as Exhibit Tab D.*

40.    In 2009, I was asked to write complaints for Tamika Coley and Pamela King because they felt they were being harassed by Tim Whepton, white male, and not receiving any support from management. Due to management not supporting other black female's complaints, I was very hesitant about complaining about all the issues that I was enduring under CCA's management and Warden Wells. [Tab D: ¶11, Tab E: ¶¶5-9]. *A true and correct copies of Hill's Affidavit is attached hereto as Exhibit Tab D. A true and correct copy of Moyes' Affidavit is attached hereto as Exhibit Tab E.*

41.    In or about July 2009, Felecia Wilcox, black female, began to complain to me that she had made complaints to Warden Wells and felt that she was being retaliated against due to these complaints. [Tab G: ¶¶ 5-14]. *A true and correct copy of Wilcox's Affidavit is attached hereto as Exhibit Tab D.* These incidents added to the stress of working in a racially hostile work environment.

42.    In September 2009, Katie Cameron was chosen as Disciplinary Hearing Officer[8], because of company paid pre-training that she had received years prior. Neither this training nor position was not posted or advertised to offer all employees equal opportunity for this training.[9] [Defendant's Tab B: p. 133, Defendant's Exh. 86, Tab D: ¶9]. *A true and correct copy of Hill's Affidavit is attached hereto as Exhibit Tab D.*

43.    Finally, in September 2009, after I had been complaining to Assistant

---

[8] Please note that CCA didn't even allow current Assistant Shift Supervisors or Lieutenants to have an opportunity to apply for Disciplinary Hearing Officer.

[9] Contrary to Fran Hartley's Affidavit [CCA's Job Posting Policy 3-13 only has the exceptions listed on page 2 of 6, C.1 [Defendant's Tab A: ¶10],], which is in accordance with the Department of Labor, Office of Federal Contract Compliance Programs, 41 CFR Part 60-250, mandatory listing requirements within this contractor's (CCA's) and CCA policy 1-5. A true and accurate copy of policy 1-5 is attached hereto as exhibit 1. Positions that are filled internally are only excluded from state-wide advertising.

Warden Orsolits for months about the lack of assistance, overtime, and prevailing wage, he came to my office to discuss my job duties because he felt that I may be doing more than the contract required. [Defendant's Exh. 28].

44.    During this meeting, the only thing that he found that he might be able to remove was some of the Inmate Requests to Staff[10] . [Defendant's Exh. 28].

45.    After not being able to find any other job duties to remove and after my insistence that I could not continue to complete all these tasks without compensation, Orsolits became upset and vengefully told me that he and the Warden had already talked and that I was not going to be getting any assistance nor was I getting the Librarian position. I was never told by anyone at CCA that I was not hired because I lacked the library science degree which contradicts CCA's Plan of Action. [Defendant's Exh(s). 28 and 31].

46.    After being told that I was not getting the Librarian position and being humiliated by Orsolits in front of staff and inmates, I felt dizzy and nauseous so Daniel Martin suggested that I walk over to medical to have my blood pressure checked. Because it was high, Daniel Martin drove me to my doctor's office. [Tab D: ¶14]. *A true and correct copy of Hill's Affidavit is attached hereto as Exhibit Tab D.*

47.    After this incident, I immediately began to have more severe headaches and nose bleeds, felt more depressed, and I felt used.

48.    I reported in my grievance that the stress that I was under was manifesting itself as anxiety, depression, sleeplessness, irritable bowel syndrome, severe headaches, and nosebleeds. [Defendant's Exh. 28].

49.    From March 2008-February 24, 2010, I earned $6,77 less per hour than the Secretary of Labor, Department of Labor's Wage determination for the job that I was completing for over twenty (20) months. *A true and accurate copy of Department of*

---

[10] Immediately, I complied with Orsolits' Instructions not to answer certain Inmate Request to Staff. Within weeks of giving this instruction, an inmate complained to Orsolits. Orsolits advised my immediate supervisor, McLendon, that I was required to answer these type requests.

*Labor's Wage determination is attached hereto as Exhibit 9.*

50.   During this time, I also complained about CCA's job description for Library Aide[11] contradicting the Service Contract Act's Library Aide job description that CCA is obligated to follow in their policies. *A true and accurate copy of Department of Labor's Wage determination is attached hereto as Exhibit 10.*

51.   On November 2009, I filed a grievance citing Retaliation, Violations of the Service Contract Act/Wage Determination procedures, negligence in applying the Affirmative Action Plan, and negligence in actively seeking a remedy for compensating me for duties/workload. [Defendant's Exh. 28].

52.   On December 4, 2009, even though CCA's grievance policy process requires a meeting within seven (7) business days at Step One[12], this meeting never happened, nor did anyone do anything to alleviate the stress of these two jobs nor did CCA advise that I stop working overtime from home. *A true and accurate copy of CCA's Grievance policy is attached hereto as exhibit 2.*

53.   In January 2010, I was interview for Records Manager. *A true and accurate copy of CCA's letter dated January 19, 2010; notifying me that I was not selected for the position is attached hereto as exhibit 7.* After reading that CCA had an Affirmative Action Plan[13] and policy 1-5 that states that CCA must comply with Executive Order 11246, I believed that because Records and Quality Assurance departments have never had a minority in a supervisory position since I started in 2003, CCA may be in violation of their Affirmative Action Plan.[14] I also believe that CCA's interviews are very

---

[11] Please note that the Service Contract Act Library Aide position description only requires minimum clerical tasks.

[12] Policy 3-6-1, p. 3 of 8, 1.b.iii., states, *"Within seven (7) calendar days of receipt of the grievance form, the grieving employee's supervisor will meet with the employee to discuss the grievance."*

[13] Shannon Pooler, HRM, was the Affirmative Action Coordinator for CCA. *A portion of the true and accurate copy of CCA's Affirmative Action Plan is attached hereto as exhibit 4.*

[14] Contractors that adhere to Executive Order 11246 must implement 41 CFR §60-2.16 (c) Placement goals. Where, pursuant to §60-2.15, a contractor is required to establish a placement goal for a particular job group,

subjective and that Assistant Warden, Marc Gunn, white male, purposely gave me low scores so that Stacey Bentson would get the position. *A true and accurate copy of CCA's Interview Outcome dated January 11, 2010, is attached hereto as exhibit 7.*

54.     From November through February 2010, after my grievances, Orsolits began to subject me to memorandums for infractions where none existed, rescind accommodations afforded to me by my immediate supervisor, threatened to take the officer out of the library, by not allowing the officer to assist me with any task which caused me further work related strain, threatening to take away my county issued notary seal, adding to my workload by requiring me to report to my supervisor for her to check documents before I notarized them. [Defendant's Exh. 38].

55.     CCA's non-compliance with the grievance procedure, and CCA's lack of effort to remedy any of my complaints caused me to be in constant fear of future retaliation by management. I was also told by James Hill, Safety Manager, the Pooler, HRM, initially refused to take my grievance and advised Hill that he should also fear retaliation from associating with me. [Tab D: ¶18]. *A true and correct copy of Hill's Affidavit is attached hereto as Exhibit Tab D.*

56.     In late February 2010, I went on stress leave after Dr. Wright diagnosed me with symptoms consistent with depression, anxiety, and chronic fatigue syndrome and referred me to psychologist. *A true and accurate copy of my FMLA paperwork is attached as exhibit C-8.*

57.     In March 2010, while on medical leave, McLendon and/or Alberta Wilcox continued to call me 3 to 6 times per week regarding tasks that needed to be completed in the Library. *A true and accurate copy of an email from Ms. McLendon dated 3-1-2010 is attached hereto as Exhibit C-7.*

---

the contractor must establish a percentage annual placement goal at least equal to the availability figure derived for women or minorities, as appropriate, for that job group. CCA policy 1-5 references adherence to Executive Order 11246. A true and accurate copy of CCA's policy 1-5 is attached hereto as exhibit 1.

58.    During the investigation in March, Shannon Pooler stated "during the initial accreditation process, the facility had the services of a contract librarian and no deficiencies applicable to the librarian position or library service were noted." Please note that I was the full-time Librarian during this timeframe.[ Defendant's Exh. 41]

59.    On or about March 26, 2010, I received a memorandum from Mr. Bird, Human Resource Manager, stating that my insurance would be cancelled if payment was not received within 15 days of his memorandum. *A true and accurate copy of an email from Mr. Bird, dated 3-26-2010 is attached hereto as Exhibit C-9.*

60.    In April 2010, I responded by e-mailed stating that MetLife had refused to pay and I did not have the funds. Mr. Bird was aware that MetLife refused to pay because they felt that I should be compensated through Worker's Compensation. *A true and accurate copy of an email I sent to Mr. Bird, dated 4-12-2010 is attached hereto as Exhibit C-9.*

61.    On or about April 1, 2010, I received a call from Warden Wells and Stephanie Parker, Ethics Investigation Manager, telling me that my claims had been unsubstantiated. I asked for a copy of the investigation in order to get an understanding of how CCA arrived at this conclusion and to be able to appeal the decision in accordance with CCA's grievance procedure. *A true and accurate copy of CCA's grievance policy is attached hereto as Exhibit 2.* [Defendant's Tab B: p. 239].

62.    On April 5, 2010, I emailed a FOIA request for the investigation results and request for information on how to appeal the unsubstantiated decision to Stephanie Parker, Warden Wells, and Kenya Golden. *A true and accurate copy of this email dated 4-5-2010 is attached hereto as Exhibit C-10.*

63.    On April 28, 2010, I emailed a FOIA request for the investigation results to Brian Collins and copied in Warden Wells, Stephanie Parker, Kenya Golden, and William Bird. In this email I asked for a copy of my investigation report, steps to appeal, and I requested that my situation be reviewed and remedied so that I could return to

work. *A true and accurate copy of this email dated 4-28-2010 is attached hereto as Exhibit C-10.*

64.   On May 12, 2010, I emailed Bird, white male, letting him know that due to CCA cancelling my insurance[15] I had to cancel much needed appointments with my psychiatrist and physician. I requested a remedy for this problem[16]. On May 21, 2010, Bird emailed that he would have my insurance restored once I paid the arrears. *True and accurate copies of these email correspondences dated 5-12-2010 are attached hereto as Exhibit C-9.*

65.   Throughout April and May 2010, my access to the internal grievance procedure was limited by CCA overtly ignoring my emails requesting to appeal and move to the next step of the grievance procedure. *A true and accurate copy of emails dated 4-8-2010 and 4-28-2010 are attached hereto as Exhibit C-9.* As a result of CCA's refusal to answer my requests to appeal, I was not afforded an opportunity to have my issues reviewed by our Managing Director like other employees that grieved are, Gunn, white male. *A true and accurate copy of the Managing Director's response to Gunn is attached hereto as exhibit F.*

67.   At this point I felt that CCA had incompletely investigated my complaints to cover up the discrimination, hostile work environment, FLSA, and wage and hour violations. I had also been given excerpts from CCA's false position statement to the EEOC[17]. I believed that it would be impossible for me to continue to complete the task of

---

[15] Please note that when MetLife finally sent payment in September 2010, MetLife withheld premiums because Bird, white male, had not cancelled my insurance as he had stated which prevented me from seeking medical attention. *A true and accurate copy of email date 9-2-2010 is attached hereto as exhibit C-10.*

[16] CCA's Position Statement to the EEOC states, "Following the investigation and actions taken, Ms. Jackson has not complained of any further alleged illegal conduct." Please note that I did not work at the facility after February 24, 2010. I continued to complain in an effort to correct the violations before I was constructively discharged. A true and accurate copy of the emails and memorandums in which I complained are attached hereto as exhibits C-9, C-10. [Defendant's Exh. 59]

[17] CCA's Position Statement to the EEOC states, "Although there was no objective support for Ms. Jackson's allegation that she worked from home and had not been paid, as a result of the investigation, the Facility paid Ms.

two positions without additional help, I didn't want to continue to work from home without compensation to complete the tasks, I feared my health and emotional well-being, I felt that I would be retaliated against due to my other complaints to other federal agencies and I knew that nothing had been done about CCA's racially hostile work environment.

68.    On May 28, 2010, I was resign only after CCA willfully failed to promote me, failed to pay me overtime and prevailing wages, refused to provide assistance, provided false statements to the EEOC in their Position Statement, retaliated against me by not adhering to the grievance procedure and continued to deny my repetitive attempts to obtain a copy of their investigation to appeal their grievance decisions.  [Defendant's Exh. 59]

69.    On or about June 2010, I applied for unemployment and was denied because CCA insisted that they had not violated any labor laws; which contradicts *the true and accurate copy of the Wage Determination Receipt of Payment and Pay History report attached hereto as exhibit 9.* I believe that because management knew they were in violation of FLSA and other labor laws, they should not have deliberately blocked me from receiving unemployment benefits.

70.    On January 4, 2011, I relocated away from my family and friends to Conyers, GA to search for employment.

71.    On or about January 25, 2011, I surrendered my home to the bank. I lost the equity in my home and defaulted on a second mortgage that I used for home improvement.

72.    Overall, I no longer enjoy my life to the degree that I did when my job was going well. I'm still taking antidepressants and sleep aides and still feel the pain, anxiety,

---

Jackson for hours she allegedly worked at home without permission." Please note that after the investigation was concluded on or about March 25, 2010, I did not receive any additional pay for the hours that I worked at home. Additionally, there is no indication that Golden investigated the additional hours that I worked and complained of in my grievance. [Exh. 41, Exh. 9]

and humiliation from this job loss. I still worry without ceasing about my future and the impact that unemployment, filing bankruptcy, and this lawsuit will have on my future career options.

73.    I also fear that the present unemployment rates, labor market, and limited availability of other work opportunities will continue to hamper my ability to find a new job.

74.    Due to the aforementioned, I have suffered unemployment, economic damages, severe emotional distress, health issues, and damages to my credit rating. I have also had to get loans from my dad, mom, and sister.

75.    On or about August 2012, I got the determination from the Department of Labor (DOL) whereby it could be inferred that the DOL agreed that I was performing the duties of Librarian and not being paid the prevailing wage. *A true and accurate copy of the Wage Determination Receipt of Payment and Pay History report attached hereto as exhibit 9.*

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

This 21st day of December 2013.

VERNEISA JACKSON

16

EXHIBIT C-1

*Is interested in job but
cannot relocate until July.
Is involved in Master's Program
+ will complete in July.
Wants to stay in touch.*

*RPH
4-29-03*

65 Thornberry Drive
Augusta, Georgia 30909
706- 667-8670
912-568-7678
jacksonv_30904@yahoo.com

4-20-03

Corrections Corp. of America
1000 Jim Hammock Drive
McRae, GA 31055

Ms. Shirley Ellis:

I would like to be considered for open positions at the Corrections Corporation of America facility in McRae, Georgia. I am a graduate of Brenau University with a Bachelor of Business Administration degree in Management. In addition to a Bachelor degree, I will complete a Master of Science degree in Management at Troy State University on July 27, 2003.

I strongly believe my qualifications would prove to be an asset to your facility. I have consistently exceeded the expectations of previous and present employers by taking the initiative to accomplish job goals. I have consistently advanced to positions of greater responsibility within each organization where I have held a position. Within weeks of starting my current position, I had proven to my supervisor that I was worthy of taking on the responsibility of structuring and executing the functions of one of the new community service projects.

If you could use a hardworking, goal-oriented, adaptive individual with a genuine interest in pursuing a long-term professional career within your facility, I would be glad to make myself available for an interview at your convenience to discuss my qualifications further. Should you require additional information prior to our meeting, please contact me at the phone numbers or e-mail address listed above.

Thanks for your consideration and for your time. I look forward to a favorable response.

Sincerely,

Verneisa McRae – Jackson

CCA 00872





Troy State University

This Certifies That

The Board of Trustees of The Troy State University System
upon Recommendation of the Faculty Has Conferred on

Bernita McRae Jackson

the Degree of

Master of Science in Management

with all Rights, Privileges and Honors thereunto appertaining.

In Witness Whereof the seal of the University and the signatures of its duly
authorized officers are hereto affixed.  Granted this
month of August, in the year of our Lord
two thousand three

EXHIBIT C-2



CORRECTIONS CORPORATION OF AMERICA
McRae Correctional Facility

# MEMORANDUM

TO:          Michael V. Pugh, Warden

FROM:        Robert E. Herndon, Principal

SUBJECT:     ACA Standard 4-4506

DATE:        January 29, 2004

A new librarian was employed in August 2003. Ms. Verneisa Jackson began work on August 25, 2003. She holds a Master of Science degree in Management. A copy of her diploma is included in the ACA file. She is working under the supervision of an American Library Association certified librarian, Ms. Judy Harris. Ms. Harris is on contract and works eight (8) hours a month.

EXHIBIT C-3

# CCA
CORRECTIONS CORPORATION OF AMERICA

## PAYROLL STATUS CHANGE FORM

| | | | |
|---|---|---|---|
| FACILITY # | 2503 | FACILITY NAME | McRae Correctional Facility |
| EMPLOYEE # | 1703007 | EFFECTIVE DATE OF CHANGE | 5/1/2005 |
| REQ. # | | | |

NAME (FIRST)  Vernelsa            (M.I.)  M  (LAST)  Jackson

SSN #                              NAME PRIOR TO CHANGE

STREET ADDRESS

CITY                              STATE _____   ZIP

PHONE #                           EMERGENCY #

EMERGENCY CONTACT

| PLEASE CHECK THE REASON FOR CHANGE | | | | | | | |
|---|---|---|---|---|---|---|---|
| | ADDRESS | | | NAME | | | MARITAL STATUS |
| | W-4 | | | INSURANCE | | X | DEPARTMENT |
| X | TRANSFER | | X | PAY RATE | | X | PROMOTION |
| | DEMOTION | | | LEAVE OF ABSENCE | | | F/T OR P/T |
| | SSN | | | EXEMPT/NONEXEMPT | | | OTHER |

---

**Promotion to Case Manager - Promotion Code 002**

---

| CHANGE FROM | TO |
|---|---|
| Librarian | Case Manager |
| Job Code: 2013; Department: 06 | Job Code: 2003; Department: 07 |
| $34,163.25 | $34,163.25 |

---

### (FOR USE ONLY WITH EMPLOYEES CHANGING FULL-TIME OR PART-TIME STATUS)

1 TO FULL-TIME - PLEASE MAKE SURE EMPLOYEE'S INSURANCE PAPERWORK IS IN.
2 TO PART-TIME _____ # OF VACATION HOURS TO BE PAID
3 TO PART-TIME _____ # OF SICK HOURS TO REMOVE FROM PAYROLL SYSTEM.
4 TO PART-TIME - ATTACH PAPERWORK TO REMOVE UNAVAILABLE BENEFITS (I.E. COBRA NOTICE).

FACILITY ADMINISTRATOR'S/WARDEN'S SIGNATURE        DATE  4.23.05

V.P. OF OPERATION'S SIGNATURE (IF APPLICABLE)      DATE

| FOR CORPORATE OFFICE USE ONLY | |
|---|---|
| Payroll | Human Resources |
| | |

CCA  00034

# CCA
CORRECTIONS CORPORATION OF AMERICA

## PAYROLL STATUS CHANGE FORM

| | | | |
|---|---|---|---|
| FACILITY # | 2503 | FACILITY NAME | McRae Correctional Facility |
| EMPLOYEE # | 1703007 | EFFECTIVE DATE OF CHANGE | 05/15/2005 |
| POSITION ID # | | | |
| NAME (FIRST) | Vernelsa | (M.I.) (LAST) | Jackson |
| SSN # | | NAME PRIOR TO CHANGE | |

STREET ADDRESS

CITY _____ STATE ___ ZIP _____

PHONE # _____ EMERGENCY # _____

EMERGENCY CONTACT

### PLEASE CHECK THE REASON FOR CHANGE

| ADDRESS | | NAME | | MARITAL STATUS | |
|---|---|---|---|---|---|
| W-4 | | INSURANCE | X | DEPARTMENT | X |
| TRANSFER | X | PAY RATE | | PROMOTION | |
| DEMOTION | | LEAVE OF ABSENCE | | F/T OR P/T | |
| SSN | | EXEMPT/NONEXEMPT | | OTHER | |

### PLEASE PROVIDE A WRITTEN EXPLANATION FOR THE CHANGE

Payroll Adjustment - Code 008

| CHANGE FROM | TO |
|---|---|
| Librarian | Case Manager |
| Job Code: 2013 Department 06 | Job Code : 2003 Department 07 |
| $34,163.25 | $33,425.60 |

### (FOR USE ONLY WITH EMPLOYEES CHANGING FULL-TIME OR PART-TIME STATUS)

1 TO FULL-TIME - PLEASE MAKE SURE EMPLOYEE'S INSURANCE PAPERWORK IS IN.
2 TO PART-TIME _____ # OF VACATION HOURS TO BE PAID
3 TO PART-TIME _____ # OF SICK HOURS TO REMOVE FROM PAYROLL SYSTEM.
4 TO PART-TIME - ATTACH PAPERWORK TO REMOVE UNAVAILABLE BENEFITS (I.E. COBRA NOTICE).

MWA _____ 5/17/05

FACILITY ADMINISTRATOR'S/WARDEN'S SIGNATURE     DATE

_____ _____

V.P. OF OPERATION'S SIGNATURE (IF APPLICABLE)     DATE

### FOR CORPORATE OFFICE USE ONLY

| Payroll | Human Resources |
|---|---|
| | |

CCA 00818

EXHIBIT C-4

AGREEMENT

BETWEEN

JANICE E MOCK

AND

CORRECTIONS CORPORATION OF AMERICA

THIS AGREEMENT is entered into by and between JANICE E MOCK, hereinafter "CONTRACTOR", whose address is 188 Davis Chapel Church Road, Alamo, Georgia 30411 and CORRECTIONS CORPORATION OF AMERICA, hereinafter "CCA", whose address is 10 Burton Hills Boulevard, Nashville, Tennessee 37215 for provision of services at the McRae Correctional Facility, hereinafter "Facility" whose address is 1000 Jim Hammock Dr, McRae GA 31055

WHEREAS, CCA desires to engage the services of the Contractor and Contractor desires to deliver the services on the terms and conditions provided herein.

NOW, THEREFORE, in consideration of the mutual covenants, terms and conditions herein contained, it is agreed by and between the parties hereto as follows:

1.    SCOPE OF WORK AND RESPONSIBILITY

The responsibilities of the Contractor shall be as follows, subject to the limitation on hours worked set forth below:

a.    Oversee and monitor professional library services as needed;

b.    Consultation to the Facility Warden and other designated staff as needed;

c.    Develop a training plan for both staff and inmate library aides;

d.    Submit lists of recommended acquisitions;

e.    Develop written policies and procedures, as needed, to operate the library consistent with good correctional and library practices;

f.   Conduct an annual evaluation of the library service program against the stated performance goals and objectives;

g.   Periodically review the procedures followed by Facility personnel in the provision of library services, both general and legal. Recommend, in writing, revisions and new procedures as necessary;

h.   Cooperate fully with the Facility to evaluate the quality of library services being delivered and to report regularly on the effectiveness of the library services;

i.   Cooperate fully with any peer group designated by the Facility to review and evaluate the library services provided and assist in implementation of recommendations made by such group;

j.   Comply with CCA Policy and Procedure 3-3, Standards of Business Ethics and Conduct, a copy of which is attached.

Contractor shall perform the services pursuant to a schedule mutually agreeable between the Contractor and the Facility. Contractor shall not work more than four (4) hours per quarter without express written approval from the Facility Warden.

2.   OBLIGATIONS OF THE FACILITY

The responsibility of the Facility toward fulfillment to this Agreement is as follows:

a.   Employ all management, library and supportive personnel whom the Facility and the Contractor may reasonably agree are necessary.

b.   The Facility, at its sole expense, will provide all supplies and equipment, presently utilized for the delivery of library services.

3.   TERM

This Agreement is effective as of March 09, 2009 and may be terminated upon thirty (30) days written notice by either party. In the event of termination by CCA, other than as a result of Contractor's breach of this Agreement, in which case CCA's sole responsibility under this Agreement shall be to pay Contractor for any undisputed amounts due and owing to Contractor for work performed prior such termination, CCA shall pay to the Contractor the greater of (i) $67 or (ii) an amount equal to the hourly rate set forth in Section 4 below times Contractor's actual hours worked during the

EXHIBIT C-5

RE: Sick Day- Enterprise Vault Archived Item                    Page 1 of 1

From      Mclendon, Betty                    Date   Fri , September 25, 2009 9:01:26 AM
To        Jackson, Vernelsa
Cc
Subject   RE: Sick Day

📎 Contract Labor Sign In Sheet.xls (53 KB HTML)

Thank you for the information.  I hope you get to feeling better.  Please see the attached form and use if
necessary.


From: Jackson, Vernelsa
Sent: Friday, September 25, 2009 8:24 AM
To: Mclendon, Betty; Driggers, Mary
Subject: Sick Day

Good Morning,

Having the same stomach issues all night and this morning. Will try, with your approval to come in on
Saturday or Sunday to get paysheet & QCP completed if I can get a sitter. Ms. Pooler had informed me that
with your approval, that if I log each task and the hours worked, I could work from home from time to time.
Due to so many library task being behind, if I cannot find a sitter this weekend, would it be possible to work on
these tasks from home?

EXHIBIT C-7

(241 unread) - syriusbyzness7 - Yahoo Mail



Headache (2)

Me *Subject unavailable*                                    Feb 18, 2010

Melendon, Betty                                            May 4, 2010
To Me

I trust that everything is going well with you.  ACA questions?

Where will I find LIBRARY CLERKS' SCHEDULE?

MCF Library -  Monthly Report  (Most Recent)

Thank you for a response.

-----Original Message-----
From: syriusbyzness7 [mailto:syriusbyzness7@yahoo.com]
Sent: Thursday, February 18, 2010 7:51 AM
To: Melendon, Betty
Subject: Headache

Severe headache this. I also have sinus. I reported yesterday to
maintenance that it was freezing in my office to no avail.. The inmates
were also complaining all day and two staff members that stopped in also
contacted maintenance because it was so cold.
Sent from my Verizon Wireless Blackberry

----------------------------------
(i) This e-mail and any files transmitted with it are confidential
and intended solely for the use of the intended recipient(s). If
you have received this e-mail in error, please notify the sender
immediately and delete this e-mail and any associated files from
your system. (ii) Views or opinions presented in this e-mail are
solely those of the author and is not necessarily represent those
of Corrections Corporation of America. (iii) The recipient should
check this e-mail and any attachments for the presence of viruses.
The company accepts no liability for errors or omissions caused by
e-mail transmission or any damage caused by any virus transmitted
by or with this e-mail. This email has been scanned for content and
viruses by the CipherTrust Email Security System.

Reply, Reply All or Forward | More

2014 CHEVROLET
MALIBU

EXHIBIT C-8



### McRae Correctional Facility
#### 1000 Jim Hammock Dr., McRae, GA. 31055

### CERTIFICATION OF HEALTH CARE PROVIDER

1. NAME _Vernessa McRae Jackson_   SOCIAL SECURITY NO. _____ -5117_

2. PATIENT'S NAME (if different from employee) _Verneisa L McRae_

3. The attached sheet describes what is meant by a "serious health condition" under the Family and Medical Leave Act. Does this patient's condition[1] qualify under any of the categories described? If so, please check the applicable category.
   1) ___ 2) ___ 3) _✓_ 4) ___ 5) ___ 6) ___, or None of the above ___

4. Describe the medical facts which support your certification, including a brief statement as to how the medical facts meet the criteria of one of these categories:
   _Pt multiple symptoms consistent with depression & anxiety as well as chronic fatigue syndrome._

5. (a) State the approximate date the condition commenced, and the probable duration of the condition (and also the probable duration of the patient's present incapacity[2] if different):
   _unknown onset, duration 2-4 wks if medically responsive to treatment_

   (b) Will it be necessary for the employee to work only intermittently or to work on a less than full schedule as a result of the condition (including for the treatment described in item 6 below)?  ☒ Yes   ☐ No

   (c) If the condition is a chronic condition (condition #4) or pregnancy, state whether the patient is presently incapacitated and the likely duration and frequency of episodes of incapacity:  _4-6 wks of incapacity_

6. (a) If additional treatments will be required for the condition, provide an estimate of the probable number of such treatments:  _2-4 treatments & possibly continuous PRN._

   If the patient will be absent from work or other daily activities because of treatment on an intermittent or part-time basis, also provide an estimate of the probable number and interval between such treatments, actual or estimated dates of treatment if known, and period required for recovery, if any:  _unknown at this point_

   (b) If any of these treatments will be provided by another provider of health services (e.g., physical therapist), please state the nature of the treatments:  _May consider psychiatric consult if pt is not responsive to initial treatment_

   (c) If a regimen of continuing treatment by the patient is required under your supervision, provide a general description of such regimen (e.g., prescription drugs, physical therapy requiring special equipment):  _Counseling, prescription drugs & possible reinforcements_

[1] Here and elsewhere on this form, the information sought relates only to the condition for which the employee is taking FMLA leave.

[2] For purposes of FMLA, "incapacity" is defined to mean inability to work, attend school or perform other regular daily activities due to...

https://owa.correctionscorp.com/exchange/VerneisaJackson/Notes/Save%20This/FMLA%2... 5/19/2010

JACKSON et al.; v. CORRECTION CORPORATION OF AMERICA
V. JACKSON CONFIDENTIAL # 283

7. (a) If medical leave is required for the employee's absence from work because of the employee's own condition (including sickness due to pregnancy or a chronic condition), is the employee unable to perform work of any kind?
☐ Yes   ☐ No

(b) If able to perform some work, is the employee unable to perform any one or more of the essential functions of the employee's job (the employee—or the employer should supply you with information about the essential job functions)?   ☐ Yes   ☐ No

If yes, please list the essential functions the employee is unable to perform:

_____
_____
_____

(c) If neither (a) nor (b) applies, is it necessary for the employee to be absent from work for treatment? ☐ Yes  ☐ No

8. (a) If leave is required to care for a family member of the employee with a serious health condition, does the patient require assistance for basic medical or personal needs or safety, or for transportation?   ☐ Yes   ☐ No

(b) If so, would the employee's presence to provide psychological comfort be beneficial to the patient or assist in the patient's recovery?   ___ N A

If the patient will need care only intermittently or on a part-time basis, please indicate the probable duration of this need:

_____
_____

_____  ____  3/14/10  ____  Family Medicine
Signature of Physician (or Practitioner)                          (type of Practice)

10 North 3rd Ave, McRae, Ga. 31055  ____  229 562 3069
Address                                                                  Telephone

**TO BE COMPLETED BY THE EMPLOYEE NEEDING FAMILY LEAVE TO CARE FOR A FAMILY MEMBER:**

State the time you will provide and an estimate of the period during which care will be provided, including a schedule if leave is to be taken intermittently or if it will be necessary for you to work less than a full schedule:

_____
_____
_____

_____  _____
Employee Signature                                        Date

https://owa.correctionscorp.com/exchange/VerneisaJackson/Notes/Save%20This/F...   5/19/2010

JACKSON et al.; v. CORRECTION CORPORATION OF AMERICA
V. JACKSON CONFIDENTIAL # 284

## REQUEST FOR LEAVE

Whenever possible, this form should be completed thirty days before the requested beginning date of the leave. It should be given to your immediate supervisor or the personnel coordinator.

You should consult with the personnel coordinator if you have any questions regarding the types of leave provided by CCA, including questions about eligibility for, duration of, and benefits entitlement during leave.

Name: _Vernisia Jackson_                Position: _Library Aide_

Department: _Education_        Supervisor: _Mrs. Betty McLendon_

### DATES REQUESTED

Date Leave Commences _2-22-2010_        Expected Return Date* _approx. 3-8-2010_

——————OR——————

Intermittent Leave Requested on the Following Terms:

_Work related Stress leave_

* *Certification of fitness-for-duty from your health care provider must be submitted before your scheduled return date from a General Medical or FMLA Personal Illness Leave.*

### TYPE OF LEAVE REQUESTED

_____ General Medical**

_____ Military (A copy of your military orders should accompany this form.)

_____ Discretionary

_✓_ FMLA (check reason)

☐ Parental
☑ Personal Illness
☐ Family Illness**

**A Certification of Health Care Provider form is required and should be submitted with this form.

Date: _2-22-2010_    Employee Signature _Vernisia Jackson_

CCA 00687

EXHIBIT C-9

**MEMORANDUM**

TO:      Ms. Vernesia Jackson

FROM:    William Bird, Manager, Human Resources

RE:      Insurance Premiums

DATE:    March 26, 2010

According to our records, you have been on unpaid leave since pay period ending February 27, 2010 and have made no provision to pay your portion of benefits premiums during this time. Company policy states that an employee's benefits may be cancelled if premium payments are not made for a period greater than thirty days. This is to advise you that your insurance premium payment of $34.95 for Dental coverage, $186.86 for Medical, $10.32 for Vision coverage is now due. In order to keep current on insured benefits a check in the amount of $232.13 must be mailed or brought to this facility for pay periods:

February 28 – March 13, 2010
March 14 – March 27, 2010

If payment is not received within 15 days of the date of this letter, your health coverage will lapse as of the last date that premium payments were made.

Your anticipated return to work date is undetermined at this time. You must provide a release to return to work at that time.

If you have further questions, please phone me at 229-868-7778 ext. 2211.

**From:** Jackson, Verneisa
**Sent:** Monday, April 12, 2010 9:55 PM
**To:** Bird, William
**Subject:** Memorandum - Insurance Premiums

Good Morning,

On your letter dated March 26, 2010, you advised if I did not make the premium payment on my insurance within 16 days, my insurance would be cancelled.  To date, I have not received any FMLA compensation from MetLife. As a result, I do not have the funds to pay these premiums. Will these benefits be reinstated once I return to work and begin making the payments?

You also stated that I must give the facility an anticipated return to work date at the time I make the payment. My appointment with my physician is on 04-14-2010. He will advise me on that date regarding my return to work date. Could you please e-mail or mail the "release to work" paperwork that I will need him to complete to return to work. Thank you for your assistance with these matters.

**Jackson, Vernelsa**

| | | | |
|---|---|---|---|
| **From:** | Jackson, Vernelsa | **Sent:** | Wed 5/12/2010 1:59 PM |
| **To:** | Bird, William | | |
| **Cc:** | | | |
| **Subject:** | MetLife | | |
| **Attachments:** | | | |

Good Afternoon,

FYI - I had to cancel an appointment with my psychiatrist this morning due to not having insurance coverage. These appointment are imperative to my recovery. Due to anxiety attacks and other issues with depression, I need to have prescriptions filled. This has also effected coverage for my daughter. I've seen that other companies, in cases like this, offer the option to pay the premiums and seek reimbursement when the employee returns to work. Due to the problems I incurred with MetLife paying for the past 10 weeks, would this be an option that CCA would consider?

Also, I wanted to check the status of your FSC Human Resource contact efforts to convince MetLife to provide coverage or reverse their denial of my claim. Thank you,

Labor in 2003?

3.  Under its federal contract, is CCA/MCF obligated to adhere to the Service Contract Act and retroactively compensate me for the work that I have done for the past 17 months while fulfilling the duties of Librarian and Library Aide? If your answer is no, will I be required to continue to perform the managerial duties of Librarian to include ACA, QCP, and the duties outlined under the Service Contract Act's job description for the Librarian or would I only be responsible for the Library Technician upon my return to work?

4.  I am currently on FMLA leave for work-related stress due the explanations and grievances attached. Our HR department told me that I did not qualify for Worker's Compensation; however, OSHA deems stress related illnesses to be injury. Should I have been allowed to file a Worker's Compensation claim?

5.  I have been on FMLA leave for approximately 8 weeks without compensation from MetLife due to problems with the paperwork. This has left me without any compensation while I am on leave. This is especially critical because I have been unable to pay for my portion of the health care insurance at MCF. As a result my insurance has been cancelled. I received the following e-mail from our HR manager Mr. Bird, *("While on FMLA and your insurance will cancel due to non-payment, you can re-enroll when and if you return before your 12 weeks of FMLA expires. If you are off longer than that (general medical leave but no longer FMLA) you are not entitled to re-enroll and would have to wait until Open Enrollment.")* **Due to the severity of my medical issues, is there any assistance your office can offer to remedy this problem? I was advised once that employees who didn't elect one of the preferred insurances would be placed on CCA's free insurance. Is this still an option?**

6.  Please also see the e-mail below. I am forwarding it to you for your attention (Sent: Thu 4/8/2010 2:25 PM, To: Parker, Stephanie, Cc: Wells, Walt; Golden, Kenya). As of today, I have not received a reply. **May I also request an answer to those questions? In accordance with CCA Memorandum (attached) dated July 7, 2007, page 3, I am the subject of the Investigative Report and have a "need to know" certain aspect in order to resolve these issues.**

6.  Within the past six months I have filed three grievances against the facility (attached). The grievance against Mr. Bird was the only one that was answered in a professional and timely manner; hence, we were able to resolve it. The other two grievances against A/W Orsolits were HELD

Page 1 of 6

ⓘ You forwarded this message on 5/25/2010 6:36 AM.
This message was sent with high importance.
Attachments can contain viruses that may harm your computer. Attachments may not display correctly.

**Jackson, Verneisa**

| | | | |
|---|---|---|---|
| **From:** | Jackson, Verneisa | | |
| **To:** | Collins, Brian | **Sent:** | Wed 4/28/2010 2:20 PM |
| **Cc:** | Wells, Walt; Parker, Stephanie; Golden, Kenya; Bird, William | | |
| **Subject:** | FW: FOIA - Investigation Results | | |

**Attachments:** ⫐ CCA - 3-06B - Grievance Form- 11-25-2009[1].DOC(32KB) ⫐ Complaint_Orsolits - McRae-e-file 2nd_edit 2010 e-mail[1].doc(55KB) ⫐ CCA - 3-06B - Grievance Form- 3-18-2010 e.doc(29KB) ⫐ 3-6-1B Employee Grievance - Orsolits (2-01-10).doc(94KB) ⫐ Internal Investigation Administrative Directive (339-05-07).doc(190KB) ⫐ 1 Ethics Office Memo_7-2-2007_Incl attachments.pdf(80KB)

Greetings Mr. Collins,

I regret to bother you with the trivial details of my employment at one of the facilities that you direct, however, I am at my wits end in search of a solution to my work-related problems and have painstakingly and patiently exhausted remedies sought through the management of McRae Correctional Facility (MCF) and the Facility Support Center.

I have attached some of my complaints and grievances. I ask that you please provide advise in a timely manner. I am scheduled to be re-evaluated in three weeks by my physicians and psychologist to determine if I am ready to return to work. Due to the health problems and stress that I endured over the past years at MCF, my anxiety levels have escalated at the thought of returning to the same violation-filled environment without reconciliation, compromise, or remedy. It is my hope that these issues will be addressed in order to facilitate my return.

Before my return, I would like the following questions (in red font) addressed:

1. Will Corrections Corporation of America and the BOP finally grant me the waiver necessary to re-instate me as Librarian at the McRae Correctional Facility? I conditionally accepted the position of Library Aide with the understanding that as soon as the waiver of the MLS requirement was granted I would be Librarian. I began my employment at MCF with this waiver as Librarian under the supervision of a Contract Librarian, Ms. Judy Harris, who worked 8 hours per month along with the assistance of a library aide, Ms. Quinn. After being employed at the facility for approximately one year, I questioned the facilities adherence to the Wage Determination requirement and was told that because I was an exempt employee the facility was not obligated to adjust my wages. A formal request was made to FSC and willfully denied.

2. Was the facility required under the Service Contract Act to compensate me at the Wage Determination rate determined by the Department of

pending a fraudulent, untimely, inefficient, bias, and misleadingly investigation performed by Ms. Kenya Golden, CCA employee. Ms. Golden was identified and misrepresented by MCF as an "independent investigator." With the exception of the grievance from Mr. Bird (3-19-2010), To date, I have not received a reply on the grievance paperwork (11-25-2009 or ), have not been informed as to which step in the grievance process we are on, whether Ms. Golden investigated both grievances, and have not been given an opportunity to proceed or answer whether either grievance was

resolved.

Can you please address and follow-up with MCF regarding why the aforementioned was not handled properly by using CCA Policy 3-22 Internal Investigations or 3-6-1 Employee Grievance Procedures standards?

6. Lastly, could you address how Ms. Golden could conclude that my claims were unsubstantiated when CCA under its contact is obligated to abide by the Service Contract Act of 1965, Wage And Hour Violations, Affirmative Action Laws, Violations Georgia Law regarding Notary Services, Retaliation Laws, and Title VII of the Civil Rights Act of 1964? I grieved these issues in November 2009, why were they not investigated until two weeks prior to A/W Orsolits resigning? Does FSC usually conclude an investigation as unsubstantiated without an earnest effort to interview all witnesses? May I also request to review a copy of the Internal Investigation Handbook, Tool A, Investigation Guide, and Checklist outlined in Policy 3-22 and also outlined in your memorandum dated May 7, 2008, regarding procedures for Internal Investigations? I feel that the severity of my allegations warranted an external investigation by the Georgia Department of Labor and the Office of Internal Affairs.

Please advise. Thank you for your attention to these matters.

**From:** Jackson, Vernelsa
**Sent:** Thu 4/8/2010 2:25 PM
**To:** Parker, Stephanie
**Cc:** Wells, Walt; Golden, Kenya
**Subject:** RE: FOIA - Investigation Results

## Good Afternoon Ms. Parker.

Thank you for responding to my request. It is my understanding that if a federal agency (i.e. BOP) contracts with a private company (i.e. CCA) to conduct certain activities of the agency, the contractor (i.e. CCA) is required to comply with U.S.C. codes, Executive Orders (specifically 11246 and 13166), existing requirements in FAR 52.203-13, and other federal laws and rules. I apologize if I have misapplied CCA's obligations under its federal contract.

With or without legal compliance to specific government policies, specifically my question is: What procedures would

I have to follow in order to obtain a copy of the "Internal Investigation" by Kenya Golden. I understand that if I am permitted a copy, portions of a record which are exempt from disclosure may be withheld or deleted.

Secondly, I asked in my last e-mail, "**Please also advise me regarding steps to appeal your decision within the company and/or if I have exhausted the company's internal avenues to an appeal.**" Please provide an answer regarding FSC's procedure regarding this request.

Lastly, I asked, "**Lastly, does CCA make the Federal Bureau of Prisons, Office of Internal Affairs, or the Office of Inspector General aware of grievances and decisions such as this?**" If FSC is not obligated to provide a copy of this report, this is imperative because I will have to make a request to the federal agency, which you provide this information.

If you should have any questions pertaining to this request please e-mail me at this address or call me at 229-860-1238. Thank you for your consideration of this request.

Please mail a copy to:

Verneisa M. Jackson
1 W. Graham Street
McRae, GA 31055

**From:** Parker, Stephanie
**Sent:** Tue 4/6/2010 2:03 PM
**To:** Jackson, Verneisa
**Cc:** Wells, Walt; Golden, Kenya
**Subject:** RE: FOIA - Investigation Results

Ms. Jackson,

We received your request for records pursuant to the federal Freedom of Information Act (FOIA), 5 USC § 552. The provisions of FOIA mandate that federal agencies follow strict procedures for the disclosure and nondisclosure of records. To assist you in requesting the records from the appropriate federal official, we are providing the following contact information:

Wanda M. Hunt, Chief, FOIA/PA Section

FOIA/Privacy Act Requests

Federal Bureau of Prisons

https://owa.correctionscorp.com/exchange/VerneisaJackson/Notes/Save%20This/RW:%20E...    5/28/2010



Department of Justice

Room 841, HOLC Building

320 First Street, N.W.

Washington, DC 20534

(202) 514-6655

Should you find it more convenient, you may also make your request via the internet at the following web site:

http://www.bop.gov/foia/submit.jsp

Using either method will ensure that you have access to the records to which you are entitled under FOIA.

Thank you,

Stephanie Parker

Manager, Ethics Investigations

Corrections Corporation of America

Phone: 615.263.3967

Fax:     615.263.3020

**From:** Jackson, Verneisa
**Sent:** Monday, April 05, 2010 8:24 AM
**To:** Wells, Walt; Parker, Stephanie; Golden, Kenya
**Subject:** FOIA - Investigation Results



*Good Morning,*

https://owa.correctionscorp.com/exchange/VerneisaJackson/Notes/Save%20This/FW:%20F...   5/28/2010

On 04-01-2010, I received the results of the "Internal Investigation" lead by
CCA's Kenya Golden telephonically from Ms. Stephanie Parker and W. Wells.
Upon receiving the decision that the allegations that I made were
unsubstantiated I informally requested a copy of the investigation report and
was told by Ms. Parker that a copy would not be provided.

Please accept this e-mail as my formal request for a copy of the investigation
under the Freedom of Information Act, 5 U.S.C. Sec. 552. "The FOIA requires an
agency to provide a requester with any "reasonably segregable portion" of a
record after deletion of the portions which are exempt" from disclosure."

Please also advise me regarding steps to appeal your decision within the
company and/or if I have exhausted the company's internal avenues to an
appeal.

Lastly, does CCA make the Federal Bureau of Prisons, Office of Internal Affairs,
or the Office of Inspector General aware of grievances and decisions such as
this?

If you should have any questions pertaining to this request please e-mail me at
this address or call me at 229-860-1238. Thank you for your consideration of
this request.

Please mail a copy to:

Verneisa M. Jackson

1 W. Graham Street

McRae, GA 31055

ⓘ You forwarded this message on 5/27/2010 4:55 PM.

**Jackson, Verneisa**

| | | |
|---|---|---|
| **From:** | Bird, William | **Sent:** Fri 5/21/2010 1:55 PM |
| **To:** | Jackson, Verneisa | |
| **Cc:** | Wells, Walt; Latko, Michael | |
| **Subject:** | RE: W/C claim | |
| **Attachments:** | | |

Ms. Jackson,

Let me know when you receive your copy of the denial conformation of Workers Compensation letter. I should also receive one, but if you receive your copy first, get it to me and I will forward it to MetLife. They will review your claim for STD/LTD and once approved, you should receive back payments from the beginning eligibility date of your FMLA.

As for your insurance premium payments, you will need to catch up the payments that are in arrears. I will prepare the total for you so that you can pay that amount. Once we receive you payment, we will have insurance restored.

I know that your leave has ended, but you may request 30 days of discretionary medical leave. If you wish to apply for this extension, please let me know and I will get the Warden's approval for you.

If you have any questions, let me know.

Bill Bird

HRM

McRae

229-868-7778

**From:** Jackson, Verneisa
**Sent:** Friday, May 21, 2010 10:02 AM
**To:** Latko, Michael; Bird, William
**Cc:** Wells, Walt
**Subject:** W/C claim

Good Morning,

EXHIBIT C-10

From: vernetsa jackson [mailto:jacksonv_30904@yahoo.com]
Sent: Thu 9/2/2010 12:12 PM
To: Wells, Walt; Bird, William; Latko, Michael; Hill Jr, James; INSURANCE AND SAFETY FIRE COMMISSIONER'S
Subject: Insurance Refund Denial Response

Mr Latko,

Obviously we are not all reading from the same page. These misunderstandings are apparent by Mr. Bird's response to my numerous complaints. As I address the attached 'denial of refund response' letter from Mr. Bird, could someone help me to better understand the following:

Mr. Bird states, *"~~Correctional Corrections, Corrections Corporation of America did provide coverage to you during the duration of your leave~~"*

- I have several e-mails, memorandums, and I have spoken to Mr. Bird telephonically whereby he stated that on approximately the 1st week in April my insurance ended. At the end of May, he responded to another e-mail stating that if I would like my insurance "restored" I had to pay the arrears. With this in mind, Mr. Bird says that based on the fact I used my insurance throughout my leave (which is not true, I paid out-of-pocket) I cannot be compensated for the time period for which I had no coverage. **How could I have used insurance that had been cancelled?**

I did not have coverage, as per Mr. Bird, during the month of April and May. I could not attend many of my doctors visits due to the cost and now I'm being told after a review from FSC, I can not have a refund for a period of time I was not insured. **Please help me to understand that.**

Mr. Bird further stated in his memorandum, *"As a result, the employee contributions that MetLife withheld from your disability checks were due and were applied to that time period only."*

- Mr. Bird is aware that MetLife did not compensate me for over 18 weeks after my disability because until they believed that Worker's Compensation should be responsible. As a result, MetLife sent a check that covered me until the last date of my employment (which I'm told by MetLife is there standard unless otherwise notified.) Mr. Bird e-mailed that my insurance was cancelled during the second week in April 2010.

Mr. Bird and Mr. Latko, along with their advisors at FSC, have also violated the laws and standards of the Department of Labor's Wage and Hour Division, Office of Federal Contract Compliance Programs, Georgia State Board of Worker's Compensation, and Equal Employment Opportunity Laws. If I do not receive a refund for this time period that I was not insured but Charged for, Mr. Bird will also be in violation of the Georgia Insurance Commission laws. I am still taken aback by the consistency of these errors and CCA's willful disregard of CCA and BOP policies.

2

CCA 00787

Bottom line: Mr. Bird informed me that he cancelled my insurance, hence, all physicians' visit from that point were paid from my pocket because I had NO INSURANCE. MetLife paid, from my disability check, for a period where I HAD NO COVERAGE. I been asking nicely for over six weeks for a refund for the insurance I was not allowed to use.

Lastly Mr. Bird addressed the 3 hour pay issue: *"Your second inquiry was related to three hours of pay in addition to payout for the compensation fringe benefits. Both of these issues were owed compensation due you and were paid in accordance to FLSA and past fringe benefits due."*

I've stated in the UNRESOLVED grievance I turned in on 3-17-2010, but appartly no one is listening or have read the grievance, the issues I have surrounded these "three hours", if you care to check, is in my file. In brief, the problem is that I was told that it was mandatory that I come in for those three hours, which I should not have been forced to do. I was on stress leave and had no desire to come in which I made known to the staff at CCA. I only asked to be compensated for those hours by check to prove that I had worked during my FMLA stress leave for "three hours."

Verneisa Jackson
Owner/Business Consultant
P.M.S. (Priority Managerial Services)
1 West Graham Street
McRae, GA 31055
229-868-6588

3

CCA 00788

EXHIBIT C-11

# CCA Employees Go Back to School at EKU

Aug 28 2009 12:00 PM

Section:Careers & Benefits (/insidecca/section/careers-benefits)

As autumn returns, school is back in session for 24 CCA-employed students. One year into CCA's partnership with Eastern Kentucky University (EKU), those students are working toward certifications and degrees, and changes are underway to allow for even greater participation.

"When it first started, it was an all-scholarship program," says Tom Sammons, CCA Divisional Training Manager (Business Unit II), who serves as liaison between EKU and CCA employees. "That has changed to a 60-40 cost-split between CCA and employees. CCA will absorb 60% of the tuition costs and will provide $100 per semester for books; each employee will be responsible for 40 percent of the tuition and the remainder of the textbook costs, as well as any application fees or other supplies as required by EKU."

Other facets of the program, however, remain the same.

"It's 100% distance learning," Sammons says. "After completing their reading assignments, students have virtual discussions with their classmates either through a Blackboard-like posting system or call-in, audio posting system."

While the program remains open to CCA employees of all positions, candidates must first have the approval of their supervisors and meet EKU's admissions requirements. Once enrolled, students can still earn three EKU credit hours for each Samberg Frontline Leadership and Foundations class they take.

"I think the program is holding steady but I would really like to see more active involvement from all of the CCA graduate certificate students who have been admitted or who are thinking about the program," says Amy Eades, EKU Assistant Coordinator for the Correctional and Juvenile Justice Studies (CJJS) graduate program.

Currently, 10 CCA employees are earning graduate degrees and 14 are completing their undergraduate studies at EKU. Some of the program's first participants are scheduled to graduate this winter and next spring.

"We have been very pleased with those CCA employees who dedicated themselves to furthering their education through our CCA/EKU partnership," says Steve Kaiser, CCA Managing Director, Staff and Organization Development. "We are hoping that next year's funding will allow us to continue and maybe even expand our offering of this career development program."

As they work toward graduation, CCA employees are putting their experience to work in the classroom. "While some younger students tend to speak from socialized beliefs and/or emotional ideas, the CCA students share their real life prison experiences," says Lou Martin, EKU Assistant Program Coordinator for the CJJS undergraduate online degree program.

Daniel Akers, Assistant Warden at Marion Adjustment Center, has been able to share his real-world perspective and gain valuable insights in class.

"It's interesting to see how people think corrections agencies should run and then to see how they run each day because you're part of it," Akers says. "In our classes, we watch the lecture on video, read the chapters, complete the Blackboard assignments, and at the end of the week we take timed quizzes."

Faculty advisors maintain regular contact with students to help them stay on track, and an introductory course prepares them for the interactive online classroom. The curriculum encompasses a variety of topics, including corrections history and the theories surrounding industry practices.

"We address many issues, from intake to release, in our weekly discussions," Martin says. "As an advisor and an instructor, I can honestly say that the program is going very well. The CCA employees bring a wealth of experience and knowledge to our program."

EKU maintains a high-quality corrections curriculum that offers students a well-rounded education.

"EKU has put a lot of work into making this a program that is very relevant to corrections," Sammons says. "The school has a great faculty that's well-versed in the industry at all levels. It provides an excellent educational experience."

*By DeAndra Mack*

# CCA and Eastern Kentucky University Form New Partnership

Nov 20 2008 12:00 PM

Section:General (/press-releases/section/general)

NASHVILLE, Tenn. – Correction Corporations of America (CCA) has partnered with Eastern Kentucky University (EKU) in a new program that bridges the daily demands of correctional operations with the increasing qualifications expected of today's corrections professionals.

Through the company-paid program, participating CCA employees study online undergraduate and graduate level correctional courses, leading to professional certifications in corrections. These credit hours may also be applied toward bachelor's or master's degree programs in related disciplines at EKU and other universities.

"With Damon Hininger, our newly appointed president and chief operating officer, who joined the company as a correctional officer five months after graduating from Kansas State University, drawing parallels between attending college and climbing the career ladder is especially timely," said Bill Rusak, CCA chief human resources officer.

Participants on the undergraduate track take 24 hours of coursework, focusing on subjects such as law and ethics, evidence-based offender intervention strategies, women in corrections and addictions treatment, eventually leading to a professional certificate in correctional interventions. Those on the graduate level track take 12 hours of coursework, emphasizing administration, rehabilitation, law and ethics and adult corrections, earning a professional certificate in correctional leadership upon completion.

"For correctional professionals at all stages of their careers, CCA offers training that meets them where they are – and provides the foundation to take them where they aspire to be," said Steve Kaiser, CCA managing director, Organizational Development, Staffing and Training. "In order for us to meet our vision to be the best full-service adult corrections system in the nation, we have to have the best people."

As one of the first universities to offer a degree program specializing in corrections, EKU offers participating CCA employees training a program with a track record more than 30 years strong.

"This partnership serves as a model for future programs, allowing CCA to continue to strengthen its work force and overall staff performance," Rusak said.

To learn more about the partnership, visit www.cca.eku.edu (http://www.cca.com/newsroom/news-

rbleases/152/www.cca.eku.edu).

**About CCA**

CCA is the founder and industry leader of the private corrections management industry, representing the nation's fifth-largest corrections system, behind the federal government and three states. CCA currently operates 64 facilities, including 42 that are company-owned, with a total design capacity of approximately 81,000 beds in 19 states and the District of Columbia, with more than 17,000 employees who provide comprehensive educational, vocational, therapeutic and addictions treatment programs intended to prepare inmates for successful re-integration with society.

© 2008 Corrections Corporation of America. All right reserved.

EXHIBIT 1

CHAPTER 1:            GENERAL ADMINISTRATION
SUBJECT:             EQUAL EMPLOYMENT OPPORTUNITIES
SUPERSEDES:          MAY 15, 1994
EFFECTIVE DATE:      AUGUST 7, 2000
FACILITY:            ALL CCA BOP FACILITIES – MCRAE CORRECTIONAL FACILITY
FACILITY SUPERSEDES: DECEMBER 1, 2002
FACILITY EFFECTIVE DATE: JULY 26, 2004


APPROVED:   SIGNATURE ON FILE
            MIKE QUINLAN
            CHIEF OPERATING OFFICER/
            EXECUTIVE VICE PRESIDENT

APPROVED:   SIGNATURE ON FILE
            LINDA G. COOPER
            VICE PRESIDENT, LEGAL AFFAIRS

1-5.1   PURPOSE:

To promote equal opportunity without regard to race, color, sex, national origin, religion, age, disability or any other status or characteristic protected by applicable federal, state or local law in recruiting, hiring, and all other terms and conditions of employment at the Company.

1-5.2   AUTHORITY:

Corporate and Facility Policy.

1-5.3   DEFINITIONS:

None.

1-5.4   POLICY:

Corrections Corporation of America's policy is to select, place, train and promote the best qualified individuals based upon relevant factors such as work quality, attitude and experience, and to take positive steps to provide equal employment opportunity for all employees without regard to race, color, sex, national origin, religion, age, disability or any other status or characteristic in compliance with applicable federal, state, or local law.

This equal employment opportunity policy applies to all CCA employment decisions, including but not limited to, recruiting, hiring, firing, wages, terms, conditions, training, transfers, promotions and benefits.

CCA specifically prohibits employment discrimination in violation of this policy.

CCA takes positive affirmative measures to promote the employment of qualified minorities, women, veterans, handicapped and older persons in positions at all organizational levels.

1-5.5   PROCEDURES:

Questions or allegations of violations of this policy should be directed to the Corporate Managing Director, Personnel or the Vice President, Legal Affairs.

Proprietary Information - Not for Distribution - Copyrighted

1-5.6   REVIEW:

This policy will be reviewed as needed by the Vice President, Legal Affairs or the Managing Director, Personnel.

1-5.7   APPLICABILITY:

All CCA operations.

1-5.8   ATTACHMENTS:

None

1-5.9   REFERENCES:

Applicable anti-discrimination laws and regulations; Executive Order 11246.  ACA Standards.  The ACA Standards for this facility are as follows:

**4-ACI-4053 and 4054**

Proprietary Information - Not for Distribution - Copyrighted

EXHIBIT 2

| CCA | POLICY TITLE | Employee Grievance Procedures | | |
|---|---|---|---|---|
| **CORRECTIONS CORPORATION OF AMERICA** | CHAPTER | 3 | POLICY NUMBER | 3-6-1 | Page 1 of 8 |
| | EFFECTIVE DATE | | SUPERSEDES DATE | |
| | SEPTEMBER 1, 2009 | | JUNE 15, 1997 (3-6) | |
| *SIGNATURE ON FILE AT FACILITY SUPPORT CENTER*<br>*William K. Roush*<br>*Executive Vice President, Human Resources* | FACILITY NAME | ALL CCA/BOP-CONTRACTED FACILITIES | | |
| *SIGNATURE ON FILE AT FACILITY SUPPORT CENTER*<br>*Richard P. Seiter*<br>*Executive Vice President/Chief Corrections Officer* | FACILITY EFFECTIVE DATE | | FACILITY SUPERSEDES DATE | |
| *SIGNATURE ON FILE AT FACILITY SUPPORT CENTER*<br>*G.A. Puryear, IV*<br>*Executive Vice President/General Counsel* | FEBRUARY 1, 2010 | | JULY 26, 2005 (POLICY 3-6) | |

**3-6-1.1 POLICY:**

Employment related problems, misunderstandings, or conflicts may arise in any organization. CCA provides a grievance process as a means for all employees to promptly address employment related issues under a consistent and objective procedure. Prior to engaging in the formal grievance process, employees are encouraged to attempt to resolve employment related issues informally with their supervisor and/or management level employees through open communication consistent with the open Communications policy set forth in CCA Policy 3-3 Code of Conduct.

The formal grievance procedure provided for in this policy is for situations where informal means of problem-solving have failed or, because of the nature of the dispute, may be inappropriate.

**3-6-1.2 AUTHORITY:**

CCA Company Policy

**3-6-1.3 DEFINITION:**

Bargaining Unit Employee – A CCA employee working within a bargaining unit represented by a labor union.

CCA Peer Review Panel - A panel of trained, eligible CCA employees selected to participate in the finding of fact for the CCA Peer Review Process

CCA Peer Review Process – An objective dispute resolution process conducted before the CCA Peer Review Panel.

Employee – For the purpose of this policy, a person employed in an approved full-time, part-time, or PRN position that is designated as such in the authorized staffing pattern.

Executive Officer – CCA's Chairman of the Board, Chief Executive Officer (CEO), President, Executive Vice Presidents, and those Senior Vice Presidents who report directly to the CEO and President.

Full-Time Employee - A person employed in an approved full-time position that is designated as such in the authorized facility staffing pattern or has been approved through the requisition process.

Part-Time Employee - A person employed in an approved part-time position that is designated as such in the authorized facility staffing pattern or has been approved through the requisition process.

Pro Re Nata (PRN) Employee – A person employed by CCA on a part-time, as needed basis without any regular set schedule.

Temporary Employee – A person employed by CCA for a limited period of time usually for a specific assignment.

**3-6-1.4 PROCEDURES:**

Proprietary Information – Not For Distribution – Copyrighted        Property of Corrections Corporation of America        CCA000632

PROCEDURES INDEX

| SECTION | SUBJECT |
|---------|---------|
| A | Availability of Information |
| B | Training |
| C | Protection from Reprisal |
| D | Non-Grievable Matters |
| E | Eligibility |
| F | Guidelines |
| G | Terminated Employees |
| H | Response & Filing Extensions |
| I | Remedies |
| J | Grievance Log Maintenance & Access |

A.   AVAILABILITY OF INFORMATION

    1.   This policy and corresponding forms will be available to all employees through normal means of policy communication (i.e. policy manuals, policy share drives, company intranet).

    2.   Copies of the policy and/or forms will be provided, by the facility Manager, Human Resources, to any employee upon request.

    3.   Any revisions to this policy and/or forms must be communicated to all employees.

    4.   Employees will be required to sign a 3-6-1A Policy Acknowledgement form upon implementation of this policy. In addition the 3-6-1A must be completed each time this policy is revised.

B.   TRAINING

    Employees will be trained on the facility's grievance procedures during new employee orientation, during annual in-service, and any time the policy is revised.

C.   PROTECTION FROM REPRISAL

    1.   Employees shall not be subject to retaliation, reprisal, harassment, or discipline for use or participation in the grievance process. Any allegations of this nature should be reported to the facility Manager, Human Resources, appropriate Senior Director, Human Resources, or the CCA Ethics Hotline (1-866-757-4448).

    2.   The Ethics Office must be notified of all allegations of retaliation, reprisal, harassment, or discipline and will be responsible for promptly and thoroughly investigating the allegation and ensuring corrective measures are taken, when necessary, in accordance with procedures outlined in CCA Policy 3-22 Internal Investigations.

D.   NON-GRIEVABLE MATTERS

    1.   The following matters are <u>not</u> grievable by employees through these grievance procedures:

        a.   Requirements or policies of the facility's management contract, actions taken pursuant to directives of the facility's management contract, or actions taken as a result of an employee becoming disqualified to work under the facility's management contract;

        b.   Decisions relating to the methods, means, and personnel utilized to carry out work activities;

Proprietary Information – Not For Distribution – Copyrighted     Property of Corrections Corporation of America  CCA00853

Case 3:11-cv-00111-DHB-BKE   Document 68-4   Filed 12/30/13   Page 62 of 146

    c.    Assignment of employees to perform duties, other than normal duties, during emergency situations;

    d.    Claims arising under certain federal or state laws such as: The Employee Retirement Income Security Act ("ERISA") governing the administration of 401K, and health and welfare plans; workers' compensation, OSHA regulations; or matters under the National Labor Relations Act;

    e.    Claims arising out of or related to the terms of any non-compete, non-solicitation, or confidentiality agreements; and/or

    f.    Claims arising under patent, copyright, trademark, or intellectual property laws.

2.    The Executive Vice President, Human Resources or designee will make the final determination should any dispute arise whether an action is grievable.

E.    ELIGIBILITY

    1.    Current Employees

        Access to the grievance process will be afforded to all full-time, part-time, PRN, and temporary employees unless they fall under one (1) of the categories listed below:

        a.    Bargaining Unit Employees;

        b.    Individuals working under a personal services or an employment contract for a specific duration with CCA; and/or

        c.    Executive Officers.

    2.    Former Employees

        Former employees, except those that at the time of their termination of employment were working in one of the categories outlined in E.1.a., b., or c., will be afforded access to the grievance process for a period of fourteen (14) calendar days from the date of termination.

F.    GUIDELINES

    The step-by-step process outlined below applies at all facilities, including the Facility Support Center (FSC), for the processing of eligible grievances under this policy. A condensed version of the guidelines is outlined in the 3-6-1AA Grievance Procedure Flow Chart for quick reference.

    1.    Step One

        a.    Filing

            i.    Employees will have seven (7) calendar days from the date of the incident, or the date on which the employee discovered or should have reasonably discovered the action, to file a grievance.

            ii.    The employee must complete the 3-6-1B Employee Grievance form and submit it to the facility Manager, Human Resources. Employees who can demonstrate they had no, or delayed, access to the grievance form or process may have the time limitation for filing the grievance extended by the Company.

        b.    Processing

            i.    Upon receipt, the facility Manager, Human Resources will document receipt of the grievance on the 3-6-1C Employee Grievance Log.

Proprietary Information – Not For Distribution – Copyrighted    Property of Corrections Corporation of America    CCA 00854

    ii.    The original grievance form will be forwarded to the appropriate supervisor.

    iii.    Within seven (7) calendar days of receipt of the grievance form, the grieving employee's supervisor will meet with the employee to discuss the grievance.

    iv.    Following the meeting, the supervisor will document their Step One response to the grievance on the original 3-6-1B form and forward it back to the facility Manager, Human Resources.

    v.    The Company will issue it's Step One response within fifteen (15) days of completing the investigation of the events and circumstances giving rise to the grievance or the employee's first day of work following completing such investigation, whichever is later. The Company has the right to extend this deadline with notice to the grievant.

    vi.    The facility Manager, Human Resources will be responsible for documenting the supervisor's disposition on the 3-6-1C form.

    vii.    The facility Manager, Human Resources will return the original 3-6-1B back to the grieving employee and a copy of the 3-6-1B form will be placed in the grievance file, separate from the employee file.

2.    Step Two

    a.    Filing

        i.    If the supervisor's Step One response does not resolve the grievance, the grievant may appeal the response within seven (7) calendar days of receipt of the response and proceed to Step Two.

        ii.    The grievant must indicate their desire to appeal the response on the 3-6-1B and return it to the facility Manager, Human Resources.

        iii.    If the grievant does not submit the 3-6-1B indicating their desire to appeal the response within the required time limit, the grievance shall be considered resolved.

    b.    Processing

        i.    The facility Manager, Human Resources will forward the 3-6-1B to the appropriate senior level manager, i.e., Warden/Administrator (for facility employees) or FSC Manager (for FSC employees), as applicable. In the event, the Warden/Administrator or FSC Manager or designee, as applicable, is the immediate supervisor of the grieving employee, the appeal should be forwarded as follows:

        •    Facility Employees

        The appeal will be sent to the appropriate Managing Director, Facility Operations to process as outlined below. The Managing Director, Facility Operations has the authority to assign the appeal to another qualified manager to process.

        •    FSC Employees

        The appeal will be sent to the appropriate next senior level manager to process as outlined below. The FSC senior level manager has the authority to assign the appeal to another qualified manager to process. ...

    ii.   The Warden/Administrator or FSC Manager, as applicable, will meet with the employee to discuss the grievance.

- The grieving employee will be notified of the meeting date and time in advance.

- The grieving employee will be allowed to call witnesses to support his/her position, provided they are available, their anticipated statement is relevant, material, and not repetitious, and their participation will not unduly burden the grievance process or operation of the facility. Reasonable accommodations will be made to hear witness statements. However, CCA assumes no responsibility for assuring the presence of the witnesses.

    iii.   Following the meeting, the Warden/Administrator or FSC Manager or designee, as applicable, will document their response to the appeal on the original 3-6-1B form and forward it back to the facility Manager, Human Resources.

    iv.   The Company will issue it's Step Two response within fifteen (15) days of completing the investigation of the events and circumstances giving rise to the grievance or the employee's first day of work following completing such investigation, whichever is later. The Company has the right to extend this deadline with notice to the grievant.

    v.   The facility Manager, Human Resources will be responsible for documenting the Warden/Administrator or FSC Manager's disposition on the 3-6-1C Employee Grievance Log.

    vi.   The facility Manager, Human Resources will return the original 3-6-1B back to the grieving employee and a copy of the 3-6-1B form will be placed in the grievance file, separate from the employee file.

3.   Step Three

   a.   Filing

      i.   If the Step Two response does not resolve the grievance, within seven (7) calendar days of receipt of the Step Two response, the grievant may appeal the response.

      ii.   The grievant must indicate their desire to appeal the Step Two response on the 3-6-1B and return it to the facility Manager, Human Resources.

      iii.   If the grievant does not submit the 3-6-1B indicating their desire to appeal the Step Two response within the required time limit, the grievance shall be considered resolved.

   b.   Peer Review Option

      i.   Certain grievances relating to a disciplinary action that resulted in a loss of status, pay, suspension, or termination will be handled as follows:

- At the time the grievance is submitted to appeal the Step Two response, the employee will have the option to choose the Step Three grievance to be processed through the CCA Peer Review Process (as outlined in CCA Policy 3-6-2 CCA Peer

Review Procedures) or the supervisor of the Step Two responding individual or that supervisor's designee.

NOTE: Employees may contact the facility Manager, Human Resources to determine whether the Peer Review Process is available or to answer any questions about the process. The Executive Vice President, Human Resources or designee will make the final determination should any dispute arise whether an action is subject to the Peer Review Process.

- If the employee chooses to utilize an existing CCA Peer Review Process, the grieving employee must complete the 3-6-1D Request for CCA Peer Review Process form and submit it to the facility Manager, Human Resources.

- Once the grieving employee selects the option for processing, the facility Manager, Human Resources will forward the 3-6-1B Employee Grievance Form and the 3-6-1D Request for CCA Peer Review form to the FSC Managing Director, Employee Relations or designee. The appeal will then be processed in accordance with procedures outlined in CCA Policy 3-6-2 CCA Peer Review Procedures.

ii. When a CCA Peer Review Process does not exist, is not chosen by the grieving employee, or when grievances are **not** related to a qualifying disciplinary action that resulted in a loss of status, pay, suspension, or termination or when grievances are not otherwise eligible for the Peer Review Process as outlined in CCA Policy 3-6-2 CCA Peer Review Procedures, the supervisor of the Step II respondent will be responsible for processing as outlined below.

c. Processing

The supervisor of the Step Two responding individual will be responsible for processing as outlined below:

i. The manager responsible for responding to the Step Three appeal will review and investigate the issue along with the responses provided during Step One and Step Two of the process.

ii. The investigating manager, or their designee, will meet with the employee as part of that investigation. The meeting may be conducted telephonically, by video conference, or in person as determined by the responding individual. The grieving employee will be notified of meeting date and time in advance.

iii. The grieving employee will be allowed to call witnesses to support his/her position, provided they are available, their anticipated statement is relevant, material, and not repetitious, and their participation will not unduly burden the grievance process or operation of the facility. Reasonable accommodations will be made to hear witness statements. However, CCA assumes no responsibility for assuring the presence of the witnesses.

iv. Following the meeting, the responding manager will document their response to the appeal on the original 3-6-1B form. The responding manager will send the original 3-6-1B to the grievant and forward a copy to the facility Manager, Human Resources.

Proprietary Information – Not For Distribution – Copyrighted         Property of Corrections Corporation of America/CCA857

    v.   The Company will issue its Step Three response within thirty (30) days of completing the investigation of the events and circumstances giving rise to the grievance. The Company has the right to extend this deadline with notice to the grievant.

    vi.   The facility Manager, Human Resources will be responsible for documenting the final disposition on the 3-6-1C Employee Grievance Log and placing the copy in the grievance file, separate from the employee file.

    vii.   The responding manager's decision in Step Three is final.

G.   TERMINATED EMPLOYEES

1.   The facility Manager, Human Resources will provide terminated employees with grievance forms and instruction documents at the time of termination or as soon as feasible thereafter.

2.   Within fourteen (14) calendar days of termination, former employees may dispute their termination by initiating the employee grievance procedure. Grievances filed by terminated employees will be by-pass Step One processing and be initiated at Step Two.

H.   RESPONSE & FILING EXTENSIONS

1.   Time limits listed throughout this policy for employees or former employees may be extended, upon request to the Manager, Human Resources, if the employee or former employee can demonstrate that access to the grievance process or grievance forms were delayed or denied or for other good reason justifying the requested extensions. Requests granted must be confirmed, in writing, by applicable Human Resources personnel.

2.   Time limits may be extended for time away from work for an approved leave of absence due to civil leave, workers' compensation, bereavement, FMLA, or scheduled PTO.

3.   All references to time limits for filing and/or advancing to the next step are calendar days and include Saturdays, Sundays, and holidays.

I.   REMEDIES

The grievance process shall afford the employee the opportunity for meaningful remedy. Remedies may cover a broad range of reasonable and effective resolutions.

1.   Remedies rendered to the grieving employee or former employee must be consistent with policies, procedures, rules, regulations, and or facility customer contract requirements.

2.   Remedies will not exceed the prescribed scope of authority of the responding supervisor/manager.

3.   Remedies provided in Steps One and/or Step Two of the process may be upheld or reversed at the next step.

4.   As a result of the grievance process, should the remedy include a reversal of any PSN issued based upon a finding that the PSN should not have been issued and was done so in error or without justification or support, the PSN will be removed from the employee's file/work record and destroyed. This action will be documented as resolution on the 3-6-1C Employee Grievance Log.

J.   GRIEVANCE LOG MAINTENANCE & ACCESS

Proprietary Information -- Not For Distribution -- Copyrighted      Property of Corrections Corporation of America

1. Each location (facility and FSC) will be responsible for logging grievances initiated at their facility on the 3-6-1C Employee Grievance Log.

2. The 3-6-1C Employee Grievance Log will be maintained, by the Manager, Human Resources or designee, in a computerized format with all requested information completed for every entry. One (1) electronic spreadsheet should be created for each calendar year.

3. Grievance logs will be maintained on file in accordance with CCA Policy 1-15 Retention of Records.

4. The 3-6-1C Employee Grievance Logs maintained under this policy will be available for inspection and review upon request from the Director/Manager of Human Resources for the Business Unit, Executive Operational Personnel, FSC Senior Human Resources Personnel, or Legal Department or the appropriate designees for each. An inspection and review of the 3-6-1C Employee Grievance Logs will be included within the internal CCA audits as well.

3-6-1.5 REVIEW:

The Executive Vice President, Human Resources or qualified designee will review this policy on an annual basis.

3-6-1.6 APPLICABILITY:

All CCA Facilities (Provided contractual requirements do not mandate otherwise)

3-6-1.7 APPENDICES:

3-6-1AA Grievance Procedure Flow Chart

3-6-1.8 ATTACHMENTS:

3-6-1A Policy Acknowledgement

3-6-1B Employee Grievance

3-6-1C Employee Grievance Log

3-6-1D Request for CCA Peer Review

3-6-1.9 REFERENCES:

CCA Policy 1-15

CCA Policy 3-3

CCA Policy 3-6-2

CCA Policy 3-22

ACA Standards. The ACA Standards for this facility are:

4-4084/4-ALDF-7E-01

4-ALDF-7E-04



**CCA**®

June 16, 2011

Marc Gunn
1501 Avenue L
South Houston, TX 77587

Dear Mr. Gunn:

This correspondence is in regards to your original employee grievance which was received in the Operations Department on April 19, 2011, and amended grievance on June 13, 2011.

After reviewing your grievances and the information from the facility, I am upholding the Warden's decision to terminate your employment. In addition, your remedy requested is denied including payment of sick bank hours and six months severance package.

As per CCA Policy 3-6-1, Employee Grievance Procedures, Section 3-6.1.4, Guidelines F.3.c.vii; the responding manager's decision in Step Three is final.

Sincerely,

Lane Blair
Managing Director, Facility Operations
Division I

/jlw


Cc:     HR Manager
        File

EXHIBIT 3

# Corrections Corporation of America
## McRae Correctional Facility Organizational Chart



Approved: ___/s/ Walt Wells, Warden___

___Original on file in OA___

1/29/2008

EXHIBIT 4

  REC'D JUN 0 9 2010

DESIGNATION OF RESPONSIBILITIES

| Affirmative Action Officer |
|---|

Ms. Shannon S. Pooler is the Affirmative Action Officer who will implement this Program. Ms. Pooler will be given the necessary management support to meet the responsibilities related to this assignment which include, but are not limited to:

A.  Developing an annual Affirmative Action Program;

B.  Establishing Program goals and objectives;

C.  Reviewing potential problem areas such as those discussed in Section F of this Part;

D.  Designing action-oriented programs and solutions to potential problem areas such as those discussed in Section G of this Part;

E.  Designing and implementing audit and reporting systems such as those outlined in Section H of this Part that:

    1.  Measure the effectiveness of the Program;

    2.  Indicate any need for remedial action; and

    3.  Determine the degree to which goals and objectives are being obtained; and

F.  Serving as liaison with area minority and female organizations, including community action groups, state employment services and private agencies concerned with employment opportunities of minorities and females.

 

**Management**

As appropriate, responsible management personnel will work with the Affirmative Action Officer to accomplish the following objectives:

A. Assisting in the identification of, and the development of resolutions for, potential problem areas;

B. Actively supporting local minority organizations, female organizations, community action groups and community service programs;

C. Auditing the Program's performance, including hiring and promoting patterns, to ensure that there are no unnecessary impediments to the attainment of goals and objectives;

D. Conducting periodic discussions with management, supervision and employees to ensure that our policies are being followed;

E. Reminding employees of their opportunities for promotion or transfer;

F. Auditing their sections of the facility to ensure compliance in areas such as proper display of posters, full desegregation of all facilities which the Company maintains for the use and benefit of its employees, and continued comparability of all locker rooms and rest rooms for both sexes;

G. Auditing their sections of the facility to ensure equal opportunity of all female and minority employees to participate fully in all company-sponsored educational, training, recreational, and social activities; and

H. Informing supervisors that assessment of equal employment opportunity efforts, including the prevention of any harassment of employees, is a part of their work performance evaluation.

 

## Supervisors

A.  Supervisors will assist with meeting the intent of our EEO Policy in all personnel actions in which they participate, including hire, training, transfer, promotion, and termination;

B.  Supervisors will take action to prevent any harassment of minority and female employees; and

C.  Supervisors will encourage minority and female employees to avail themselves of training and other employment opportunities.

## Employees

Each employee is expected to conduct himself or herself in accordance with our EEO Policy.

 

## Selection and Hiring Procedures

A.   We will continue to review job requirements to ensure that the academic, experience and skill requirements are relevant and necessary to job functions and duties.

B.   All personnel involved in the recruiting, screening, selection, promotion, disciplinary and related processes are informed of our EEO policy.

## Employee Development and Training

A.   We extend opportunities for training to current employees who, with additional training, education or experience, may become qualified for advancement.  In addition, we will study the feasibility of sponsoring special employment programs such as cooperative programs with schools, work-study programs, and summer internships.

B.   . All personnel involved in the recruiting, screening, selection, promotion, disciplinary and related processes are informed of our EEO policy.

## Promotion and Transfer Practices

All personnel involved in the recruiting, screening, selection, promotion, disciplinary and related processes are informed of our EEO policy.

## Employee Counseling and Discipline

All personnel involved in the recruiting, screening, selection, promotion, disciplinary and related processes are informed of our EEO policy.



Section G - Page 3

05-16-10  P 1:03

EXHIBIT 5

United States Department of Labor   Office of Federal Contract Compliance Programs

Southeast Region
61 Forsyth Street SW
Atlanta, Georgia 30303

29 April 2011

Mr. Steve George
Executive Vice President and General Counsel
Corrections Corporation of America
10 Burton Hills Boulevard
Nashville, Tennessee 37215

Dear Mr. George:

We recently completed a compliance evaluation of your equal employment opportunity policies and practices at McRae Correctional Facility, 1000 Jim Eisenwood Drive, McRae, Georgia.

Subject to the implementation of commitments detailed in our Conciliation Agreement of this date, it is the determination of this office that there are no further apparent violations of the requirements of our regulations. This determination does not preclude a future finding of noncompliance based on a finding that the commitments are not sufficient to achieve compliance and may be modified by the Director, Office of Federal Contract Compliance Programs. However, if the Director takes no action as it within 45 days of my signature on the Agreement, it shall be deemed approved.

We sincerely appreciate the cooperation and courtesies extended by you and your staff during the conduct of the compliance review.

Sincerely,

[signature]

Evelyn Teague
Regional Director—Southeast

Enclosure: Conciliation Agreement

c: Steve Lindsey, Assistant General Counsel

*Working for America's Workforce*

2

---

Conciliation Agreement
Between the United States Department of Labor
Office of Federal Contract Compliance Programs
And
Corrections Corporation of America
10 Burton Hills Boulevard
Nashville, Tennessee 37215-6264

**PART I: General Provisions**

1. This Agreement is between the Office of Federal Contract Compliance Programs (hereinafter OFCCP) and Corrections Corporation of America.

2. The violations identified in this Agreement were found during a compliance evaluation of Corrections Corporation of America at its McRae Correctional Facility (hereinafter CCA/McRae) located at 1000 Jim Eisenwood Drive, McRae, Georgia 31055 which began on July 7, 2004, and they were identified in a Pre-Determination Notice dated November 24, 2010 and in a Notice of Violation issued December 21, 2010. OFCCP alleges that CCA/McRae has violated Executive Order 11246, as amended, and its implementing regulations at 41 CFR Chapter 60 due to the specific violations cited in Part II below.

3. This Agreement does not constitute an admission by CCA/McRae of any violation of Executive Order 11246, as amended, and its implementing regulations.

4. The provisions of this Agreement will become part of CCA/McRae's Affirmative Action Programs (AAPs). Subject to the performance by CCA/McRae of all promises and representations contained herein and in its AAPs, all named violations in regard to the compliance of CCA/McRae with all OFCCP programs will be deemed resolved. However, CCA/McRae is advised that the commitments contained in this Agreement do not preclude future determinations of noncompliance based on a finding that the commitments are not sufficient to achieve compliance.

5. CCA/McRae agrees that OFCCP may review compliance with this Agreement. As part of such review, OFCCP may require written reports, inspect the premises, interview witnesses, and examine and copy documents, as may be relevant to the matter under investigation and pursuant to CCA/McRae compliance. CCA/McRae shall permit access to its premises during normal business hours for these purposes.

6. Nothing herein is intended to relieve CCA/McRae from the obligation to comply with the requirements of Executive Order 11246, as amended, Section 503 of the Rehabilitation Act of 1973, as amended, the Vietnam Era Veterans' Readjustment Assistance Act of 1974, as amended (38 U.S.C. 4212) and their implementing regulations, or any other equal employment statute or executive order or its implementing regulations.

7. CCA/McRae agrees that there will be no retaliation of any kind against any beneficiary of this Agreement or against any person who has provided information to assistance, or who files a complaint or who participates in any manner in any proceeding under Executive Order 11246, as amended, Section 503 of the Rehabilitation Act of 1973, as amended, and the Vietnam Era Veterans' Readjustment Assistance Act of 1974, as amended (38 U.S.C. 4212).

3

Corrections Corporation of America—30M133425
Conciliation Agreement

8. This agreement will be deemed to have been accepted by the Government on the date of signature by the Regional Director for OFCCP, unless the Regional Director otherwise notifies within 45 days of the Regional Director's signature on this Agreement.

9. If, at any time in the future, OFCCP believes that CCA/McRae has violated any portion of this Agreement during the term of this Agreement, CCA/McRae will be promptly notified of that fact in writing. This notification will include a statement of the basis and documentation relied upon in forming such belief. In addition, the notification will provide CCA/McRae with 15 days from receipt of the notification to respond in writing, except where OFCCP alleges that such a delay would result in irreparable injury.

Enforcement proceedings for violation of this Agreement may be initiated at any time after the 15-day period has elapsed (or sooner, if irreparable injury is alleged) without issuing a Show Cause Notice.

Where OFCCP believes that CCA/McRae has violated this Conciliation Agreement, OFCCP may seek enforcement of this Agreement itself and shall not be required to present proof of the underlying violations resolved by this Agreement.

Liability for violation of this Agreement may subject CCA/McRae to sanctions as set forth in Section 209 of the Executive Order, and/or other appropriate relief.

PART II: Specific Provisions

1. VIOLATIONS: Personnel activity data provided by CCA/McRae for the period November 1, 2004 through October 31, 2005 revealed that, from a pool of 41 qualified minority applicants, CCA/McRae hired nine minorities (xx%) into Correctional Officer positions. During the same period, from a qualified applicant pool of 48 nonminority applicants, CCA/McRae hired 18 nonminorities (xx%) into Correctional Officer positions. This disproportionate hiring pattern is statistically significant at the level of 2.34 standard deviations, with a shortfall of four minorities.

Accordingly, OFCCP finds that CCA/McRae has discriminated against 34 qualified minority applicants (hereinafter Class Members) for Correctional Officer positions because of their race, in violation of 41 CFR 60-1.4(a)(1).

REMEDY: CCA/McRae will attempt to locate the 34 Class Members listed on Attachment A to this Agreement. Within 15 days of the signing of this Agreement by the Regional Director, OFCCP, CCA/McRae will contact the Class Members at Attachment A by "Certified Mail, Return Receipt Requested" for the purpose of, inter alia, using Attachment B, "Notice to Class Members," Attachment C "Employment Interest Verification Form," and Attachment D "Release of Class Members under the Executive Order." Class Members will have 14 days from the "postmarked" date of the "Notice to Class Members" form and "Release of Class Members under the Executive Order."

CCA/McRae will notify OFCCP, Atlanta District Office, in writing, of all of the Class Members it has located and all of the Class Members it has not located within 30 days after the signing of this Agreement by the Regional Director, OFCCP.

OFCCP will attempt to locate Class Members not located by CCA/McRae. Within 30 days of receiving the list of Class Members located and not located by CCA/McRae, OFCCP will

---

Corrections Corporation of America—30M133425
Conciliation Agreement

provide CCA/McRae with a list of addresses OFCCP has obtained for Class Members not located by CCA/McRae. CCA/McRae will have an additional 30 days from receiving the list of Class Members located by OFCCP to notify them of their status to Class Members and to determine their interest in employment using Attachments B, C, and D, as described above.

CCA/McRae will make various job offers to Class Members listed on Attachment A until four Class Members have accepted the offers for Correctional Officer positions or until the list is exhausted, whichever occurs first. CCA/McRae will make job offers to Class Members in the order that CCA/McRae timely receives the completed "Employment Interest Verification Form" and "Release of Class Members under the Executive Order" stating the Class Member's availability. CCA/McRae will hire Class Members who successfully complete CCA/McRae's post-offer selection and screening process. It is understood that successful completion of CCA/McRae's post-offer selection and screening process will require that the class member successfully complete a Bureau of Prisons (BOP) background investigation; and a general pre-employment drug screen and physical examination, and agreement to accept work available in open positions. The criteria CCA/McRae uses for selecting or rejecting any Class Member will be no more stringent than the criteria used during the review period November 1, 2004, through October 31, 2005; however, to the extent that BOP background investigation standards have changed since that time, Class Members must meet the current BOP background investigation standards.

CCA/McRae will hire Class Members as vacancies occur, but no later than 180 days after the Regional Director signs this Agreement. Once hired, each Class Member will begin no more than 14 days from the date of receiving a job offer or at the first date thereafter that a training class for new hires becomes available. New hired must agree to a start date no more than 14 days from the date of receiving a job offer if they choose and if a training class for new hires is scheduled to begin within that time frame. Any new hire who fails to report to work on the start date and/or time scheduled, without prior approval by CCA/McRae, will be treated as having declined the job offer. All hiring decisions, including offers made and documentation of reasons for rejection will be available for review by OFCCP.

CCA/McRae will hire Class Members at CCA/McRae's current starting rate of pay for Correctional Officer positions. CCA/McRae will provide each Class Member hired with a company service date, as of the date of this Agreement, for the purpose of layoff and benefit based on the company service date, subject to the standard eligibility requirement for other hires.

CCA/McRae will place into an interest-bearing account the gross amount of $14,345.26 in back pay, plus $14,345.00 into an interest-bearing account in the prevailing amount as the net 46th day after the acceptance of this Agreement by the Regional Director. CCA/McRae will notify OFCCP within five days of the inception of this account that this account is complete. The specification will be in writing, and identify to OFCCP the period when the interest was earned and specify the current balance of the account. The financial settlement of $28,744.00 plus interest from the interest-bearing account will be divided equally among all Class Members who accept and return the "Employment Interest Verification Form" and "Release of Class Members under the Executive Order." It will be paid to each of the Class Members in the form of a lump sum, less appropriate legal deduction. Disbursement of payment will be contingent upon acceptance by a Class Member of CCA/McRae's job offer.

CCA/McRae will distribute the monetary settlement to the Class Members no sooner than 45 days and no later than 210 days after the acceptance of this Agreement by OFCCP, acting as the prevailing Director. OFCCP agrees that the settlement of all efforts to locate Class Members have been exhausted by the parties in accordance with this Agreement. CCA/McRae will complete the process of monetary disbursement, and will

Correctional Corporation of America—000153425
Conciliation Agreement

provide OFCCP with evidence of the hours, dates of pay slips showing legal deductions and copies of cancelled checks; as disclosed in Part I of this Agreement.

CCA/McRae will not retaliate against Class Members ... based on or in relation to the terms or provisions of this Agreement.

Within 90 days of the Regional Director's signature on this Agreement, CCA/McRae will provide training on its equal employment opportunity program for all persons involved in the selection process. Thereafter, CCA/McRae will update this training annually.

CCA/McRae changed its selection procedures for all applicants for Correctional Officer positions to ensure that this Violation has ceased. In addition, CCA/McRae will review at least annually and revise, as needed, its selection procedures to ensure that this Violation does not recur.

2.   VIOLATION: CCA/McRae failed to consider the individual components of its selection process for all positions, including Correctional Officer positions, when its total selection process for the position had an adverse impact on women.

REMEDY: Where the selection process for a position has an adverse impact on a race, gender or ethnic group identified in 41 CFR 60-3.4D, CCA/McRae will examine the individual components of the selection process for that job, as required by 41 CFR 60-3.4C and, where applicable, take corrective action. In addition, CCA/McRae will review, determine and have available the information on these individual components in the selection process for at least two years after the adverse impact has been eliminated.

FUTURE CONDUCT: CCA/McRae will not repeat the above violation.

PART III: Reporting

CCA/McRae will submit four reports to, as noted below, to Nydia Rio-Dominguez, District Director—Atlanta, United States Department of Labor, Office of Federal Contract Compliance Programs, Atlanta District Office, Sam Nunn Federal Building, 61 Forsyth Street, SW, Room 7M45, Atlanta, Georgia 30303, Attention: "?".

All reporting dates and deadlines in this Agreement may be modified or extended by mutual consent.

The first report will be due 180 days after the date on which the Regional Director, OFCCP signs this Agreement. The first report shall contain the following:

1.   Written application that CCA/McRae opened the interest-bearing account for the financial settlement, with the date of deposition and, the telephone number of the contact person who can provide OFCCP with the current balance of the account;

2.   Documentation of attempts to contact all Class Members in Attachment A and the current disposition of each Class Member where CCA/McRae attempted to contact said

3.   Copies of all Attachments C and D signed and returned by Class Members, as well as copies of envelopes returned as undeliverable.

Page 4 of 6

Correctional Corporation of America—000153425
Conciliation Agreement

The second report shall be due 240 days after the date on which the Regional Director, OFCCP signs this Agreement. The second report shall contain the following information:

1.   Documentation of attempts to contact those Class Members in Attachment A was initially located and/or for whom OFCCP provided CCA/McRae with addresses, including the current disposition of each Class Member contacted, all attachments C and D signed and returned by Class Members, as well copies of envelopes returned as undeliverable;

2.   Documentation of all job offers and efforts made to hire those Class Members into Correctional Officer positions. This documentation shall include a list of all Class Members who responded to interest in employment. CCA/McRae shall provide documentation respecting the time that Class Members are hired, numbers who expressed an interest in employment;

3.   Documentation of monies disbursed to each located Class Member who received said returned Attachments C and D, including copies of the canceled checks and pay slips showing gross amount of back pay and legal disbursement;

4.   Documentation of the total amount of interest accrued from tax interest-bearing account.

5.   Documentation that CCA/McRae provided training on its equal employment opportunity programs for all persons involved in CCA/McRae's applications and selection procedures; and

6.   Documentation that CCA/McRae reviewed and corrected its selection procedures, to ensure that Violation 1 will not recur, including descriptions of any modifications made, if needed, to ensure that Violation 1 will not recur.

The third and fourth reports shall cover each successive 12-month period after the Regional Director, OFCCP signs this Agreement, and shall be mailed 60 days after the above of each 12-month period. The third and fourth reports shall each contain the following information:

1.   For each job on-the-job group during the reporting period in the total number of applicants and hires broken down by applicable gender, race and ethnic group identified in 41 CFR 60-3.4(b), to the results of CCA/McRae's analyses as to whether its total selection process has an adverse impact, as defined in 41 CFR 60-3.00, on these selection processes set forth in 41 CFR 60-3.4B; (b) the qualifications that CCA/McRae used if any, and the steps in which CCA/McRae used the qualifications as a screening factor;

2.   For each case where the total selection process has an adverse impact, as defined in 41 CFR 60-3.4D; (c) the results of CCA/McRae's evaluation of the individual components of the selection process by the individual components that any component of the selection process has an adverse impact on the continued process after determining that any component of the selection process has an adverse impact, after determining that any component of applicable gender, race and ethnic group set forth in 41 CFR 60-3.4B;

3.   Copy of applicants flow-log for Correctional Officer positions covering the 12-month period indicated above. The report will include, at a minimum, the following variables: applicant name, race, gender, job applied for (date of application), date of hire, job-hired date of hire and the reason advised, where appropriate.

Page 5 of 6

Attachment B

Correctional Corporation of America
Conciliation Agreement

## NOTICE TO CLASS MEMBERS
[Date]

Correctional Corporation of America, as its Volunteer Correctional Facility, (hereinafter CCA-McRae) and the United States Department of Labor's Office of Federal Contract Compliance Programs (OFCCP) have entered into a Conciliation Agreement to resolve alleged findings of discrimination in hiring for Correctional Officer positions at CCA-McRae Correctional Facility located at 1000 Dan Glass Road, Drive in McRae, Georgia for each a position during the time period ...

As a part of this Agreement, you are eligible for a distribution of no less than $1699.51, subject to all lawful payroll deductions. Under the terms of this Agreement, you may receive the entire proceeds of ...

Correctional Corporation of America
Shirley Hairbrooks, Managing Director, Compliance
Nashville, Tennessee

In addition to the monetary distribution, CCA-McRae will make job offers for Correctional Officer positions to those Class Members who are receiving this Notice ...

If you fail to respond to and will not be considered for employment under this Agreement. You are eligible for a monetary distribution even if you are not currently interested in employment with CCA-McRae.

By entering into this Agreement, CCA-McRae has not admitted nor has there been any adjudicated finding that CCA-McRae violated any laws when it did not employ you as a Correctional Officer.

If you have any questions, you may telephone us at 615-263-3011. If you do not reach us immediately, your call will be returned as soon as possible.

Sincerely,

Shirley Hairbrooks
Managing Director, Compliance

Enclosures:   Employment Interest Verification Form
             Roster of Claims under the Executive Order

---

Correctional Corporation of America
Conciliation Agreement

TERMINATION DATE: This Agreement will expire 90 days after OFCCP receives the fourth and final report required in Part E. ...

PARTY BY: Signature:

The persons signing this Conciliation Agreement on behalf of Correctional Corporation of America has read ...

DATE: 4-27-11
Steve Groom
Senior Vice President and General Counsel
Executive Offices, Correctional Corporation of America
10 Burton Hills Boulevard
Nashville, Tennessee 37215

DATE: 4/27/11
Cornell Hawkins-Brown
Assistant District Director
Office of Federal Contract Compliance Programs

DATE: 29 April 2011
Evelyn Teague
Regional District Director, Southeast
Office of Federal Contract Compliance Programs

DATE: 4/27/11
_____

Page 6 of 6

10

Corrections Corporation of A...   tica                                    Attachment C
Conciliation Agreement

## EMPLOYMENT INTEREST VERIFICATION FORM
[Date]

You must complete this form and the "Release of Claims under the Executive Order" in order to be eligible for the monetary distribution and/or employment opportunities under the terms of the Conciliation Agreement between Corrections Corporation of America/McBee Correctional Facility (hereinafter CCA/McBee) and the United States Department of Labor's Office of Federal Contract Compliance Programs.

Please print legibly and sign your name where indicated.

Name: _____

☐ I confirm that the address on the cover letter is correct.

☐ The address on the cover letter is not correct. My correct address is:

Address: _____

Telephone Number: _____

Notify CCA/McBee at the address below if your address changes within the next 12 months.

Your Social Security Number is required for pay purposes.

Please check whether you are currently interested in being considered for a Corrections Officer position with CCA/McBee. If you are interested and return this "Employment Interest Verification Form" and the "Release of Claims under the Executive Order," you will be eligible for the monetary distribution, whether or not you are interested in employment at this time.

☐ Yes, I am interested in employment with CCA/McBee.

☐ No, I am not currently interested in employment with CCA/McBee.

You must complete all sections of this form or it will be disregarded and you will not be eligible to participate in the settlement between CCA/McBee and OFCCP. Mail this completed form and the "Release of Claims under the Executive Order" in the enclosed envelope within 25 days of the date shown on the top of this form to the following address:

Corrections Corporation of America
10 Burton Hills Boulevard
Nashville, Tennessee 37215-6264
Attention: Stanley Hardeman, Managing Director, Compliance

"I certify that the above is true and correct."

_____                    _____
Signature                                           Date

11

---

Corrections Corporation of Amer...   a                                    Attachment D
Conciliation Agreement

## RELEASE OF CLAIMS UNDER THE EXECUTIVE ORDER

In consideration of the payment to me of at least $1659.51 (minus deductions required by law) by Corrections Corporation of America/McBee Correctional Facility (hereinafter CCA/McBee), which I agree is acceptable, and also in consideration of the Conciliation Agreement between CCA/McBee and the Office of Federal Contract Compliance Programs (hereinafter OFCCP), I agree to the following:

I.

I understand that the amount of $1659.51 as set forth above in the settlement gross amount of any portion of the monetary settlement between OFCCP and CCA/McBee, and that the actual payment to me will be reduced, in part, to account for legally required payroll deductions such as income tax withholding and Social Security contributions. I understand that this payment will be reported on an Internal Revenue Service Form W-2 and a Form 1099 at the end of the calendar year in which the payment is made. Monies reported on the Form 1099 will not be reduced for taxes or other payroll deductions and I understand that I may owe income taxes on the amounts reported to me on the Form 1099.

II.

In exchange for the monetary amount set forth above, I hereby waive, release and forever discharge CCA/McBee, its predecessors, related entities, subsidiaries, and organizations, and its and their directors, officers, employees, agents, successors, and assigns, of and from any and all actions, causes of action, damages, liabilities, and claims arising out of Executive Order 11246, as amended, which I or my representatives (heirs, executors, administrators, or surplus) have or may have which relate in any way to being hired into a Correctional Officer position at CCA/McBee at any time prior to the effective date of this Release.

III.

I understand that CCA/McBee denies that it treated me unlawfully or unfairly in any way and that CCA/McBee entered into the above-referenced Conciliation Agreement with OFCCP in the spirit of conciliation and to bring closure to the compliance evaluation initiated by OFCCP on July 3, 2006. I further agree that the payment to me of the aforesaid sum by CCA/McBee is not to be construed as an admission of any liability by CCA/McBee.

IV.

I declare that I have read this Release and that I have had a full opportunity to consider and understand its terms and to consult with my advisors. I further declare that I have decided of my own free will to sign this Release.

V.

I understand that if I do not sign this Release and the Employment Interest Verification Form and return them to CCA/McBee at the address shown above by mail or other delivery method within 25 days from the date at the top of the Employment Interest Verification Form, I will not be entitled to receive any of the financial or other relief provided in the Conciliation Agreement.

IN WITNESS WHEREOF, I have set my hand to this ____ day of _____

Corrections Corporation of America
10 Burton Hills Boulevard
Nashville, Tennessee 37215-6264
Attention: Stanley Hardeman, Managing Director, Compliance

_____
Signature

____  _____  _____
Day    Month          Year

12

EXHIBIT 6

     415-2010-00201

## EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
### INTAKE QUESTIONNAIRE

Please immediately complete the entire form and return it to the U.S. Equal Employment Opportunity Commission ("EEOC"). REMEMBER, a charge of employment discrimination must be filed within the time limits imposed by law, generally within 180 days or in some places 300 days of the alleged discrimination. Upon receipt, this form will be reviewed to determine EEOC coverage. Answer all questions as completely as possible, and attach additional pages if needed to complete your response(s). If you do not know the answer to a question, answer by stating "not known." If a question is not applicable, write "n/a." Please Print.

**1.   Personal Information**

Last Name: Jackson          First Name: Vernelsa          MI: M

Street or Mailing Address: 1 West Graham Street          Apt Or Unit #:

City: McRae          County: Telfair          State: Georgia          ZIP: 31055

Phone Numbers: Home: ( 229 ) 315-0180          Work: ( 229 ) 868-7778

Cell: ( 229 ) 315-0180          Email Address: syriusbyzness7@yahoo.com

Date of Birth: 10-16-1970     Sex: Male ☐  Female ☒     Do You Have a Disability?  ☐ Yes  ☒ No

Please answer each of the next three questions.     i.  Are you Hispanic or Latino?     ☐ Yes  ☒ No

ii.  What Is your Race? Please choose all that apply.   ☐ American Indian or Alaska Native   ☐ Asian   ☐ White

☒ Black or African American     ☐ Native Hawaiian or Other Pacific Islander

iii. What is your National Origin (country of origin or ancestry)? United States

Please Provide The Name Of A Person We Can Contact If We Are Unable To Reach You:

Name: Gloria or Howard McRae          Relationship: Parents

Address: 903 W. Hope Church RD          City: Alamo          State: GA   Zip Code:   31055

Home Phone: ( 912 ) 568-7678     Other Phone: ( 478 ) 984-6144

**2.  I believe that I was discriminated against by the following organization(s):**  (Check those that apply)

☒  Employer   ☐  Union   ☐  Employment Agency   ☐  Other (Please Specify)

**Organization Contact Information** (If the organization is an employer, provide the address where you actually worked.  If you work from home, check here ☐ and provide the address of the office to which you reported.) If more than one employer is involved, attach additional sheets.

Organization Name: McRae Correctional Facility / Corrections Corporation of America

Address: 112 Jim Hammock Drive          County: Telfair

City: McRae          State: GA   Zip: 31055          Phone: ( 229 ) 868-7778

Type of Business: Govt Contract/Prison     Job Location if different from Org. Address:

Human Resources Director or Owner Name: Shannon Pooler          Phone: 229-868-7778

Number of Employees in the Organization at All Locations: Please Check (√) One

☐ Fewer Than 15   ☐ 15 - 100   ☐ 101 - 200   ☐ 201 - 500   ☒ More than 500

**3.  Your Employment Data** (Complete as many items as you can)   Are you a Federal Employee?  ☐ Yes  ☒ No

Date Hired: 08/2003          Job Title At Hire: Librarian

Pay Rate When Hired:  $33,000 annually          Last or Current Pay Rate: $35,000 annually

Job Title at Time of Alleged Discrimination: Library Aide          Date Quit/Discharged: N/A

Name and Title of Immediate Supervisor: Mrs. Betty McLendon, Principal

RECEIVED
JAN 0 4 2010
EEOC-SLO

2

**If Job Applicant, Date You Applied for Job** _____ **Job Title Applied For** _____

**4. What is the reason (basis) for your claim of employment discrimination?**

_FOR EXAMPLE, if you feel that you were treated worse than someone else because of race, you should check the box next to Race. If you feel you were treated worse for several reasons, such as your sex, religion and national origin, you should check all that apply. If you complained about discrimination, participated in someone else's complaint, or filed a charge of discrimination, and a negative action was threatened or taken, you should check the box next to Retaliation._

☒ Race  ☒ Sex  ☐ Age  ☐ Disability  ☐ National Origin  ☐ Religion  ☒ Retaliation  ☐ Pregnancy  ☐ Color (typically a difference in skin shade within the same race)  ☐ Genetic Information; choose which type(s) of genetic information is involved:

☐ i. genetic testing  ☐ ii. family medical history  ☐ iii. genetic services (genetic services means counseling, education or testing)

If you checked color, religion or national origin, please specify: _____

If you checked genetic information, how did the employer obtain the genetic information? _____

_____

Other reason (basis) for discrimination (Explain)  <u>This is a conspiracy to keep additional funds in the budget at my expense.</u>

**5. What happened to you that you believe was discriminatory?** <u>Include the date(s) of harm, the action(s), and the name(s) and title(s) of the person(s) who you believe discriminated against you.</u> Please attach additional pages if needed. _(Example: 10/02/06 - Discharged by Mr. John Soto, Production Supervisor)_

A) Date: 08/09 or 09/09        Action: Was told by the Warden during his roundtable meeting that I would not be getting any help in the library. However, my position would be changed to Librarian if BOP approved

Name and Title of Person(s) Responsible: Walt Wells, Warden

B) Date: 11/09        Action: Informed by the Assistant Warden that the position that I was requested had been closed. Leaving me with the full burden of managing library at the lowest wage.

Name and Title of Person(s) Responsible: Victor Orsolits, Assistant Warden

**6. Why do you believe these actions were discriminatory?** Please attach additional pages if needed.
Please see attachment - Q.6

**7. What reason(s) were given to you for the acts you consider discriminatory?  By whom?  His or Her Job Title?**
I was told that a waiver was being sought in order to promote me to librarian. I have been waiting for over a year and a half. I was made aware in November 2009 by Assistant Warden Orsolits that the position had been closed. Orsolits is aware that I have been working to fulfill the duties of two positions and is also aware of the stress and health problems that I have reported to him that this workload is causing. To date, I have not been relieved of any of the duties and been threatened to have more added. (See attached)

**8. Describe who was in the same or similar situation as you and how they were treated.** For example, who else applied for the same job you did, who else had the same attendance record, or who else had the same performance? Provide the race, sex, age, national origin, religion, or disability of these individuals, if known, and if it relates to your claim of discrimination. For example, if your complaint alleges race discrimination, provide the race of each person; if it alleges sex discrimination, provide the sex of each person; and so on. Use additional sheets if needed.

Of the persons in the same or similar situation as you, who was treated _better_ than you?

| A. <u>Full Name</u> | <u>Race, sex, age, national origin, religion or disability</u> | <u>Job Title</u> |
|---|---|---|
| Darryl Wooten | White Male | Records Manager |
| <u>Description of Treatment</u>  Was granted a waiver, in order to, allow him to assume the position as Records Manager until he acquired the skills necessary to become approved by the federal Bureau of Prisons for the position. | | |

| B. <u>Full Name</u> | <u>Race, sex, age, national origin, religion or disability</u> | <u>Job Title</u> |
|---|---|---|
| James Hill | Black, Male | Safety Manager |
| <u>Description of Treatment</u>  Can attest to the retaliation, racialism, disparity in promotions and treatment of minorities | | |

Of the persons in the same or similar situation as you, who was treated *worse* than you?   3

| A, Full Name | Race, sex, age, national origin, religion or disability | Job Title |
|---|---|---|
| Leon Newson | Black, Male, approx. 27 | Sergeant (Formally a Lieutenant) |

Description of Treatment  Demoted. Not black employees in same or similarly situated positions have received no disciplinary action for worse actions.

| B. Full Name | Race, sex, age, national origin, religion or disability | Job Title |
|---|---|---|
| Larry Jackson | Black, Male, approx. 37 | Sergeant |

Description of Treatment  Terminated. Non-black employees have been charged with Code of Conduct violations and have received no disciplinary action for worse allegations. Did not receive fair investigation.

Of the persons in the same or similar situation as you, who was treated the *same* as you?

| A. Full Name | Race, sex, age, national origin, religion or disability | Job Title |
|---|---|---|
| Tamara Jordan | Black , Female, approx. 32 | Unit Manager |

Description of Treatment  Racialism, Violation of Affirmative Action, more skilled and qualified than non-blacks in positions of higher authority. By reasonable and/or without bias standards, she should be Warden.

| B. Full Name | Race, sex, age, national origin, religion or disability | Job Title |
|---|---|---|
| Erica Moye | Black , Female, approx. 34 | Correctional Counselor - Case Manager |

Description of Treatment  Harassment, Violation of ADA, Violation of Affirmative Action, Violation of Title VII of Civil Rights Act

Answer questions 9-12 **only** if you are claiming discrimination based on disability. If not, skip to question 13. Please tell us if you have more than one disability. Please add additional pages if needed.

9.  Please check all that apply:

☐  Yes, I have a disability

☐  I do not have a disability now but I did have one

☐  No disability but the organization treats me as if I am disabled

10.  What is the disability that you believe is the reason for the adverse action taken against you?  Does this disability prevent or limit you from doing anything?  (e.g., lifting, sleeping, breathing, walking, caring for yourself, working, etc.).

11.  Do you use medications, medical equipment or anything else to lessen or eliminate the symptoms of your disability?

Yes ☐    No ☐

If "Yes," what medication, medical equipment or other assistance do you use?

12.  Did you ask your employer for any changes or assistance to do your job because of your disability?

Yes ☐    No ☐

If "YES", when did you ask? _____  How did you ask (verbally or in writing)? _____

Who did you ask?  (Provide full name and job title of person)

Describe the changes or assistance that you asked for:

How did your employer respond to your request?

4

13. Are there any witnesses to the alleged discriminatory incidents? If yes, please identify them below and tell us what they will say. (Please attach additional pages if needed to complete your response)

| A. Full Name | Job Title | Address & Phone Number |
|---|---|---|
| Betty McLendon | Principal | 112 Jim Hammock Drive, McRae, GA 31055<br>229-868-7778 |

What do you believe this person will tell us?
She has requested on numerous occasions that I receive a promotion to Librarian. She has supervised previous Librarian and is aware that he could not meet the deadlines of the workload of his position. This is relevant because administration was aware of this also.

| B. Full Name | Job Title | Address & Phone Number |
|---|---|---|
| Shannon Pooler | Human Resource Manager | 112 Jim Hammock Drive, McRae, GA 31055<br>229-868-7778 |

What do you believe this person will tell us?
That she has told me that she, along with the Warden and Mrs. Aycock, have been actively trying to get a waiver to reinstate me as Librarian. I do not know how long she has known that the position has been closed.

14. Have you filed a charge previously in this matter with EEOC or another agency?   Yes ☐   No ☒

15. If you have filed a complaint with another agency, provide name of agency and date of filing:

16. Have you sought help about this situation from a union, an attorney, or any other source?   Yes ☐   No ☒
Provide name of organization, name of person you spoke with and date of contact. Results, if any?

Please check one of the boxes below to tell us what you would like us to do with the information you are providing on this questionnaire. If you would like to file a charge of job discrimination, you must do so either within 180 days from the day you knew about the discrimination, or within 300 days from the day you knew about the discrimination if the employer is located in a place where a state or local government agency enforces laws similar to the EEOC's laws. If you do not file a charge of discrimination within the time limits, you will lose your rights. If you would like more information before filing a charge or you have concerns about EEOC's notifying the employer, union, or employment agency about your charge, you may wish to check Box 1. If you want to file a charge, you should check Box 2.

Box 1  ☐ I want to talk to an EEOC employee before deciding whether to file a charge. I understand that by checking this box, I have not filed a charge with the EEOC. I also understand that I could lose my rights if I do not file a charge in time.

Box 2  ☒ I want to file a charge of discrimination, and I authorize the EEOC to look into the discrimination I described above. I understand that **the EEOC must give the employer, union, or employment agency that I accuse of discrimination information about the charge, including my name.** I also understand that the EEOC can only accept charges of job discrimination based on race, color, religion, sex, national origin, disability, age, genetic information, or retaliation for opposing discrimination.

_____          12/21/2009
Signature                                 Today's Date

PRIVACY ACT STATEMENT: This form is covered by the Privacy Act of 1974: Public Law 93-579. Authority for requesting personal data and the uses thereof are:
1.  FORM NUMBER/TITLE/DATE. EEOC Intake Questionnaire (9/20/08).
2.  AUTHORITY. 42 U.S.C. § 2000e-5(b), 29 U.S.C. § 211, 29 U.S.C. § 626, 42 U.S.C. 12117(a), 42 USC §2000ff-6.
3.  PRINCIPAL PURPOSE. The purpose of this questionnaire is to solicit information about claims of employment discrimination, determine whether the EEOC has jurisdiction over those claims, and provide charge filing counseling, as appropriate. Consistent with 29 CFR 1601.12(b) and 29 CFR 1626.8(c), this questionnaire may serve as a charge if it meets the elements of a charge.
4.  ROUTINE USES. EEOC may disclose information from this form to other state, local and federal agencies as appropriate or necessary to carry out the Commission's functions, or if EEOC becomes aware of a civil or criminal law violation. EEOC may also disclose information to respondents in litigation, to congressional offices in response to inquiries from parties to the charge, to disciplinary committees investigating complaints against attorneys representing the parties to the charge, or to federal agencies inquiring about hiring or security clearance matters.
5.  WHETHER DISCLOSURE IS MANDATORY OR VOLUNTARY AND EFFECT ON INDIVIDUAL FOR NOT PROVIDING INFORMATION. Providing of this information is voluntary but the failure to do so may hamper the Commission's investigation of a charge. It is not mandatory that this form be used to provide the requested information.



EEOC Intake Questionnaire
Attachment:  Question 6, Continued
Verneisa McRae Jackson                                    12/30/2009

**What happened to you that you believe was discriminatory? Include the dates of
harm, the actions, and the names and titles of the persons who you believe
discriminated against you.**

A.  For over three years, I have reasoned that McRae Correctional Facility (MCF)
    management staff has mistaken the **Corrections Corporation of America** (CCA)
    acronym to stand for "Coloreds Can't Advance". MCF has a corporate culture that
    breeds, supports, and protects a long-standing pattern of illegal discriminatory
    behavior. This pattern is shown in their promotion procedures, placement of non-
    minorities in positions to take advantage of opportunities for training to advance up
    the career ladder, selection of "Favored for promotion" employees to assume the
    duties of executive staff in their absence, and in that minorities are "subjected to
    differential treatment" in demotion, investigation, and firing procedures. I, as well
    as other employees, am aware of these conditions and have witnessed MCF
    management staff violate its own policies in these regards, however, had chosen to
    work harder to prove myself worthy for these promotions in an effort to avoid
    retaliation or further unjust treatment by filing a claim sooner. **If MCF abided by the
    regulations stipulated in their federal contract for affirmative action programming to
    avoid Title VII violations, there would be as many career-ladder opportunities with
    similar salary ranges for qualified minorities as there are for the white male
    employees.**

B.  Throughout the years I have been with MCF, I have been passed over for
    promotional opportunities due to aforementioned violations of Title VII of the Civil
    Rights Act. I have applied for several positions at MCF. I was once told by Shirley
    Ellis, previous Human Resource Manager, when I inquired about not being selected
    for the position of Personnel Investigator after hearing that the job was awarded to a
    candidate that I felt was less qualified, that "I was not chosen because the selection
    committee felt that I was over qualified and that with my educational background, I
    would be better suited for Program Manager." I was also told that their decision was
    also based on the Personnel Investigator position's salary being considerably less
    than my current pay. I had no way of verifying the accuracy of that claim. Since
    then the excuses continue along with the promotional discrimination, which is
    usually masked as a "buddy system" promotional practice. After reviews of my file
    December 17-22, 2009, I also noted that a few of the positions that I applied for in
    the past were not noted in my file.

C.  There are dozens of employees at MCF who would testify to and that have
    complained about discriminatory treatment to no avail. One of the most apparent

1

injustices can be seen in MCF choices for Unit Managers. Most Unit Managers delegate many of their duties to their Case Managers and or Secretaries due to their lack of training, ability or willingness to interpret policies, and or essential clerical skills but have found favor with executive staff. Most are less qualified than the protected class employees that they supervise. The protected class members that have been promoted are those who "look away" and or don't complain about the injustices that they witness.

D. I was hired at MCF, in 2003, as Librarian. I was granted a waiver in regards to the requirement of ALA certification due to having a Masters degree in management and over four years of supervisory experience in a public library. I was responsible, in 2003, for implementing the procedures for use of the law and leisure library at MCF. Over the course of six years, three ALA certified contract librarians have served as oversight in order for MCF to meet the Bureau of Prisons requirements and have not changed any of the procedures that I implemented. Under my management, I have not received any complaints from Quality Assurance in regards to ACA or QCP standards.

MCF will attempt to use the ALA certification requirement as justification for not promoting me, however, this is not justifiable for the following reasons:

1) I am currently performing the requirements of the position for the past seventeen months with performance evaluations signed by my supervisor, the Assistant Warden, and Warden stating that I "Exceed Requirements".
2) Other non-protected employees have been granted waivers and promoted.
3) My current job title, Library Aide is in violation of the Service Contract Act because I receive the salary of Library Technician and because I am also required to fulfill the duties of the Librarian. (Copies of the these job descriptions will be made available upon your request.)
4) After investigation, you will find that CCA has changed its policy in order to use the ALA certification of a Contract Librarian only to meet the Bureau of Prisons requirement at my experience. I am still left with completing the task of both positions as the Contract Librarian only works four hours per quarter and has no experience working in prison library.

I, Verneisa McRae Jackson, am filing this complaint with EEOC on December 29, 2009. I was made aware that MCF and CCA were not planning on filling the position of Librarian in October 2009. I am charging that MCF and CCA (Facility Support Center) with the following: (Count A); Systemic Discrimination and failure to promote based on race, **black** (Count B) sex discrimination, **female** (Count C); willful and deliberate negligence, by violating the Prevailing Wage Determination of the Service Contract Act, (Count D); Unfair Labor Practices by requiring that I fulfill the duties of both Librarian and Library Aide without additional compensation while awaiting the promotion for over seventeen (17) months (Count E); retaliation for opposing unlawful race and sex discrimination, unfair

2

labor practices, and violations of the Service Contract Act, and  (Count E); Undue Stress and Financial Hardship caused by the aforementioned discrimination and violations.

Thank you for your attention to this matter. If you should need additional information or documentation, please do not hesitate to contact me. I look forward to relief via a favorable response.

3

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | [ ] FEPA<br>[X] EEOC | 415-2010-00281 |
| | | and EEOC |

State or local Agency, if any

| Name (indicate Mr., Ms., Mrs.) | Home Phone (Incl. Area Code) | Date of Birth |
|---|---|---|
| Vernisa Jackson | (229) 315-0180 | 10-16-1970 |

Street Address — City, State and ZIP Code

1 West Graham Street, Mc Rae, GA 31055

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (If more than two, list under PARTICULARS below.)

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| MCRAE CORRECTIONAL FACILITY | 500 or More | (229) 868-7778 |

Street Address — City, State and ZIP Code

1000 Jim Hammock Drive, McRae, GA 31055

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| | | |

Street Address — City, State and ZIP Code

DISCRIMINATION BASED ON (Check appropriate box(es).)

[X] RACE  [ ] COLOR  [X] SEX  [ ] RELIGION  [ ] NATIONAL ORIGIN
[X] RETALIATION  [ ] AGE  [ ] DISABILITY  [ ] GENETIC INFORMATION
[ ] OTHER (Specify)

DATE(S) DISCRIMINATION TOOK PLACE
Earliest 08-01-2009   Latest 11-01-2009

[X] CONTINUING ACTION

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

I.  I began my employment with the above referenced employer in August 2003, as a *Library Aide*. Librarian. During my employment, I have complained about race discrimination and sex discrimination, when it comes to promotions and wages. I have constantly been passed over for promotions in which I am more than qualified. I have even been passed over for jobs because I was told that I was "over qualified." The last position I applied for, which was that of a Librarian, I waited for over 17 months before being told that the position would not be filled. This was in October 2009. I am currently doing the work of the Librarian and Library Aide.

II. No reasons have been given to me for the above discriminatory actions.

III. I believe I have been discriminated against because of my race, African American, sex, female, and in retaliation for opposing unlawful employment practices, in violation of Title VII of the Civil Rights Act of 1964, as amended.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT |
| _1/27/2010_  _Vernisa McRae Jackson_<br>Date   Charging Party Signature | _Vernisa McRae Jackson_<br>SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE  1/27/2010<br>(month, day, year) |

My Commission expires 1-10-2014
Notary Dodge Co. Georgia

CCA 00767



**CORRECTIONS CORPORATION OF AMERICA**

April 20, 2010

<u>VIA FEDERAL EXPRESS</u>

Ms. Taneeshia L. Marshall, Investigator
United States Equal Employment Opportunity Commission
Savannah Local Office
410 Mall Blvd., Suite G
Savannah, GA 31406

RE:   Vernisa[1] Jackson
      EEOC Charge No.: 415-2010-00261

Dear Ms. Marshall:

Please accept this letter as the statement of position[2] of CCA-McRae Correctional Facility[3] ("Respondent" or "the Facility"), a division of CCA of Tennessee, LLC,[4] hereafter "CCA" or "Respondent", with respect to the referenced charge of discrimination.

Verneisa Jackson ("Ms. Jackson" or "Charging Party") contends that the Facility discriminated against her based on her race, African American, and sex, female, in violation of Title VII of the Civil Rights Act of 1964, and subjected her to illegal retaliation. As set forth below, Ms. Jackson was not subjected to either illegal discrimination or retaliation. Hence, her Charge should be dismissed with a finding of no cause.

---

[1] Employment records indicate the correct spelling should be "Verneisa" rather than "Vernisa." (Attachments B and D)
[2] This position statement is based upon the undersigned's understanding and investigation of the facts as of the date of this letter. Respondent submits this letter for the sole purpose of responding to the government's request for information and to facilitate the Commission's statutory duty to attempt to conciliate and settle disputed matters. By submitting this position statement, CCA in no way waives its right to present new, different, or additional facts, arguments, or objections based upon subsequently acquired information or evidence for substance or clarification. Thus, this position statement, while believed to be true and accurate in all respects, does not constitute an affidavit and is not intended to be used as evidence of any kind in any administrative or court proceeding in connection with the above-referenced Charge. By its response, Respondent does not concede that the Charge is proper, timely, specific, or that charging party has legal standing. Moreover, Respondent does not waive and hereby expressly preserves any and all substantive and procedural defenses that may exist to the Charge.
[3] Physical address is 112 Jim Hammock Drive, McRae, Georgia.
[4] CCA of Tennessee, LLC is a Tennessee corporation with its headquarters in Nashville, Tennessee.

VERNISA JACKSON
EEOC CHARGE NO.: 415-2010-00261

## Introduction

CCA provides corrections services to federal, state, and local government agencies. All CCA facilities meet CCA's standards of performance as well as standards set by our customers. In addition to meeting internal and customer-imposed standards of performance, CCA also is committed to achieving accreditation by the American Correctional Association[6] ("ACA"). Currently, 85% of all CCA facilities, including this facility, are ACA accredited; an achievement which far surpasses the accreditation rate of other private corrections providers and most public-sector providers.

The McRae Correctional Facility is a multi-custody correctional facility which houses approximately 1,524 multi-custody male inmates in McRae, Georgia, for the Federal Bureau of Prisons ("BOP"). The Facility employs approximately 366[6] employees. The Facility is staffed twenty-four hours a day, seven days a week.

It is the policy of CCA to afford equal opportunity for employment to all individuals regardless of race, color, religion, creed, sex, age, national origin, disability or veteran status. (Attachment A) CCA's equal employment opportunity policy applies to all employment decisions, including but not limited to, recruiting, hiring, firing, wages, terms, conditions, training, transfers, promotions and benefits.

## Statement of Facts

I.  Employment History, Duties and Training

Ms. Jackson was hired on August 25, 2003 as the Librarian. (Attachment B) However, on May 1, 2005, it was discovered[7] that Ms. Jackson actually did not meet the minimum qualifications for the position because she did not have a library science[8] degree. Thus, Ms Jackson was transferred to an open Case Manager position at the same rate of pay she received as the Librarian.[9] (Attachments B) On March 4, 2008, Ms. Jackson applied for the Library Aide position for which she was qualified.[10] (Attachment E) Ms.

---

[6] The American Correctional Association (ACA) is a private, nonprofit organization that administers the only national accreditation program for all components of adult and juvenile corrections, which by contract, the Facility must maintain.

[6] As of February 22, 2010, the Facility employs a total to 319 employees composed of 169 females (one Asian, 65 African-Americans, four Hispanic, and 98 Caucasians) and 150 males (one Asian, 23 African-Americans, 11 Hispanic, and 115 Caucasians).

[7] On November 22, 2004, Ms. Jackson's wrote a memo to then Warden Michael Pugh (Caucasian male) in which she is requested a salary increase. In support of her request, Ms. Jackson stated that she although she did not have a library science degree, she would be willing to pursue a degree if CCA would consider providing her full or partial tuition reimbursement. (Attachment D)

[8] The Librarian job description requires a library science degree and Ms. Jackson possesses a Master of Science in Management. (Attachment C and E)

[9] Subsequently, the pay rate for the Case Manager position was reduced from $34,163.25 to the actual rate for the position pursuant to the applicable area wage determination rate of $33,426.60. (Attachment D)

[10] A library science degree is not required but only preferred for the Library Aide position. (Attachments F)

CCA 00808

VERNISA JACKSON
EEOC CHARGE NO.: 415-2010-00281

Jackson was awarded the position and transferred to her current Library Aide position on March 30, 2008. (Attachment B)

As Library Aide, Ms. Jackson is responsible for the supervision of a general purpose and law library designed to meet the social, educational and legal needs of the inmate population. In addition to obtaining and maintaining books and reference materials for inmates, Ms. Jackson ensures adequate resource materials for facility employees as well. (Attachment F) Ms. Jackson reports directly to Education Principal Betty McLendon (African-American female).

II.    Training

Upon being hired, Ms. Jackson - like all staff – attended extensive pre-service orientation and training courses.   (Attachment G) Basic training consists of the mandatory 40 hours pre-service orientation program which provides new employees information regarding the company, its policies and procedures, and other general information.  In addition to the pre-service orientation, security personnel who have daily contact with inmates undergo 160 hours of basic training designed to enhance the fundamental cognitive knowledge and practical skills necessary for maintenance of a safe, secure institutional environment.  This training can be a combination of class and/or on-the-job training.  Thus, new support personnel complete a minimum of 200 hours of basic and on-the-job training in addition to pre-service orientation.

During pre-service training Ms. Jackson was given a copy of CCA's Employee Grievance Procedure Policy. (Attachment H) The purpose of this policy and the training is to ensure that all CCA employees are aware of the Facility's grievance policy and the grievance procedures. The grievance procedure allows employees to have their complaints considered in a three-step process with the final step being review of the grievance by the corporate officer responsible for the grieving party's division.   In addition to the employee grievance procedure, CCA has a confidential Corporate Compliance Helpline through which employees can report complaints or any other issues to the corporate Ethics Office.

III.    Promotion Policy and Application

CCA's policy is to select, place, train and promote the best qualified individuals based upon relevant factors such as work quality, attitude and experience. Protected characteristics such as race and gender are not considered in the promotion process. The Facility has a Job Posting System Policy (Attachment I) through which it notifies Facility employees of open and/or available positions. Employment opportunities are posted in the Facility.[11]

---

[11] Available positions are also advertised on the company's web site (www.correctionscorp.com) and with the local Employment Office.

CCA 00809

VERNISA JACKSON
EEOC CHARGE NO.: 415-2010-00261

Eligible employees interested in applying for a posted position must complete an application within the time frame set forth on the job posting.  Employees are not eligible for promotion unless they have been employed for at least six months and, if they have been evaluated, received an overall evaluation score of at least "meets requirements" on their most recent performance evaluation. Qualified candidates are scheduled for interviews. Upon completion of the interviews, the interview panel makes a recommendation to the Facility Warden who in turn makes the final decision from among the top scoring candidates.

The Librarian position was posted from May 1-8, 2007, and again on July 3-10, 2007. Ms. Jackson did not apply for the Librarian position either time.[12]  In April 2009, the facility entered into a contract with a qualified librarian to perform the necessary librarian services at the facility.

Response to Discrimination Charge

As demonstrated above, Ms. Jackson's allegations are unfounded.  The Facility did not engage in any unlawful discriminatory practice with respect to Ms. Jackson.  Ms. Jackson was not qualified for the Librarian position when she was mistakenly placed in the position and she is not currently qualified for the position because she does not have the required degree. Although Ms. Jackson alleges that she has been passed over for "promotions" she has failed to identify the promotion opportunities which she alleges were denied due to illegal discrimination rather than the fact that the person selected was more qualified for the position.[13]

In November 2009 Ms. Jackson filed a grievance in which she complained of "Retaliation, Violation of the Service Contract Act/Wage Determination procedures, negligence in applying the Affirmative Action Plan, and negligence in actively seeking a remedy for compensating [her] for duties/work load."  Ms. Jackson submitted a lengthy narrative with the grievance in which she expounded upon the matters complained of and described in detail with her interactions with AW Orsolits.

A thorough investigation of Ms. Jackson's complaints was conducted by an investigator not associated with the McRae facility. The investigation did not substantiate Ms. Jackson's complaints of retaliation or any other illegal conduct allegedly directed toward Ms. Jackson by AW Orsolits. Although there was no objective support for Ms. Jackson's allegation that she had worked from home and not been paid, as a result of the investigation, the Facility paid Ms. Jackson for hours she allegedly worked at home without permission. Thereafter, to prevent any future misunderstanding on Ms.

---

[12] The last record of Ms. Jackson submitting a Job Posting Application for Library Aide was on March 4, 2008. (Reference Attachment E)  Notably, Ms. Jackson does not indicate on the 2008 job posting application that she possesses a Library Science degree that is required for the Librarian position.
[13] Ms. Jackson has applied for eight posted positions since she began her employment. If Ms. Jackson can provide additional information regarding her allegations related to promotional opportunities, the facility may be able to respond with more specificity to this allegation.

CCA 00810

VERNISA JACKSON
EEOC CHARGE NO.: 415-2010-00261

Jackson's part, Principal McLendon issued a memo to Ms. Jackson instructing her that she was not to perform any work at home unless she had the prior approval of the Facility Warden.  Following the investigation and actions taken as a result, Ms. Jackson has not complained of any further alleged illegal conduct.

## Conclusion

There is no evidence whatsoever to support Ms. Jackson's allegations that the Facility discriminated against her because of her race, sex or engaged in retaliation against her for opposing any alleged unlawful employment practices.

CCA trusts that the information set forth above will be sufficient to allow the Commission to close the investigation of this matter with a finding of "no cause." Should you have any questions, please direct all future communication to either Alice Lovell or the undersigned by email (susan.lindsey@correctionscorp.com), by phone (615) 263-3000 or fax (615) 263-3020.

Sincerely,

Susan G. Lindsey
Assistant General Counsel, Employment and Labor

SGL/al

Attachments

CCA 00811

U.S. Equal Employment Opportunity Commission
Savannah Local Office
410 Mall Boulevard, Suite G
Savannah, Georgia 31406-4821
912-652-4236
FAX: 912-652-4248

June 6, 2010

Greetings Ms. Marshall:

I'm appalled and disheartened at CCA/McRae Correctional Facility's attempt to defraud this investigation regarding their hostile, discriminating, and unlawful business practices. In itself the justification appears to be compelling and valid, however, several factors, which I will illustrate, will show that CCA/McRae Correctional Facility has intentionally manipulated and skewed the facts in an effort to deceive and conceal their true motives; which are race and sex discrimination.

Please accept the following as my evidence to prove that the offered justification for actions submitted by CCA/McRae Correctional Facility are false, far-reaching, misleading and a pretext for discrimination.

*Ms. Jackson was hired on August 25, 2003 as the Librarian.*
True.

*However on May 1, 2005, it was discovered that Ms. Jackson actually did not meet the minimum qualifications for the position because she did not have a library science degree.*
Pretext. False. The previous administration of McRae Correctional Facility hired me as Librarian with the foreknowledge that I did not have a Masters in library sciences, which is why the Bureau of Prisons granted the initial waiver of the library science degree requirement. Therefore, there was never a *discovery.* The current management is aware of this waiver, therefore, have intentionally submitted a false and pretextual explanation.

*Thus, Ms. Jackson was transferred to an open Case Manager position at the same rate of pay she received as the Librarian.*
Pretext. False. I requested and had to practically beg to be transferred by applying for the Case Management position. The warden, Mr. Michael V. Pugh, and Assistant Warden Ranum tried to convince me to remain in the position of librarian. Prior to being selected as Case Manager, I applied for several positions within the facility and was not selected for either position during the latter part of 2004. As I stated in the grievance dated 11-25-2009, I complained to Warden Pugh that the "isms" that plagued the facility were preventing me from having any chances to advance. I had applied for Personnel Investigator in the year of late 2004 or early 2005, however, was not selected. I complained to Ms. Shirley Ellis, former HRM, and told her that I would file a grievance. After complaining to Warden Pugh, I decided not to grieve.

Mr. Robert Herndon and Warden Pugh will attest to the fact that I had to practically beg to be released from the library and given a chance at other opportunities. Even after being

CCA 02478

awarded the position of Case Manager, Warden Pugh came to me and asked if I was sure I wanted to leave the library as it would require that I take, approximately, a fifty cent pay cut. I advised him that due to their assertion that I would not receive a pay raise, despite the prevailing wage requirement, I wanted to move to a position where I might be afforded a chance for advancement and a pay increase. Therefore, if memory serves me correctly, the statement made by CCA regarding the pay remaining the same is also false.

After applying for a few positions while working as a case manager, I was quickly acquainted with the same "kiss up" to the "good ol' boy club" concept for career advancement. Only those that turned a blind eye to the discriminatory practices were ever promoted. I detested the racist and sexist corporate culture of the institution, the way that minorities were treated, the way management were "intimately involved" with the staff they were responsible for supervising and "promoting", and the buddy/racially bias promotional system.

On March 4, 2008, Ms. Jackson applied for the Library Aide position for which she was qualified.
True.
Due to the hopeless situation in the units, I decided to return to the library because it was known that it was being poorly managed. I had been providing advice to the Contract Librarian, Mr. Richards, and to Mrs. Nieves, as well as, providing notary services to the inmates in an effort to assist since I had left the library.

After speaking with Ms. Pooler about the waiver, I applied for library aide.
Ms. Jackson was awarded the position and transferred to her current Library Aide position on March 30, 2008.
True. However, CCA failed to mention that I had spoken to Shannon Pooler, HRM, because both the Librarian and Library Aide positions were vacant. Ms. Pooler informed me that they were still in pursuit of a contract librarian and until that time they could not pursue a waiver. I asked if I accepted the job as Library Aide, would policy require that I remain [stuck] in that position for a full six months (waiting period before you can apply for another position) if they found a contract librarian in two to three months. Ms. Pooler informed me that this requirement only applied to new employees and that as soon as they found a contract librarian a waiver would be sought from the Bureau of Prisons for me to assume the position of Librarian. I would never have taken the job as Library Aide if it had not been for the opportunity to advance to Librarian. Any reasonable career minded person would have remained in Case Management with unlimited opportunities for advancement if it had not been for the lies and misleading advice from management. I assumed the position of Library Aide to assist the facility by fulfilling the duties of a hard to fill position with the hope and expectation that they would honor their side of the bargain.

After being informed by A/W Orsolits in November 2009, that the position of librarian would not be filled after being "used" for seventeen months as an aide, I was devastated and hurt. This exasperated the illnesses that I was already enduring and I went into further depression. As I was collecting evidence to report this injustice, I noticed that the CCA policy 20-104 had also been changed in February 2009, approximately the hire date of the contract librarian, to state that a full-time librarian was no longer needed as long as there

CCA 02479

was a contract librarian. This further illustrated the foreknowledge, malice, and vindictive plan of Warden Wells and A/W Orsolits to not promote me, as promised.

*As Library Aide, Ms. Jackson is responsible for the supervision of a general purpose and law library designed to meet the social, educational and legal needs of the inmate population. In addition to obtaining and maintaining books and reference materials for inmates, Ms. Jackson ensures adequate resource materials for facility employees as well.*

True. I have reported this Job Description to the U.S. Department of Labor as a violation of the Service Contract Act. The Service Contract Act's job description conflicts with CCA's job description. CCA has used this job description as a device to require me to perform the duties of two entirely distinct and separate positions.

*Ms. Jackson reports directly to Education Principal Betty McLendon (African-American female).*

This statement is unworthy of credence and irrelevant. Same race and same gender discrimination do exist and are just as illegal as any other discrimination; fortunately, in this situation it is not the case. Ms. McLendon has assisted in trying to persuade management that the library was/is inadequately staffed for years to no avail. She has spoken to me on many occasions about not understanding management's unwillingness to promote me. She also attempted to accommodate me by adjusting my work schedule and allowing me to work from home some days during my illnesses due to the work-related stress. For this effort she was admonished and scolded. She was also told that she had to rescind her offer to me in writing; which I have attached along with my grievance. As you will see when you review two of my grievances Ms. McLendon was used vicariously, as a puppet, to brandish management's assault on me with two unwarranted "letters of concern" and to rescind her attempt to accommodate my illnesses by allowing me to work a few hours from home each week.

Please also note the comments that I submitted on 12-21-2009, along with the initial questionnaire, prior to CCA's false allegations (I have highlighted key points), wherein I stated:

**MCF will attempt to use the ALA certification requirement as justification for not promoting me, however, this is not justifiable for the following reasons:**

A. I was hired at MCF, in 2003, as Librarian. I was granted a waiver in regards to the requirement of ALA certification due to having a Masters degree in management and over four years of supervisory experience in a public library. I was responsible, in 2003, for implementing the procedures for use of the law and leisure library at MCF. Over the course of six years, three ALA certified contract librarians have served as oversight in order for MCF to meet the Bureau of Prisons requirements and have not changed any of the procedures that I implemented. Under my management, I have not received any complaints from Quality Assurance in regards to ACA or QCP standards.

    1) I am currently performing the requirements of the position for the past seventeen months with performance evaluations signed by my supervisor, the Assistant Warden, and Warden stating that I "Exceed Requirements".

CCA 02480

2) Other non-protected employees have been granted waivers and promoted.

3) My current job title, Library Aide is in violation of the Service Contract Act because I receive the salary of Library Technician and because I am also required to fulfill the duties of the Librarian. (Copies of the these job descriptions will be made available upon your request.)

4) After investigation, you will find that CCA has changed its policy in order to use the ALA certification of a Contract Librarian only to meet the Bureau of Prisons requirement at my experience. I am still left with completing the task of both positions as the Contract Librarian only works four hours per quarter and has no experience working in prison library. (Please see CCA policy 20-104, 10-10-2005, and revised 02-06-2009. {Please see EEOC Exhibit list for explanation for this revision}

| Witnesses | Contact Information | I believe the witness will attest to the following: |
|---|---|---|
| 1. Warden Walt Wells | 229-868-7778 | He advised me on several occasions that I would be compensated for my efforts and that the facility was in pursuit of the waiver.

He will further attest that during his roundtable meeting in 2009 when he asked each participant, "What can be done to improve the area or position in which you work {paraphrase}? I stated, that I needed assistance and to be reinstated as librarian in order to receive adequate compensation. To which he replied to Ms. Pooler, "What is the hold up on that? Ms. Pooler replied that Ms. Pam Aycock was supposed to be handling that but she was out due to a family member's illness. **[If the facility asserts that it was found in 2005 that I was not qualified, why would they even consider this?]**

He was: Aware that I was completing the tasks of two position and the medical issues that were arising due to the stress that I was subjected to. Aware of the conflict between management and myself. Aware that I was working relentlessly to fulfill all the duties so that I would be reinstated to Librarian. |

CCA 02481

| | | |
|---|---|---|
| 2. A/W Orsolits | Victor S Orsolits<br>195 N Lakewood<br>Cir<br>Maitland, FL<br>32751-3421,<br>(Unlisted), former<br>CCA Assistant<br>Warden | He advised me on several occasions that I would be compensated and that the facility was in pursuit of the waiver.<br><br>He as also aware that I was completing the tasks of two position and the medical issues that were arising due to the stress that I was subjected to. He was aware that I was working relentlessly to fulfill all of these duties so that I would be reinstated to Librarian.<br><br>(Please see attached Memorandum dated 11-25-2009 for details) |
| 3. Shannon Pooler | 610 Cherry St<br>Dublin, GA<br>31021-5051<br>(Unlisted #),<br>former CCA HRM | She advised me on several occasions that I would be compensated and that the facility was in pursuit of the waiver.<br><br>Aware that I was completing the tasks of two position and the medical issues that were arising due to the work-related stress and discrimination. |
| 4. James Hill | 229-868-7778 or<br>912-278-8058 | Witnessed on a few occasions, Ms. Pooler advising me that I would be compensated and that the facility was in pursuit of the waiver.<br><br>Also was a victim of racial discrimination for years and will attest to the treatment he endured. He will inform you of the discrimination he endured under the supervision of A/W Orsolits.<br><br>Aware that I was completing the tasks of two position and the medical issues that were arising due to the stress that I was subjected to. Aware of the conflict between management and myself. Aware that I was working relentlessly to fulfill all the duties so that I would be reinstated to Librarian. |
| 4. Michael V. Pugh | 330-746-3777 | My awareness that the overall climate of the facility was racist and gender bias. I talked to him about this in his office. He promised that the next time a case manager job came open, he would take my qualifications into |

| | | |
|---|---|---|
| | | consideration. True to his word, I made a lateral move to case management. |
| 5. Robert Herndon | (229) 868-2520 | That I tried several times to seek employment in other areas of the institution. He had advised me that management were never going to let me leave the library because the position was too hard to fill.<br><br>Aware that the Bureau of Prisons had granted the facility a waiver to qualify me as Librarian before I accepted the position. He is aware that no "discovery" was made in 2005. |
| 6. Betty McLendon | 229-868-7778 | Aware that I was completing the tasks of two positions and the medical issues that were arising due to the stress that I was subjected to. Aware of the conflict between management and myself. Aware that my motive for working relentlessly to fulfill all the duties of both positions was so that I would be reinstated to Librarian. Aware that I was taking a lot of work home to keep up with the demands of these two positions. Aware of all of my stress-related absences and illnesses. |
| 7. Erica Moye | 229-868-7778 or 478-272-4448 | Has suffered ADA discrimination and forced to perform task, by Tim Wheaton, despite his awareness that she had light duty paperwork, which caused her to re-injure her shoulder. She will report that she had been yelled at and call a mother-fucking bitch by Mr. Wheaton, in the presence of an upper management staff member. She submitted a grievance and it comes as no surprise that her claim was unsubstantiated.<br><br>Aware that I was completing the tasks of two position and the medical issues that were arising due to the stress that I was subjected to. Aware of the conflict between management and myself.<br><br>Aware that Ms. Nieves, former Library Technician, also took a lot of work home to keep up with the demands of these two |

CCA 02483

| | | positions. |
|---|---|---|
| 8. Danielle Martin | 229-868-7778 or 404-374-1956 | Aware that I was completing the tasks of two position and the medical issues that were arising due to the stress that I was subjected to. Aware of the conflict between management and myself. Aware that I was working relentlessly to fulfill all the duties so that I would be reinstated to Librarian. |
| 10. Felecia Wilcox | 229-868-7778 or 912-253-2806 | Her own struggle with the "good ol' boy" club and the hostile work environment she endures for being outspoken and standing up for her rights.<br><br>Her awareness of my frustrations and unwillingness to play the "kiss up game." I had asserted for years and to many that the work that I do should loudly speak for me. |
| 11. Pamela King | 229-868-7778 or 478-231-8589 | Her own struggle with the "good ol' boy" club to reach the position she currently holds. She has witnessed and been the victim of discriminatory behavior from Tim Wheaton. She received an e-mail from Warden Wells with the *"original"* and *"overused"* statement, "your claim could not be substantiated. |
| 12. Bobbie Thompson | 229-868-7778 | Her own struggle with the "good ol' boy" club to reach the position she currently holds and her struggle to become Captain.<br><br>Her awareness of my frustrations and unwillingness to play the "kiss up game." I had asserted for years and to many that the work that I do should loudly speak for me. |
| 13. Robbie Thompson | 229-868-7778 | Her awareness of my frustrations and unwillingness to play the "kiss up game." I had asserted for years and to many that the work that I do should loudly speak for me. |
| 14. Tamara Jordan | 229-868-7778 or 912-583-2878 | Her own struggle with the "good ole boy" club to reach the position she currently holds. She holds a Masters in Social Services and is well versed in CCA and BOP policy. Her management skills are unmatched.<br><br>Her awareness of my frustrations and |

CCA 02484

| | | |
|---|---|---|
| | | unwillingness to play the "kiss up game." I had asserted for years and to many that the work that I do should loudly speak for me. |
| 15. Leon Newsome | 229-868-7778 or 229-315-9310 | His own struggle with the "good ole boy" club to reach his position. The demotion he was given in spite of many non-protected groups following the same protocol without being disciplined. Newsome sent two female officers on a medical run, which has routinely been done by his white superiors. Since then, Captain Ross sent officers on a medical run that were not weapons certified (which is a more serious breech of security), however, he was not demoted. |
| 16. Ms. Coley | 229-868-7778 | Her own struggle with Tim Wheaton discriminatory behavior and the intentional disregard of management. |
| 17. Ms. A. Barfield | 229-868-7778 or 229-868-9854 | Her own struggle with the "good ole boy" club. She acted for several months as a teacher. A/W Orsolits constantly ridiculed her. She suffered a heart attack, which may have stemmed from the stress that she was under.<br><br>Her awareness of my frustrations and unwillingness to play the "kiss up game." |
| 18. Ms. Mock, Contract Librarian | 229-868-7778 | She can attest the overwhelming workload. She can also attest to the burnout I was experiencing while trying to carry the burden alone. She didn't understand what she could do in just four hours per quarter that would assist me with the workload. |

To further illustrate the hostile work environment, apparent racial divide, and the discriminatory labor practices that CCA/McRae Correctional Facility breeds, I offer the following points as evidence of bias and reckless indifference to employees' civil rights:

- Our previous warden, Michael V. Pugh, had an inappropriate sexual relationship with a white secretary with a G.E.D. Under his management she quickly accelerated her career to Unit Manager. These promotions enraged many staff members including myself. Because of this relationship, he resigned from CCA/McRae Correctional Facility. The managers at the Facility Support Center came to the facility to threaten that if any staff members were found discussing the situation, disciplinary action would be taken (most of

CCA 02485

the staff were present, briefed, and will attest to this). After a couple of years away from
CCA, it was rumored that Warden. Pugh was working at the Northeast Ohio CCA.
Recently it was revealed in the CCA newsletter that he is, in fact, Assistant Warden at the
Northeast Ohio Facility. What message does this send to the staff regarding fair labor
practices? How many other employees could come back to an esteemed position after
such a severe violation of policy?

φ  Darryl Wooten, white male, prior experience Wal-Mart clerk. Because of nepotism he
quickly was promoted to Unit Manager and then Records Manager under contract
Records Manager, Pat Davis. The Bureau of Prisons gave him a waiver because he did
not meet the five years experience in a records department in a correctional facility. This
is also proof that similarly situated individuals of a different class were treated better.

φ  Several other staff members allegedly were given a waiver because they lacked the
educational/substitution of experience for educational background required for their
position. Some were also presented with the opportunity to receive the training essential
for meeting the minimum qualification of their desired position. These people are J.
Spires, Chief of Security; Cynthia Wilkinson, Chief of Unit Management; Katie
Cameron, Disciplinary Hearing, and Officer Carter, Records department.

φ  Tim Wheaton, Unit Manager, white male, has habitually humiliated, assaulted,
threatened, and made chauvinist/vulgar slurs to female staff. Most of the staff is aware of
his behavior and he has been reported to management multiple times in the form of
grievances yet management claims that they have thoroughly investigated and
management deems these claims to be unsubstantiated.

φ  Back dock officer, Fred Hewlett, white male, fired his weapon in a hospital while on
duty, endangering the lives of many. He wasn't demoted but was given a slap on the wrist
(a brief suspension.)

φ  Jonathan Spires, Chief of Security, has constantly refers to himself in the presence of
many witnesses, as a redneck. He also uses racially bias promotional practices.

φ  Arthur Treat (white male), and Mrs. Cantella (black female) were both reprimanded for
the same offense (falsifying documentation). Arthur treat was demoted and within
months promoted. Mrs. Cantella was fired.

φ  Mrs. Wimber (white female), from Educational Counselor to Teacher; pay was not
reduced. Mr. Yancey (white male), from Assistant Chief of Security to Unit Manager;
pay was not reduced. Ms. A. Barfield (white female), from Correctional Officer to
Mailroom clerk, pay was not changed. Verneisa Jackson (black female), from Librarian
to Case Manager; pay was reduced. Mrs. Erica Moye (black female) from Case Manager
to Correctional Counselor; pay was reduced. [it is also rumored that Ms. McLaughlin
(white female), from Unit Manager to Phone Clerk, was offered a higher wage that the
wage determination requires or her pay was not reduced.

φ  Sgt. Mickey Best (white male) wrecked the brand new facility bus by slamming into two
parked staff vehicles. Safety Manager James Hill recommended the procedural drug test,

CCA 02486

however, the drug test was not administered. Several character witnesses will testify that based on his drinking habits he may have been intoxicated and this was probably an attempt by management to cover-up for Sgt. Best. No disciplinary action was taken.

- Others have wrecked company vehicles. Ms. Lytle (white female) recently wrecked the perimeter truck while off the premises by running into a civilian vehicle. Ms. Wilkinson (white female) wrecked the Warden's company issued Ford Explorer. No action was taken in either case.

- Correctional Officer, Teryon Kinsey (black male) wrecked the perimeter truck. His drug test was clean. He was terminated.

I appreciate your assistance in this matter. It is my hope that the Equal Employment Opportunity Commission will make a "good-faith" effort to ensure that Corrections Corporation of America does not continue to willfully and haphazardly disregard these laws in an effort to capitalize at the expense of their employee's civil rights, health, and welfare. If you should need to contact me, please do not hesitate to call 229-860-1238 or e-mail me at jacksonv_30904@yahoo.com. Thanks in advance for your attention to this matter.

My Sincerest Regards,

Verneisa McRae Jackson, MSM / Library Aide
McRae Correctional Facility/Corrections Corporation of America

Enc: *Documentation Significance Explanation / EEOC Exhibit List*

CCA  02487

Reply to: Pre-Determination Letter
*Verneisa Jackson v. McRae Correctional Facility*
EEOC Charge No. 415-2010-00261

Verneisa M. Jackson
1 W. Graham Street
McRae, Georgia 31055
229-860-1238

## Documentation Significance Explanation / EEOC Exhibit List

| Number (Letter) | Description | Documentation Significance Explanation |
|---|---|---|
| **A.** | **Correlated History: 2004 -2005** | |
| A.1 | Memorandum dated 11-22-2004 | *Petition for Salary Increase* |
| A.2 | Memorandum dated 01-07-2005 | *Salary Petition/ Warden Pugh/Denied (It does not answer the question regarding stipulations under the Service Contract Act for the prevailing wage. Attached in my file was a yellow post-it reflecting that someone researched the Job Description for Librarian that the SCA Directory-DOL listed and wrote $49,441.60. At the time I only earned $33,000 per year.)* |
| A.3 A.4 A.5 | Memorandums dated 12-14-2004 | *Reflect positions applied for - Not Chosen* |
| **B.** | **Service Contract Act / Wage Determination** | |
| | | *Failure to define accurately Federal service employees on a particular contract will result in a violation of the Service Contract Act and a potential back-wage liability enforced by the Department of Labor. Federal service employees include all employees working under a contract subject to the Service Contract Act (SCA).* |
| B.1 | U.S. Department of Labor: Prevailing Wage Resource Book 2009 | *If an employee works in different capacities in the performance of a covered contract, then the time spent the employee spends in work properly related to each classification should be segregated and paid according to the wage rate specified for each class of work. The proper classification of a worker depends on the specific duties the worker performs and not a previously assigned occupational title. If the contractor cannot provide affirmative proof (employer records) of the hours spent in each class of work, then the contractor must pay the* |

I

CCA  02488

Reply to: Pre-Determination Letter
*Verneisa Jackson v. McRae Correctional Facility*
EEOC Charge No. 415-2010-00261

Verneisa M. Jackson
1 W. Graham Street
McRae, Georgia 31055
229-860-1238

*employee the highest of such rates in the applicable wage determination for all hours worked in the workweek. 29 C.F.R. § 4.169.*

*"Acting capacity pay" procedures to follow when assigning duties to an employee that may warrant a reclassification or designating an employee to receive acting capacity pay "The amount of acting capacity pay shall be an amount that an employee would receive if permanently promoted to the higher classification, unless otherwise provided by law."*

| | | |
|---|---|---|
| B.2 | *SCA Directory of Occupations (5th Edition) (Pgs. 1, 45, 46)* | *Job Descriptions for Librarian, Library Technician, and Library Aide* |
| B.3 | *Register Of Wage Determinations Under The Service Contract Act (pgs. 1,3)* | *Wage Determination Minimum Rate of Pay* |

**C. Proof of Deliberate Negligence**

| | | |
|---|---|---|
| | | *Reflects Warden Wells' awareness and intent regarding the selection of a Librarian, which contradicts the plan conveyed to me regarding the waiver so that I might assume the position of Librarian.* |
| C.1 | *Memorandum: Librarian Vacancy, dated 01/13/2009: From Walt Wells, To: Linda Turner, SSTM* | *Other staff members have been awarded positions throughout the facility that do not meet the minimum requirement, however, were given waivers and promotions.* |
| | | *Shannon Pooler, Warden Wells, and Victor Orsolits continuously conveyed that I would be granted a waiver at the discretion of the BOP, just as I was granted prior to my hire date.* |
| C.2 | *POA 1/13/2009* | *"Same as above"* |
| | | *CCA does not abide by its AAP.* |
| C.3 | *Affirmative Action Plan (AAP) & Designation of Responsibilities -- Affirmative Action Officer* | *{Executive Order 11246 is EEO and Affirmative Action Guidelines for Federal Contractors* |

2

CCA  02489

Reply to: Pre-Determination Letter
*Vernoisa Jackson v. McRae Correctional Facility*
EEOC Charge No. 415-2010-00261

Vernoisa M. Jackson
1 W. Graham Street
McRae, Georgia 31055
229-860-1238

*Helps contractors understand their contractual obligations for EEO and Affirmative Action} Investigator will check to see if contractor is making special efforts to achieve EEO through affirmative action.*

| | | |
|---|---|---|
| **D.** | | |
| D.1 | *CCA Policy 20-104, effective 10-10-2005* | *\* See 20-104.5 A.1. "Library services....full-time staff librarian.* |
| D.2 | *CCA Policy 20-104, effective 02-06-2009* | *\*See 20-104.3 "Staff Librarian – A position selected by the Warden that may be held by a full-time or part-time employee and may be filled by a volunteer or contract personnel*<br><br>*\*See 20-104.4 A.1. "Library services...under the supervision and coordination of a staff librarian, library aide, or designee."* |

**Credentials, Awards, and Performance Evaluations**

| | | |
|---|---|---|
| E.1 | *Resume requested by QA on 02-19-2009* | *Quality Assurance requested my Resume and I was informed that I was being considered. Warden Wells and S. Pooler, HRM, informed me that QA was responsible for obtaining the waiver and ensuring BOP compliance.*<br><br>*Keep in mind that the Quality Assurance Team, Warden Wells, and Shannon Pooler were all aware at this time that the changes were being made to Policy No. 20-104 and didn't intent to promote me.* |
| E.2 | *Performance Evaluation - 11-16-2009, signed and acknowledged by Warden Wells & AW Orsolits)* | *Illustrates the awareness of management (signed by Warden Wells, A/W V. Orsolits, and B. McLendon, Principal) that I performed the duties of both positions without compensation.*<br><br>*(PLEASE SEE ALL HIGHLIGHTED AREAS)* |

**F.   Contract Librarians**

3
CCA 02490

Reply to: Pre-Determination Letter
*Vernelsa Jackson v. McRae Correctional Facility*
EEOC Charge No. 415-2010-00264

Vernelsa M. Jackson
1 W. Graham Street
McRae, Georgia 31055
229-860-1238

$67.00 per hour – 4 hours per quarter

| | | |
|---|---|---|
| F.1 | *Contract of Mrs. Mock, 03-09-2009* | *This illustrates: CCA's attempt to meet the B.O.P.'s requirement for an MLS without paying the on-staff library worker for completing ALL the tasks. There is not much Ms. Mock can do to assist in four hours per quarter, (which she will testify)* |
| F.2 | *Contract of Mr. Richards, 05-02-2005* | *$40.00 per hour -- 8 hours per month* |
| **G.** | **Employee Grievances** | |
| G.1 | *Employee Grievance Form 11-25-2009* | *Violation of Service Contract Act, Affirmative Action, and Negligence in actively seeking a remedy for compensating me for my duties/workload.*<br><br>*Explanations (PLEASE See Highlighted points)* |
| G.2 | *Memorandum: Assistant Warden Orsolits -- Retaliation Complaint* | |
| G.3 | *Email: Re: Contact, 12-09-2009* | *Policy 3-6: violation of time frame to give this notice* |
| G.4 | *Memorandum: Wells, 11-30-2009* | *Policy 3-6: violation of time frame to give this notice* |
| G.7 | *Employee Grievance Form 01-27-2010* | *Violation of federal and state laws by A/W Orsolits* |
| G.8 | *Memorandum: January 28, 2010, Notarizing Documents* | *Retaliation -- writing notice of error that is unwarranted to harass.* |
| G.9 | *Memorandum: February 04, 2010, Work Schedule* | *Retaliation - I have been working from home when needed for months with permission from my supervisor. A/W Orsolits rescinded the offer as an act of retaliation. By doing this he also failed to offer accommodations for the work-related injuries that I had sustained.* |
| G.10 | *Memorandums, E-mail, and other documentation reflecting that I was allowed a flexible schedule prior to the retaliation* | |

4

CCA  02491

Reply to: Pre-Determination Letter
*Verneisa Jackson v. McRae Correctional Facility*
EEOC Charge No. 415-2010-00261

Verneisa M. Jackson
1 W. Graham Street
McRae, Georgia 31055
229-860-1238

| | | |
|---|---|---|
| *G.11* | *Grievance Response: 02-12-2010* | *Policy 3-6: violation of time frame to give this notice* |
| | | *Investigation did not substantiate my claim* |
| | | *May I also point out that CCA took almost four months to lodge an investigation into my claim.* |
| *G.12* | *Grievance Response: 04-02-2010* | *During this time I was force to work under the supervision of my harasser. One of the main factors that lead to my constructive dismissal was the failure of my employer to provide any type of accommodation or adjustment until an investigation was completed.* |
| *G.13* | *Employee Grievance Form 03-17-2010* | *Human Resource Manager / Violation* |
| *G.14* | *E-MAIL, RE: Independent Investigation, From Mr. Bird* | *See Grievance for explanation* |
| *G.15* | *E-mail, RE: Independent Investigation, From Mr. Bird* | *See Grievance for explanation* |
| *G.16* | *Grievance Response 3-19-2010* | |
| *G.17* | *Grievance Unresolved Response, 04-05-2010* | |

**H. Other Violation**

| | | |
|---|---|---|
| *H.1* | *Photos of all staff bulletin boards* | *Reflects that all postings required by the federal contract are not posted.* |
| *H.2* | *(WH Publication 1313)*<br><br>*and*<br><br>*Wage Determination (listed in section B.4 of this document)* | *EMPLOYEE NOTIFICATION AND POSTER SCA § 2(a)(4), 29 C.F.R. § 4.6(e) and FAR, 48 C.F.R. § 52.222-41(g)*<br><br>*Reflects SCA standards and Wage Determination (WH Publication 1313) are not posted at McRae Correctional Facility. This is a violation of CCA's contract. (I had to find a copy (2B) from the web)* |

Reply to: Pre-Determination Letter
*Verneisa Jackson v McRae Correctional Facility*
EEOC Charge No. 415-2010-00261

Verneisa M. Jackson
1 W. Graham Street
McRae, Georgia 31055
229-860-1238

**H.3**                                    *\*\*The EEO Poster is also not posted\*\*\**

**I.**     **Offer Positions Applied for**

**I.1**    *Records Manager / 01-19-2010, Not*
           *Selected*

**I.2**    *Summary & Qualifications for*
           *Records Manager*

**Insurance Premiums, FOIA**
**Investigation Results, MetLife, and**
**Workers' Compensation**

**J.1**    *McRae Correctional Facility's*          *Provided to my employer citing depression,*
           *Certification of Health Care Provider,*  *anxiety, and chronic fatigue syndrome.*
           *02-24-2010*

**J.2**    *Memorandum, Insurance Premiums,*
           *03-26-2010*

**J.3**    *E-mail, Insurance Premiums, 04-16-*
           *2010*

**J.4**    *E-mail, FOIA-Investigation Results*     *Informed staff at the Facility Support Center*
                                                    *that all of my claims of harassment and their*
                                                    *violations of my rights and their BOP contract*
                                                    *were being ignored.*

                                                    *Mr. Bird advised me that stress is not*
                                                    *compensable under GA W/C benefits.*

                                                    *I informed the facility that MetLife stated that*
                                                    *my claim should be filed under Workers'*
                                                    *Compensation.*

**J.5**    *E-mail(s), RE: Workers'*                *I asked was depression, anxiety, and chronic*
           *Compensation*                           *fatigue syndrome which were caused by work-*
                                                    *related stress compensable under the Georgia*
                                                    *Workers' Compensation benefits laws.*

                                                    *I informed McRae Correctional Facility and*
                                                    *FSC that I was forced to miss several Drs*
                                                    *appointments due to my insurance being*
                                                    *cancelled and no payment from MetLife or*
                                                    *Workers' Compensation.*

CCA  02493

Reply to: Pre-Determination Letter
*Vernelsa Jackson v. McRae Correctional Facility*
EEOC Charge No. 415-2010-00261

Vernelsa M. Jackson
1 W. Graham Street
McRae, Georgia 31055
229-860-1238

*Mr. Bird informed me at this point that he could not file a claim with the W/C provider because no Injury Report was ever filed.*

*Mr. Bird advised me that he had been informed to file my claim under W/C.*

| J.6 | *E-mail(s), MetLife* | *How could he have if no injury report was ever filed?* |
|-----|----------------------|---------------------------------------------------------|
| J.7 | *E-mail(s), Workers' Compensation Claim* | |
| J.8 | *E-mail, W/C claim* | |
| J.9 | *Letter: AIG/ W/C denied by Chartis Insurance* | *Your claim has been denied because the present injury/disability/death did not arise out of and in the course of employment.* |
| J.10 | *E-mail, Unanswered Questions, Mr. Michael Latko* | *Another attempt to resolve my grievances* |
| J.11 | *E-mail, Resignation/Constructive Dismissal or Discharge* | *Constructive Dismissal or Discharge: Reasons I was forced to resign my employment with CCA.* |

7

CCA  02494

EXHIBIT 7



**CORRECTIONS CORPORATION OF AMERICA**
McRae Correctional Facility

January 19, 2010

Ms. Verneisa M. Jackson
101 West Graham Street
McRae, GA 31055

Dear Ms. Jackson:

Thank you for your interest in the recent Records Manager position. The chore of filling this position was a challenge as the field of candidates was extremely competitive. After considering all of the candidates, we have selected another candidate that more closely matches the experience and skill level this position requires.

Your efforts and dedication to CCA and to McRae Correctional Facility do not go unnoticed. I strongly encourage you to continue to pursue advancement opportunities within the company.

Again, thank you for your dedication, enthusiasm and desire to advance throughout this selection process.

Sincerely,

Walt C. Wells, Warden

112 Jim Hammock Drive, McRae , Georgia 31055, Phone: 229-868-7778, Fax: 229-868-7964

JACKSON et al.; v. CORRECTION CORPORATION OF AMERICA
V. JACKSON CONFIDENTIAL # 221

**EXHIBIT 36**



**CCA**
CORRECTIONS CORPORATION OF AMERICA

*McRae Correctional Facility*
*Walt Wells, Warden*

# MEMORANDUM

To:      **Walt Wells**
         **Warden**

From:    Marc R. Gunn
         Assistant Warden, Operations

Date:    January 11, 2010

Re:      **Records Manager**
         **Interview Outcomes**

Ms. C. Wilkinson, Ms. T. Jordan and myself conducted interviews for the Records Manager on January 8 and 11,
2010. The following represents the outcome of this interview. The board members concur with the ratings as listed.

| EMPLOYEE | | RATING | SCORE |
|---|---|---|---|
| Stacy Bentson | | | |
| | CW | High | 34 |
| | TJ | High | 34 |
| | MG | High | 35 |
| | | | 103 |
| | | | |
| Michael C. Carter | | | |
| | CW | Low | 27 |
| | TJ | Low | 25 |
| | MG | Low | 25 |
| | | | 77 |
| | | | |
| Patricia Murphy | | | |
| | CW | Low | 26 |
| | TJ | Low | 26 |
| | MG | Moderate | 23 |
| | | | 75 |
| | | | |
| Vernelsa Jackson | | | |
| | CW | High | 33 |
| | TJ | High | 36 |
| | MG | Moderate | 28 |
| | | | 97 |
| | | | |
| Wesley McVey | | | |
| | CW | Moderate | 31 |
| | TJ | Moderate | 29 |
| | MG | High | 32 |
| | | | 92 |

CCA 01328

EXHIBIT 35



# JOB POSTING APPLICATION
*(Please type or print, using black ink)*

**RECEIVED**

**DEC 2 2 2009**

MCRAE CORRECTIONAL FACILITY
HUMAN RESOURCES DEPARTMENT

Name __Stacy Atchley Bentson__

Posting Deadline __12-22-2009__

Position Desired __Records Manager__      Facility or Work location __McRae__      Department __Inmate Systems Management__

**WORK EXPERIENCE AT CCA** *(Please start with current position and work backwards)*

1. FROM (Month/Year) __02/06__                TO __Present__

   Position __Records Supervisor__      Supervisor __Darrell Wooten__

   Facility __McRae Correctional Facility, McRae Georgia__

   Job Duties   Have ability to perform supervisory duties successfully which includes understanding and comprehending BOP and CCA policies, programs, regulations and procedures.
   Possess knowledge of policies and statues governing jail credit, release of inmates, and sentence computations.
   Supervise Records and Intake staff and departmental duties.
   More information is included on the attached "Resume".

2. FROM (Month/Year) __10-02__                TO __02-06__

   Position __Accounting Clerk__      Supervisor __Linda White__

   Facility __McRae Correctional Facility, McRae Georgia__

   Job Duties   Develop procedures and perform duties pertaining to Inmate Account functions in accordance with policies and regulations, to include:  FRP processing, deposits, release of funds, court ordered filing fee payments, various inmate account transactions including postage, phone, etc...
   Assisted with commissary duties, accounts payable duties, and Inmate Telephone System duties.
   More information is included on the attached "Resume".

3. FROM (Month/Year) __N/A__                TO ____

   Position ____      Supervisor ____

   Facility ____

   Job Duties ____

An *EEO/AA Employer M/F/V/H*
**Corrections Corporation of America**                    CCA 01276

**SPECIALIZED SKILLS** *(List any Training, skills and certification you have acquired which would qualify you for consideration for other positions.)*

| TRAINING/SKILLS | MONTHS/YEARS | CERTIFICATION |
|---|---|---|
| Microsoft Excel and Word | 17 year | |
| Bureau of Prisons, Sentry, Quattro Pro 10 and Word Perfect 10 | 7 years | |

**EDUCATION**

| SCHOOL | FROM (mm/yy) | TO (mm/yy) | DEGREE | BUSINESS-RELATED COURSES COMPLETED |
|---|---|---|---|---|
| Telfair County High School | 8/82 | 5/86 | Diploma | |
| Georgia Bankers Association, Southern Operations and Technology School | 1999 | 11/2001 | Certificate | |

**PREVIOUS EMPLOYMENT** *(Last three positions held before you began working for CCA.)*

| | EMPLOYER | FROM (mm/yy) | TO (mm/yy) | POSITION |
|---|---|---|---|---|
| 1. | Security Bank | 2000 | 10/2002 | Operations Officer / Loan Manager |

Job Duties   Managed the operations of the loan department for multi-branch banking.  Developed procedures to merge a mortgage lending company with banking regulations and systems.  Oversee the conversion team for branch banking system conversions.  Daily General Ledger Balancing.

| | EMPLOYER | FROM | TO | POSITION |
|---|---|---|---|---|
| 2. | Security Bank | 1998 | 2000 | Asst. Operations Officer / Loan Manager |

Job Duties   To ensure loan input was in compliance with banking law and regulations.  Work closely with auditing teams.  Utilized report writing programs for executive management.  Worked directly with the CEO, CFO, etc.  Daily General Ledger Balancing.

| | EMPLOYER | FROM | TO | POSITION |
|---|---|---|---|---|
| 3. | Security Bank | 1994 | 1998 | Loan Processor |

Job Duties   To ensure loan input was in compliance with banking law and regulations.  Daily General Ledger Balancing.

**Discuss your STRENGTHS as a CCA employee**

I am a reliable, conscientious and respectful team member of CCA.  I am very receptive to change and different methods of conducting day - to - day tasks.  I feel I can be an asset to any team with my management and procedure development skills.

Employee's Signature

CCA 01277



**CORRECTIONS CORPORATION OF AMERICA**
McRae Correctional Facility

# MEMORANDUM

**TO:**      Walt C. Wells, Warden

**FROM:**  Marc R. Gunn, Assistant Warden, Operations

**SUBJECT:** Records Manager Interviews

**DATE:**    January 12, 2010

The interview board to fill the vacant Records Manager position was held on Friday, January 08, 2010 and Monday, January 11, 2010. The board consisted of Tamara Jordan, Unit Manager; Cynthia Wilkinson, Chief of Unit Management and me. The following information is for your review in making a selection for the Records Manager position.

| Ranking by Seniority | Employee Name | McRae Experience | Total Experience | Awards / PSN's | Performance Appraisal Score | Total Interview Score |
|---|---|---|---|---|---|---|
| 1 | Stacy A. Bentson | 7 years and 2 months | 7 years and 2 months – 3 years and 10 months in Records Supervisor position | Employee of the Month – March 2003 | ER | 103 |
| 2 | Verneisa M. Jackson | 6 years and 4 months | 6 years and 4 months – Has Master's degree in Management | Performance Award – July 2009; Performance Award – August 2008; PSN – May' 2008; 100% Club Award – (1 year) – 2005 | ER | 97 |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |

CCA 01329

| 3 | Charles W. McVey | 5 years and 10 months | 5 years and 10 months - Has Associate degree in Business Management | Performance Award – July 2009 | ER | 92 |
| 4 | Patricia A. L. Murphy | 2 years and 2 months | 2 years and 2 months -- Has Bachelor degree -- Business Administration | N/A | ER | 75 |
| 5 | Michael C. Carter | 7 months | 7 months -- Has Associate of Arts degree | N/A | None submitted | 77 |

*CONFIDENTIAL MATERIAL – LIMITED OFFICIAL USE*
112 Jim Hammock Drive, P.O. Box 388, McRae, GA  31055  Phone: 229-868-7778
FAX Main Building: (229)868-7964; Administration: (229)868-7640; Human Resources: (229)868-6810

CCA 01330

EXHIBIT 8



CORRECTIONS CORPORATION OF AMERICA
McRae Correctional Facility

# MEMORANDUM

**TO:**       Walt C. Wells, Warden

**FROM:**   Jody L. Yancey, Assistant Chief of Security

**THRU:**   Marc R. Gunn, Assistant Warden, Operations

**SUBJECT:** Assistant Shift Supervisor Interviews

**DATE:**     September 04, 2009

The interview board to fill the vacant Assistant Shift Supervisor position(s) was conducted on August 31, 2009 and September 3, 2009. The board consisted of Carol Lavely, Executive Assistant, Ricardo Angel, Case Manager Supervisor and me. The following information is for your review in making a selection for the Assistant Shift Supervisor position(s).

| Ranking by Seniority | Employee Name | McRae Experience | Total Experience | Awards / PSN's | Performance Appraisal Score | Total Interview Score |
|---|---|---|---|---|---|---|
| 1 | Milania M. Lane | 6 years and 4 months | 6 years and 4 months | Letter of Commendation (NEOCC) – June 2005 | ER | 91 |
| 2 | Barbara A. Price | 6 years and 3 months | 9 years and 7 months | Supervisor of the Month – May 2007; 100% Club (1 Year) – July 2004 | MR | 60 |
| 3 | Katee A. Cameron | 6 years and 1 month | 6 years and 1 month; Has Bachelor degree in Criminal Justice | Performance Award – May 2009; Employee of the Month – October 2005 | ER | 106 |
| 4 | Mario J. Antonetty | 1 year and 1 month (External) | 5 years and 2 months | N/A | N/A | 70 |
| 5 | Leondress Faison | External Candidate | 14 years and 11 months | N/A | N/A | 124 |

EXHIBIT 86

EXHIBIT 9

**Corrections Corporation of America**
**June 2009 - May 2010 Time and Pay History Detail Report Computation**
**Vernessa M. Jackson, EE # 1703007**

| Pay Period | Pay Type | Description | Hours | Account Number | Hourly Rate | Gross | Librarian Rate | Difference Due | Wages Due |
|---|---|---|---|---|---|---|---|---|---|
| 06/06/09 | 200 | Overtime | 2.70 | | $ 26.91 | $ 72.66 | $ 36.92 | $ 10.01 | $ 27.03 |
| 06/06/09 | 1 | Regular | 79.90 | 25030007 | $ 17.94 | $ 1,433.41 | $ 24.61 | $ 6.67 | $ 532.93 |
| 06/20/09 | 300 | Holiday | 8.00 | | $ 17.94 | $ 143.52 | $ 24.61 | $ 6.67 | $ 53.36 |
| 06/20/09 | 1 | Regular | 64.03 | | $ 17.94 | $ 1,148.70 | $ 24.61 | $ 6.67 | $ 427.08 |
| 06/20/09 | 804 | Personal SC | 8.00 | | $ 17.94 | $ 143.52 | $ 24.61 | $ 6.67 | $ 53.36 |
| 07/04/09 | 1 | Regular | 53.53 | 25030007 | $ 17.94 | $ 960.33 | $ 24.61 | $ 6.67 | $ 357.05 |
| 07/04/09 | 804 | Personal SCA | 16.00 | 25030007 | $ 17.94 | $ 287.04 | $ 24.61 | $ 6.67 | $ 106.72 |
| 07/18/09 | 1 | Regular | 76.53 | | $ 17.94 | $ 1,372.95 | $ 24.61 | $ 6.67 | $ 510.46 |
| 07/18/09 | 200 | Overtime | 1.05 | | $ 26.91 | $ 28.26 | $ 36.92 | $ 10.01 | $ 10.51 |
| 07/18/09 | 804 | Personal SCA | 1.50 | 25030007 | $ 17.94 | $ 26.91 | $ 24.61 | $ 6.67 | $ 10.01 |
| 08/01/09 | 1 | Regular | 68.35 | | $ 17.94 | $ 1,226.20 | $ 24.61 | $ 6.67 | $ 455.89 |
| 08/01/09 | 807 | Sick SCA | 12.00 | | $ 17.94 | $ 215.28 | $ 24.61 | $ 6.67 | $ 80.04 |
| 08/01/09 | 804 | Personal SCA | 1.00 | | $ 17.94 | $ 17.94 | $ 24.61 | $ 6.67 | $ 6.67 |
| 08/01/09 | 200 | Overtime | 2.55 | | $ 26.91 | $ 68.62 | $ 36.92 | $ 10.01 | $ 25.53 |
| 08/15/09 | 1 | Regular | 65.48 | 25030007 | $ 17.94 | $ 1,174.71 | $ 24.61 | $ 6.67 | $ 436.575 |
| 08/25/09 | 804 | Personal SCA | 4.00 | 25030007 | $ 17.94 | $ 71.76 | $ 24.61 | $ 6.67 | $ 26.68 |
| 08/25/09 | 807 | Sick SCA | 8.00 | | $ 17.94 | $ 143.52 | $ 24.61 | $ 6.67 | $ 53.36 |
| 08/29/09 | 1 | Regular | 44.82 | 25030007 | $ 17.94 | $ 804.07 | $ 24.61 | $ 6.67 | $ 298.95 |
| 08/29/09 | 804 | Personal SCA | 16.00 | | $ 17.94 | $ 287.04 | $ 24.61 | $ 6.67 | $ 106.72 |
| 08/29/09 | 807 | Sick SCA | 14.75 | | $ 17.94 | $ 264.62 | $ 24.61 | $ 6.67 | $ 98.38 |

CCA 00726

CCA 00727

| Date | Code | Type | Hours | Account | Rate | Amount | | | |
|---|---|---|---|---|---|---|---|---|---|
| 09/12/09 | 1 | Regular | 67.58 | | $17.94 | 1,212.39 | $24.61 | $6.67 | 450.76 |
| 09/12/09 | 300 | Holiday | 8.00 | | $17.94 | 143.52 | $24.61 | $6.67 | 53.36 |
| 09/12/09 | 804 | Personal SCA | 3.75 | | $17.94 | 67.28 | $24.61 | $6.67 | 25.01 |
| 09/26/09 | 1 | Regular | 75.48 | 25030007 | $17.94 | 1,354.11 | $24.61 | $6.67 | 503.45 |
| 10/10/09 | 1 | Regular | 77.90 | 25030007 | $17.94 | 1,397.53 | $24.61 | $6.67 | 519.59 |
| 10/24/09 | 1 | Regular | 66.95 | 25030007 | $17.94 | 1,201.08 | $24.61 | $6.67 | 446.56 |
| 10/24/09 | 807 | Sick SCA | 8.00 | 25030007 | $17.94 | 143.52 | $24.61 | $6.67 | 53.36 |
| 11/07/09 | 1 | Regular | 71.48 | 25030007 | $17.94 | 1,282.35 | $24.61 | $6.67 | 476.77 |
| 11/21/09 | 1 | Regular | 63.28 | 25030007 | $17.94 | 1,135.24 | $24.61 | $6.67 | 422.08 |
| 12/05/09 | 1 | Regular | 44.73 | 25030007 | $17.94 | 802.46 | $24.61 | $6.67 | 298.35 |
| 12/05/09 | 807 | Sick SCA | 2.00 | | $17.94 | 35.88 | $24.61 | $6.67 | 13.34 |
| 12/05/09 | 804 | Personal SCA | 17.00 | | $17.94 | 304.98 | $24.61 | $6.67 | 113.39 |
| 12/05/09 | 300 | Holiday | 16.00 | | $17.94 | 287.04 | $24.61 | $6.67 | 106.72 |
| 12/19/09 | 1 | Regular | 44.95 | 25030007 | $17.94 | 806.40 | $24.61 | $6.67 | 299.82 |
| 12/19/09 | 804 | Personal SCA | 16.00 | | $17.94 | 287.04 | $24.61 | $6.67 | 106.72 |
| 12/19/09 | 807 | Sick SCA | 5.00 | 25030007 | $17.94 | 89.70 | $24.61 | $6.67 | 33.35 |
| 01/02/10 | 1 | Regular | 24.47 | | $17.94 | 438.99 | $24.61 | $6.67 | 163.21 |
| 01/02/10 | 804 | Personal SCA | 21.37 | | $17.94 | 383.38 | $24.61 | $6.67 | 142.54 |
| 01/02/10 | 799 | PTO Prior Yr | 18.17 | | $17.94 | 325.97 | $24.61 | $6.67 | 121.19 |
| 01/02/10 | 300 | Holiday | 16.00 | | $17.94 | 287.04 | $24.61 | $6.67 | 106.72 |
| 01/16/10 | 1 | Regular | 52.18 | 25030007 | $17.94 | 936.11 | $24.61 | $6.67 | 348.04 |
| 01/30/10 | 1 | Regular | 69.47 | | $17.94 | 1,246.29 | $24.61 | $6.67 | 463.36 |

CCA 00728

| Date | Code | Type | Hours | | Rate | Gross | Rate | Total Backwages Due |
|---|---|---|---|---|---|---|---|---|
| 01/30/10 | 200 | Overtime | 6.97 | | $ 26.91 | $ 187.56 | $ 36.92 | $ 69.77 |
| 01/30/10 | 807 | Sick SCA | 3.75 | | $ 17.94 | $ 67.28 | $ 24.61 | $ 25.01 |
| 02/13/10 | 1 | Regular | 18.88 | 25030007 | $ 17.94 | $ 338.71 | $ 24.61 | $ 125.93 |
| 02/27/10 | 804 | Personal SCA | 32.00 | | $ 17.94 | $ 574.08 | $ 24.61 | $ 213.44 |
| 02/27/10 | 300 | Holiday | 24.00 | | $ 17.94 | $ 430.56 | $ 24.61 | $ 160.08 |
| 02/27/10 | 1 | Regular | 11.05 | 25030007 | $ 17.94 | $ 198.24 | $ 24.61 | $ 73.70 |
| 04/24/10 | 400 | Bonus | | | | $ 450.00 | | |
| | | Hours / Bonus | 1,434.60 | 25030007 | GROSS | $ 26,305.79 | | $ 9,613.10 |



**U.S. Wage and Hour Division**
**U.S. Department of Labor**
**Wage and Hour Division**

**Receipt for Payment of Back Wages,**
**Employment Benefits, or Other Compensation**

Contract Number:JIPCC-008

I, _____ Jackson, Vernetta _____, have received payment of wages, employment benefits,
(typed or printed name of employee)

or other compensation due to me from _____ McRae Correctional Facility, 112 Jim Hammuck Drive, Mc Rae, GA 31055 _____
(name and location of the establishment)

for the period beginning with the workweek ending _____ 06/06/2009 _____ through the workweek

ending _____ 02/27/2010 _____. The amount of the payment I received is shown below.

This payment of wages and other compensation was calculated or approved by the Wage and Hour Division and is based on
the findings of a Wage and Hour Division investigation. This payment is required by the Act(s) indicated below in the marked
box(es):

☐ Fair Labor Standards Act                ☑ Service Contract Act
☐ Family and Medical Leave Act            ☐ Davis-Bacon and Related Act(s) _____
☐ Employee Polygraph Protection Act       ☐ Other _____
☐ Migrant and Seasonal Agricultural Worker Protection Act
☐ Contract Work Hours and Safety Standards Act

Gross Amount Back Wages _____ $9,613.10

× Legal Deductions _____ $3,234.81

Other Amount Paid _____
(please specify type)

× Net Amount Received _____ $6,378.29

NOTICE TO EMPLOYEE UNDER THE FAIR LABOR STANDARDS ACT (FLSA) – Your acceptance of this payment of
wages and other compensation due under the FLSA based on the findings of the Wage and Hour Division means that you
have given up the right you have to bring suit on your own behalf for the payment of such unpaid minimum wages or unpaid
overtime compensation for the period of time indicated above and an equal amount in liquidated damages, plus attorney's
fees and court costs under Section 16(b) of the FLSA. Generally, a 2-year statute of limitations applies to the recovery of back
wages. Do not sign this receipt unless you have actually received this payment in the amount indicated above of the wages
and other compensation due you.

×Signature of employee _____ ×Date _____

×Address _____

**EMPLOYER'S CERTIFICATION TO WAGE AND HOUR DIVISION OF THE**
**DEPARTMENT OF LABOR:**

×I hereby certify that I have on this (Date) _____ paid the above-named
employee in full covering lost or denied wages or other compensation as stated above.

× Signature _____ ×Title _Assistant General Counsel_
(Employer or authorized representative)

**PENALTIES INCLUDING FINES OR IMPRISONMENT ARE PRESCRIBED FOR A FALSE**
**STATEMENT OR MISREPRESENTATION UNDER U.S. CODE, TITLE 18, SEC. 1001**

1. WAGE AND HOUR COPY                                Form WH-58 (Rev. September 2010)

Date: 06/21/2012 11:44:54 AM          Case ID: 1596085                         Page 1

JACKSON et al.; v. CORRECTION CORPORATION OF AMERICA
V. JACKSON CONFIDENTIAL # 280

Summary of Unpaid Wages

**U.S. Department of Labor**
Wage and Hour Division

| ( Office Address) | Investigator: | Date: |
|---|---|---|
| Atlanta GA District Office<br>U.S. Department of Labor<br>Wage and Hour Division<br>61 Forsyth Street, S.W., Room 7M10<br>Atlanta, GA  30303<br>404-893-4600 | Warren Williams<br><br>Employer Fed Tax ID Number   62-1806755 | 06/05/2012 |

| 1. Name | 2. Address | 3. Period Covered by Work Week Ending Dates | 4. Act(s) | 5. Gross Amounts Due |
|---|---|---|---|---|
| 1. McRae Jackson, Vernelsa | 2580 Country Club Dr.<br>Conyers, GA  30013 | 08/08/2009<br>to   02/27/2010 | 3 | $9,480.26 |

| | | TOTAL | $9,480.26 |
|---|---|---|---|
| I agree to pay the listed employees the back wages shown due and to mail proof of payment to the Wage and Hour District Office shown above by<br><br>7/27/2012<br>Signed: _[signature]_ | Employer Name and Address:<br><br>McRae Correctional Facility<br>Corrections Corporation of America<br>112 Jim Hammock Drive<br><br>Mc Rae, GA 31055 | | * Column 4-Code<br>FLSA        1<br>PCA         2<br>SCA         3<br>CWHA      4<br>DWHSSA   5<br>CCPA       6<br>FHRA       7 |

Form WH-56

Date: 06/05/2012 7:37:34 PM          Case ID:  1596085          Page 1

JACKSON et al.; v. CORRECTION CORPORATION OF AMERICA<br>V. JACKSON CONFIDENTIAL # 281

Summary of Unpaid Wages

**U.S. Department of Labor**
Wage and Hour Division

| ( Office Address) | Atlanta GA District Office<br>U.S. Department of Labor<br>Wage and Hour Division<br>61 Forsyth Street, S.W., Room 7M10<br>Atlanta, GA  30303<br>404-893-4600 | Investigator:<br>**Warren Williams** | Date:<br>06/05/2012 |
|---|---|---|---|
| | | Employer Fed Tax ID Number   **62-1606765** | |

| 1. Name | 2. Address | 3. Period Covered by Work Week Ending Dates | 4. Act(s) | 5. Gross Amounts Due |
|---|---|---|---|---|
| 1. *McRae Jackson, Vernelsa* | *2580 Country Club Dr.*<br>*Conyers, GA  30013* | *06/06/2009*<br>to   *01/30/2010* | *1* | *$132.84* |

| I agree to pay the listed employees the back wages shown due and to mail proof of payment to the Wage and Hour District Office shown above by<br><br>_4/24/2012_<br>Signed: _Susan G. [signature]_ | Employer Name and Address:<br><br>*McRae Correctional Facility*<br>*Corrections Corporation of America*<br>*112 Jim Hammock Drive*<br><br>*Mc Rae, GA 31055* | | TOTAL. | $132.84 |
|---|---|---|---|---|

* Column 4-Code

| | |
|---|---|
| FLSA | 1 |
| PCA | 2 |
| SCA | 3 |
| DBRA | 4 |
| CWHSSA | 5 |
| CCPA | 6 |
| FMLA | 7 |

Form WH-56

Date: 06/05/2012 7:38:22 PM        Case ID:  1596085        Page 1

JACKSON et al.; v. CORRECTION CORPORATION OF AMERICA
V. JACKSON CONFIDENTIAL # 282

EXHIBIT 10

**SCA DIRECTORY OF OCCUPATIONS**
**(Fifth Edition)**

## 01000 ADMINISTRATIVE SUPPORT AND CLERICAL OCCUPATIONS

This category includes occupations concerned with preparing, transcribing, transferring, systematizing, and preserving both written and computerized communications and records; gathering and distributing information. The duties in this category also include: operating office machines; storing, distributing, accounting for stores of materials; distributing mail and delivering messages. Performing other administrative support and clerical duties may be required.

01010 ACCOUNTING CLERK (Occupational Base)

The Accounting Clerk performs one or more accounting tasks such as; posting to registers and ledgers; balancing and reconciling accounts; verifying the internal consistency, completeness, and mathematical accuracy of accounting documents. In addition, tasks include; assigning prescribed accounting distribution codes; examining and verifying the clerical accuracy of various types of reports, lists, calculations, and postings.

This position is responsible for preparing journal vouchers; making entries of adjustments to accounts; and working with spreadsheets. Level I requires a basic knowledge of routine clerical methods, office practices and procedures as they relate to the clerical processing and recording of transactions. Levels II and III require a knowledge and understanding of the established and standardized bookkeeping and accounting procedures and techniques used in an accounting system, or a segment of an accounting system where there are few variations in the types of transactions handled. In addition, most jobs at each level will require a basic knowledge and understanding of the terminology, codes, and processes used in an automated accounting system.

01011 ACCOUNTING CLERK I

This position is responsible for performing one or more routine accounting clerical operations such as: examining, verifying, and correcting various accounting documents to ensure completeness and accuracy of data in accordance to accounting procedures. Specific tasks/duties are assigned under adequate supervision. Entry-level reconciliation and posting will be assigned under detailed guidance. In most instances, an employee in this position will rely on the supervisors' instructions. Completed work will be reviewed for accuracy and compliance with procedures.

that have been conceived by others and presented in the form of rough sketches.  This illustrator does not exercise an extensive knowledge of the subject matter involved when preparing medical, scientific or technical equipment illustrations, but does acquire information about the subject assigned to illustrate and develop a background of subject matter knowledge through carrying out these illustrating assignments.  However, the kind of illustrating work assigned does not require an extensive prior knowledge about the subjects illustrated.

13043 ILLUSTRATOR III

The projects to which the Illustrator III are assigned, usually involve several of the common art media (as in the case of Illustrator II), but the illustrations themselves typically require a higher degree of skill in the use of many of the media.  This degree of skill is required for the following reasons:  (a) the speed with which the illustration must be completed requires the ability to work quickly and competently in order to produce an acceptable finished product within the available time limit.  (b) The illustration calls for the use of fine detail, special artistic effects, or an unusual use of the chosen medium or;  (c) The method of reproduction, how the illustration will be used, or the information or artistic results desired, calls for exceptional care and skill in the use of the medium.

The themes illustrated may be either concrete in nature or they may represent ideas and abstract concepts.  The illustrations differ from those typical of Illustrator II in that they are expected to interpret the publications, chart, poster, or exhibit in which they appear, while Illustrator II presents factual, rather than interpretative material.  Illustrator III is required to have knowledge of a specialized subject matter field such as medicine, science, or technical equipment, and will prepare illustrations that are designed to reproduce the appearance of specific medical or scientific specimens or of pieces of technical equipment.

13047  LIBRARIAN

The Librarian maintains library collections of books, serial publications, and documents, audiovisual and other materials and assists groups and individuals in locating and obtaining materials, furnishes information on library activities, facilities, rules and services, explains and assists in use of reference sources, such as card or book catalog, or book and periodical indexes to locate information.  This worker issues and receives materials for circulation or use in library, assembles and arranges displays of books and other library materials, maintains reference and circulation materials.  The Librarian also answers correspondence on special reference subjects, may compile list of library materials according to subjects or interests, and may select, order, catalog and classify materials.

13050 LIBRARY AIDE/CLERK

The Library Aide/Clerk works under the supervision of Librarian and Library Technician at the main circulation desk following simple repetitive tasks including; issuing library cards, explaining library rules and borrowing procedures, recording information such as reports of lost or damaged items, requests for materials, and overdue materials and refers this

information to Library Technician or Librarian.  This Worker contacts borrowers by telephoning or issuing overdue notices, shelves books, magazines, and other materials under supervision of Library Technician or Librarian, accesses and enters limited routine information in a few screens of automated database, performs routine clerical duties such as referring callers or visitors to appropriate staff, and assists Library Technician with processing duties such as labeling and stamping and preparing materials such as posters or book lists for events.

13054 LIBRARY INFORMATION TECHNOLOGY SYSTEMS ADMINISTRATOR

The Library Information Technology Systems Administrator administers and supports daily operational requirements of library and information computer network systems including workstation, file servers, and web servers.  Duties typically involve the installation of hardware, software, systems upgrades, network accounts, network security, and web page design, interface and updates, planning and implementing long-range automation plan, period reports, and local system design documentation.  This Administrator trains staff on software applicable to their position, assists patrons with information technology, and provides instruction on computers and applications.

13058 LIBRARY TECHNICIAN

The Library Technician provides information service such as answering questions regarding card catalogs and assists in the use of bibliographic tools, such as Library of Congress catalog.  The incumbent performs routine cataloging of library materials, files cards in catalog drawers according to system used, answers routine inquiries, and refers persons requiring professional assistance to Librarian.  This Technician verifies bibliographic information on order requests, works or directs workers in maintenance of stacks or in section of department or division with tasks such as ordering or receiving section of acquisitions department, card preparation activities in catalog department, or limited loan or reserve desk operation of circulation department.

13060 MEDIA SPECIALIST (Occupational Base)

The Media Specialist maintains functionality (expiration dates, incorrect labeling, etc.) for a variety of media sources, e.g., tapes, cassettes, microfiche, film, and compact disks/DVDs, in addition to introduction of new media technology.  Troubleshoots and resolves media errors and data processing problems; lower level media specialists focus on preplanned procedures when troubleshooting, while higher level media specialist may deviate from standard operating procedures.

13061 MEDIA SPECIALIST I

The Media Specialist I maintains library of media (tapes, cassettes and microfiche), which presents few difficult data processing problems (e.g. damaged media or misplaced media).  In response to data processing problems, this person applies data processing or corrective procedures, refers problems which do not have preplanned procedures, and works under general supervision of the higher-level Media Specialists.

46



| Job Title | | Job Code |
|---|---|---|
| LIBRARY AIDE | | 5017 |

| Department | EEO Code | EEO Category | FLSA Status | Hours/Week | Full Time | Part Time |
|---|---|---|---|---|---|---|
| 06 | 005 | OC | Non Exempt | 40 | X | N/A |

## SUMMARY:

The Library Aide is responsible for the supervision of a general purpose and/or law library designed to accommodate the social, educational and legal interest and needs of an inmate population. In addition to obtaining and maintaining reference materials for inmates, the Library Aide will ensure adequate resource materials for facility employees.

## ESSENTIAL FUNCTIONS:

The successful applicant should be able to perform ALL of the following functions at a pace and level of performance consistent with the actual job performance requirements.

- Develop and maintain library catalog system that identifies specific categories and subject matter.

- Examine book reviews, publishers' catalogs and other information sources to recommend acquisition of material consistent with the needs of the population; order and maintain reference materials for inmates/residents.

- Direct workers and/or staff in performing such tasks as receiving, shelving and locating materials.

- Search catalog files, biographical dictionaries and indexes and examine content of reference materials to assist individuals in locating and selecting materials.

- Assemble and arrange materials for display.

- Develop policies and procedures governing the use of library, equipment and supplies.

- Develop goals and objectives based on staff and inmate needs and interests.

- Develop an annual budget to purchase books, periodicals, magazines and other materials based on needs, laws, regulation and applicable standards governing the library operation and the replacement of materials that are beyond repair.

- Create and encourage the use of reading programs that serve as a therapeutic release of negative attitudes and provide new positive interests.

 

| Job Title | Job Code |
|---|---|
| LIBRARY AIDE | 5017 |

- Oversee the maintenance and sanitation of library area.

- Develop and maintain an accounting system to monitor the location of books and persons responsible for proper treatment and return of materials back to the library; conduct inventories, as required, to monitor compliance.

- Conduct, or assist in conducting, physical inventories of library holding, supplies, equipment and/or related materials, as required.

- Create and/or maintain general files in an organized manner, to include sorting, labeling, filing and retrieving, in accordance with corporate and facility file retention and storage procedures; and maintain confidentiality and security of records.

- Assist administration in implementing and enforcing all policies and rules governing inmate conduct; develop reasonable procedures and rules of behavior; and maintain order in a fair and just manner.

- Participate in faculty and/or professional meetings, conferences and training workshops.

- Prepare and maintain a variety of standard narrative, statistical, summary and/or operational records, reports and logs, using appropriate grammar, to include filing, alphabetizing and labeling; review reports and records produced by staff; properly process all reports and documents in a timely manner.

- Thoroughly, neatly and legibly complete required forms or records.

- Read and comprehend textbooks, reference materials, handwritten text, correspondence, policies, regulations, procedures, reports, directions for forms completion and other simple or moderately complex documents.

- Communicate effectively and coherently with staff, inmates/students and visitors, to include responding to verbal/written inquiries and requests or referring to appropriate staff member; giving information and directions; mediating disputes; advising of rights and processes.

- Answer telephone and route calls and/or take accurate and legible messages.

- Review, process and respond (via corporate counsel) to lawsuits; attend court hearings, when necessary.



| Job Title | Job Code |
|-----------|----------|
| LIBRARY AIDE | 5017 |

- Demonstrate communication skills, including providing reliable testimony, in court and other formal settings as the need may arise.

- Maintain equipment and supplies as required; order replacement items in a timely manner; requisition appropriate purchases as required.

- Attend scheduled staff meetings, promote communications and the proper flow of relevant information between administration, staff and inmates/residents.

- Perform searches of people, objects capable of concealing contraband, buildings and outdoor areas which will involve detecting and identifying objects and detaining people.

- Monitor the area and make reliable visual identification of inmates/students, authorized personnel and other individuals to maintain safety and security.

- Engage in functions in confined areas and physically check doors, windows and other areas to confirm that they are secure.

- Endure verbal and mental abuse when confronted with the hostile views and opinions of inmates/residents and others encountered in an antagonistic environment.

- Perform rescue functions at accidents, emergencies and disasters to include administering basic emergency medical aid, physically removing people away from dangerous situations, and securing and evacuating people from confined areas.

- Take appropriate action to prevent or diffuse potentially disruptive situations.

- Monitor safety practices; prepare and disseminate safety and accident reports as required by policy; take appropriate action in cases of serious and unusual incidents and emergencies.

- Operate audio-visual equipment.

- Endeavor to comply with the requirements of applicable regulations, laws, rules, procedures, policies, standards and/or contract.

- Experience exposure to body fluids, wastes and experience encounter with deceased or contagious persons.

- Establish and maintain effective working relations with others and handle difficult interpersonal contacts.



| Job Title | Job Code |
|---|---|
| **LIBRARY AIDE** | **5017** |

- Define problems, collect data, establish facts and draw valid conclusions; apply management techniques to problems of administration and devise workable solutions.

- Add, subtract, multiply and divide using whole numbers, common fractions and decimals; apply concepts such as fractions, percentages, ratios and proportions to practical situations.

- Participates in in-service and other training programs as required.

- Remain alert at all times and react quickly, efficiently and calmly in emergency and other high stress situations.

**QUALIFICATIONS:**

Graduate from an accredited college or university with a degree in library science preferred. Prior library experience that includes program development, usage of reference materials and information services is also preferred. Demonstrate a working knowledge of audio-visual equipment and be familiar with audio-visual materials. A valid driver's license is preferred, unless required by contract or applicable statute.

| Job Title | Job Code |
|---|---|
| LIBRARIAN | 2013 |

| Department | EEO Code | EEO Category | FLSA Status | Hours/Week | Full Time | Part Time |
|---|---|---|---|---|---|---|
| 08 | 002 | P | Exempt | ... | X | N/A |

## SUMMARY:

The Librarian coordinates the activities of a general purpose and/or law library designed to accommodate the social, educational and legal interest and needs of an inmate/resident population.   Also acquires and maintains adequate resource materials for facility employees.

## ESSENTIAL FUNCTIONS:

The successful applicant should be able to perform ALL of the following functions at a pace and level of performance consistent with the actual job performance requirements. Any additional qualifications and/or essential job functions for specific facility locations will be contained in Appendix A.

- Develop and maintain library catalog system that identifies specific categories and subject matter.

- Examine book reviews, publishers' catalogs and other information sources to recommend acquisition of material consistent with the needs of the population; order and maintain reference materials for inmates/residents.

- Direct workers and/or staff in performing such tasks as receiving, shelving and locating materials.

- Search catalog files, biographical dictionaries and indexes and examine content of reference materials to assist individuals in locating and selecting materials.

- Assemble and arrange materials for display.

- Develop policies and procedures governing the use of library, equipment and supplies.

- Develop goals and objectives based on staff and inmate needs and interests.

| Job Title | Job Code |
|-----------|----------|
| LIBRARIAN | 2013 |

- Develop an annual budget to purchase books, periodicals, magazines and other materials based on needs, laws, regulation and applicable standards governing the library operation and the replacement of materials that are beyond repair.

- Create and encourage the use of reading programs that serve as a therapeutic release of negative attitudes and provide new positive interests.

- Oversee the maintenance and sanitation of library area.

- Develop and maintain an accounting system to monitor the location of books and persons responsible for proper treatment and return of materials back to the library; conduct inventories, as required, to monitor compliance.

- Conduct, or assist in conducting, physical inventories of library holding, supplies, equipment and/or related materials, as required.

- Create and/or maintain general files in an organized manner, to include sorting, labeling, filing and retrieving, in accordance with corporate and facility file retention and storage procedures; and maintain confidentiality and security of records.

- Assist administration in implementing and enforcing all policies and rules governing inmate conduct; develop reasonable procedures and rules of behavior; and maintain order in a fair and just manner.

- Participate in faculty and/or professional meetings, conferences and training workshops.

- Prepare and maintain a variety of standard narrative, statistical, summary and/or operational records, reports and logs, using appropriate grammar, to include filing, alphabetizing and labeling; review reports and records produced by staff; properly process all reports and documents in a timely manner.

- Thoroughly, neatly and legibly complete required forms or records.

- Read and comprehend textbooks, reference materials, handwritten text, correspondence, policies, regulations, procedures, reports, directions for forms completion and other simple or moderately complex documents.

- Communicate effectively and coherently with staff, inmates/students and visitors, to include responding to verbal/written inquiries and requests or referring to appropriate staff member; giving information and directions; mediating disputes; advising of rights and processes.

| Job Title | Job Code |
|---|---|
| LIBRARIAN | 2013 |

- Answer telephone and route calls and/or take accurate and legible messages.
- Review, process and respond (via corporate counsel) to lawsuits; attend court hearings, when necessary.

- Demonstrate communication skills, including providing reliable testimony, in court and other formal settings as the need may arise.

- Maintain equipment and supplies as required; order replacement items in a timely manner; requisition appropriate purchases as required.

- Attend scheduled staff meetings, promote communications and the proper flow of relevant information between administration, staff and inmates.

- Perform searches of people, objects capable of concealing contraband, buildings and outdoor areas which will involve detecting and identifying objects and detaining people.

- Monitor the area and make reliable visual identification of inmates/students, authorized personnel and other individuals to maintain safety and security.

- Engage in functions in confined areas and physically check doors, windows and other areas to confirm that they are secure.

- Endure verbal and mental abuse when confronted with the hostile views and opinions of inmates/students and others encountered in an antagonistic environment.

- Perform rescue functions at accidents, emergencies and disasters to include administering basic emergency medical aid, physically removing people away from dangerous situations, and securing and evacuating people from confined areas.

- Take appropriate action to prevent or diffuse potentially disruptive situations.

- Monitor safety practices; prepare and disseminate safety and accident reports as required by policy; take appropriate action in cases of serious and unusual incidents and emergencies.

- Experience exposure to body fluids, wastes and experience encounter with deceased or contagious persons.

| Job Title | Job Code |
|-----------|----------|
| LIBRARIAN | 2013 |

- Endeavor to comply with the requirements of applicable regulations, laws, rules, procedures, policies, standards and/or contract.

- Establish and maintain effective working relations with others and handle difficult interpersonal contacts.
- Define problems, collect data, establish facts and draw valid conclusions; apply management techniques to problems of administration and devise workable solutions.

- Add, subtract, multiply and divide using whole numbers, common fractions and decimals; apply concepts such as fractions, percentages, ratios and proportions to practical situations.

- Participates in in-service and other training programs as required.

- Remain alert at all times and react quickly, efficiently and calmly in emergency and other high stress situations.


**QUALIFICATIONS:**

Graduate from an accredited college or university with degree in library science. Must possess certificate, license or other legal credentials required in the state of employment. Requires prior library experience, knowledge of informational services and legal reference materials. A valid driver's license may be necessary to comply with state or contract requirements.



**CORRECTIONS CORPORATION OF AMERICA**
McRae Correctional Facility

# MEMORANDUM

**TO:**       Walt C. Wells, Warden

**FROM:**   Lee Vaughn, Assistant Warden, Programs

**SUBJECT:** Unit Manager Interviews

**DATE:**     January 31, 2008

The interview board to fill two vacant Unit Manager positions was conducted on beginning on January 17, 2008 and finalizing on January 28, 2008. The board consisted of Cynthia Wilkinson, Chief of Unit Management and me. After completion of the interview process, the board would like to recommend the following candidate for your consideration: Tamara Jordan.

| Ranking by Seniority | Employee Name | McRae Experience | Total Experience | Awards / PSN's | Performance Appraisal Score | Total Interview Score |
|---|---|---|---|---|---|---|
| 1 | Nereida I. Huerta | 5 years and 5 months | 5 years and 5 months | Translator Award – August 2006 Employee of the Month – December 2004 | FE | 84 |
| 2 | Latarus L. Newson | 5 years and 1 month | 7 years and 10 months | Supervisor of the Month (Respect) – April 2006 | ER | 69 |
|   |   |   |   |   |   |   |
|   |   |   |   |   |   |   |
|   |   |   |   |   |   |   |
|   |   |   |   |   |   |   |
|   |   |   |   |   |   |   |
|   |   |   |   |   |   |   |

| 9 | Steven D. Thornton | 3 years and 6 months | 5 years and 1 month – Has 2 years and 1 month Military experience | N/A | ER | 75 |
| 10 | Martin L. Brock | 3 years and 2 months | 3 years and 2 months – Has BS degree in Sociology; 20 years Military experience | N/A | ER | 77 |
| 11 | Brandon T. Reynolds | 2 years and 7 months | 6 years and 7 months | Supervisor of the Month – February 2007 | ER | 78 |
| 12 | David F. Gilbert | External Candidate | 7 years and 3 months – Has 20 years Military experience | N/A | N/A | 71 |
| 13 | Sandra R. Watkins | Declined Interview | | | | |

*CONFIDENTIAL MATERIAL – LIMITED OFFICIAL USE*
1000 Jim Hammock Drive, P.O. Box 388, McRae, GA  31055  Phone: 229-868-7778
FAX Main Building:  (229)868-7964;  Administration:  (229)868-7640;  Human Resources:  (229)868-6810

CCA 01064

| 3 | Harold K. Wimber II | 5 years and 1 month | 5 years and 1 month – Has BA degree in Sociology; BBA in Business Management | Verbal Reprimand- December 2004 | MR | 70 |
|---|---|---|---|---|---|---|
| 4 | Theodore Ruggenberg, Jr. | 5 years | 14 years and 5 months | N/A | ER | 87 |
| 5 | Joyce A. King | 4 years and 11 months | 4 years and 11 months -- Has BS degrees in Criminal Justice and Human Services | One day suspension – April 2006; Written Reprimand – March 2006 and Three day suspension – March 2004 | MR | 62 |
| 6 | ~~Tamara M Martin~~ | 4 years and 8 months | 4 years and 8 months -- Has ~~Master's degree in Criminal Justice and Technology~~ | Employee of the Month – April 2005 | FE | 92 |
| 7 | Verneisa M. Jackson | 4 years and 5 months | 4 years and 5 months -- Has Master's degree in Science and Management | N/A | ER | 83 |
| 8 | Bobby Cooper, Jr. | 4 years | 7 years and 1 month | N/A | ER | 69 |

CCA 01063

Corrections Corp. of America
Job Posting Log - Salary Based
Job Posting Log-Adult Developmental Applicant List

EuroOpp
CCA00020
Location
EEO Cat
Posting Deadline    JeffCnty Detain BU    EventfK-Level Difficulted & App    1/15/2008    User ID  SPOOLER
Page    13/1:57    JPD11
Environment

Job Type    1012    UNIT MANAGER

| Req. No. | Employee Number | Employee Name | Application Date | Race | Gender | Dob | VET | Current Position | Current Facility # | Interview Date | Remarks |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 257527 | 1293111 | GILBERT, DAVID J | 1/2/2008 | W | M | | | B | UNIT MANAGER | 2902 | 2/5/2008 | Selected pended candidate |
| 257527 | 1644432 | RUGGENBERG JR, THEODORE A | 1/16/2008 | W | M | | | | CASE MANAGER | 2902 | 1/17/2008 | Set App-Mastery yrs of Ed |
| 257527 | 1374101 | LOPEZ, MYONG C | 11/00/2008 | A | F | | | | SECRETARY I | 2502 | 1/17/2008 | Set App-Mastery yrs of Ed |
| 257527 | 1601517 | KURTZ A, NOREEN I | 11/00/2008 | X | F | | | | CASE MANAGER | 2545 | | Denied meets minimums re |
| 257527 | 1875289 | COOPER JR, BOBBY | 11/12/2008 | X | M | | | | CASE MANAGER | 2502 | 1/17/2008 | Set App-Mastery yrs of Ed |
| 257527 | 1459189 | KING, JOYCE A. | 1/18/2008 | W | F | | | | SHIFT SUPERVISOR | 2521 | 1/26/2008 | Set App-Mastery yrs of Ed |
| 257527 | 2014716 | BROCK, MARTIN L | 11/16/2008 | W | M | | | | COUNSELOR | 2551 | 1/26/2008 | Set App-Mastery yrs of Ed |
| 257527 | 1190549 | THORNTON, STEVEN D | 11/15/2008 | B | M | | | B | CASE MANAGER | 2557 | 1/17/2008 | Set App-Mastery yrs of Ed |
| 257527 | 1472534 | WIMBER II, PASOLO K | 6/16/2008 | W | F | | | | ASST SHIFT SUPERVISOR | 2792 | 1/17/2008 | Set App-Mastery yrs of Ed |
| 257527 | 1476758 | JORDAN, TAMARA M | 11/4/2008 | W | M | | | | CASE MANAGER | 2592 | 1/17/2008 | Set App-Mastery yrs of Ed |
| 257527 | 1476394 | WATKINS, SANDRA R | 11/4/2008 | B | F | | | | CASE MANAGER | 2593 | 11/17/2008 | Selected |
| 257527 | 1458819 | REYNOLDS, BRANDON T | 11/5/2008 | W | M | | | | SHIFT SUPERVISOR | 2592 | | Applicant declined interv |
| 257527 | 1790907 | JACKSON, VERNESSA M. | 1/1/2008 | B | M | | | | CASE MANAGER | 2593 | 1/22/2008 | Set App-Mastery yrs of Ed |
| 257527 | 1421310 | NEWSOM, LEON | 1/12/2008 | B | F | | | | ASST SHIFT SUPERVISOR | 2593 | 1/27/2008 | Set App-Mastery yrs of Ed |

CCA 01065

 

 CC1 | **Job Posting Application**

# JOB POSTING APPLICATION

*(Please type or print, using black ink.)*

JUN. 2 5 2009

MCRAE CORRECTIONAL FACILITY
HUMAN RESOURCES DEPARTMENT

Name  Tim Wheaton

Posting
Deadline Tuesday, June 30, 2009 @ 10:00

Position
Desired  Unit Manager

Facility or
Work Location  Mc Rae Correctional Facility          Department Programs

**WORK EXPERIENCE AT CCA** *(Please start with current position and work backward.)*

1.  FROM (Month/Year)  10 / 2008          TO  PRESENT

    Position  Acting Unit Manager          Supervisor Cynthia Wilkinson

    Facility Mc Rae Correctional Facility

    Job Duties:  Provide direct supervision for all staff assigned to the unit which includes directing, scheduling and leave approval, evaluating, training, counseling, recognizing staff and being responsive to staff concerns. Develop the unit plan and unit mision, objectives, schedules, policies and programs. Chair reclassification and other unit team meetings. Make daily rounds through the unit evaluating operations, and talking with staff and inmates. Make rounds through other areas in the facility where    inmates may be temporarily housed, programmed or work. Review all unit paperwork and inmate central files for compliance with audits.

2.  FROM (Month/Year)  10 / 2007          TO  9/2008

    Position Criminal Investigator          Supervisor Stacey Stone

    Facility  McRae Correctional Facility

    Job Duties:  Conduct formal investigations as authorized by the Warden. Maintain records on all investigations, inmate and staff for audit purposes. Directly supervise all STG (Security Threat Groups) activity. Monitor process of all Urinalysis collection of staff and inmates, Monitor process for inmate phone calls going out of the facility, Assist with federal, state, and local law enforcement agencies request, such as collection of records, mail, and setting up interviews of inmates.

3.  FROM (Month/Year)  10/2006          TO  9/2007

    Position Shift Supervisor          Supervisor  Robert Ritenour

    Facility  McRae Correctional Facility

    Job Duties: Enforce policies in a minimum federal custody facility, dealing with male residents. Schedule for employees on shift. Monitor employee's hours. Maintain a safe/secure facility. Review all paperwork for shift. Communicate effectively and coherently to administration, staff, inmates/residents, visitors and the general public, handling difficult interpersonal contacts; particularly in situations requiring tact, diplomacy, understanding, fairness, firmness and good judgment. Deter escapes made/or attempted.

*An EEO/AA Employer M/F/V/H*

**SPECIALIZED SKILLS**(*List any training, skills and certifications you have acquired which would qualify you for consideration for other positions.*)

| TRAINING/SKILLS | MONTHS/YEARS | CERTIFICATION |
|---|---|---|
| ACA / CFM / Operations Mock Auditor | 2 / 8 yrs | No |
| | | |
| | | |

**EDUCATION**

| SCHOOL | FROM (mm/yy) | TO (mm/yy) | DEGREE | BUSINESS-RELATED COURSES COMPLETED |
|---|---|---|---|---|
| St Clair Shores High School | 6 / 82 | 3 / 88 | Yes | None |
| | | | | |
| | | | | |

**PREVIOUS EMPLOYMENT** (*Last three positions held before you began working for CCA.*)

| | EMPLOYER | FROM (mm/yy) | TO (mm/yy) | POSITION |
|---|---|---|---|---|
| 1. | | | | |
| | Job Duties | | | |
| 2. | | | | |
| | Job Duties | | | |
| 3. | | | | |
| | Job Duties | | | |

**Discuss your STRENGTHS as a CCA employee**

As an employee of Corrections Corp. of America, I continue to grow in my career, learning much about the corrections business. I enjoy sharing knowledge I have learned and what I have obtained from others. I have strong principles and apply them each day while performing my duties. My biggest Strength from the CCA way, would be "Integrity" I put this principle first in everything I do. It is who I am, and what I expect from others. I am firm, fair, and consistent with all staff. I look at this as an opportunity for continue learning in my career.

*Employee's Signature*