# EXHIBIT D

# James Hill Affidavit

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
DUBLIN DIVISION

| | |
|---|---|
| VERNEISA JACKSON, | *  *  * |
| Plaintiffs, | *  * |
| v. | *   CIVIL ACTION NO: |
| | *   3:11-cv-111-DHB-WLB |
| CORRECTIONS CORPORATION OF AMERICA, | *  *  * |
| Defendant. | * |

## AFFIDAVIT OF JAMES HILL, JR.

I, James Hill, Jr., swear and affirm under penalty of perjury that the following statements are true and correct to the best of my knowledge, information, belief, and except where indicated to be on information and belief and where so stated I verily believe them to be true:

1. I have personal knowledge of the facts set forth herein and can provide competent testimony regarding these matters.

2. I am over 18 years of age and reside in Baxley, Georgia.

3. I am an African American male.

4. I began my employment with CCA in approximately October 2002.

5. I am currently employed as the Safety Manager for the Defendant in this case, Corrections Corporation of America (Hereafter referred to as "CCA"), which is located in McRae, Georgia. CCA is a minimum security federal detention facility, which operates as a contractor for the U.S. Bureau of Prisons.

6. During my employment at CCA, I reported an incident of harassment by Assistant Warden Orsolits that was witnessed by Daniel Martin. I was later retaliated against by Orsolits in the form of a substandard performance evaluation which led to an inadequate raise in pay, attempts to undermine my ability to effectively perform my job duties, unjustifiable verbal reprimands, and work sabotage.

1

7. In 2005, I was in a meeting with Shirley Ellis, former Human Resource Manager, and Warden Pugh regarding being given a waiver to become Chaplain. Pugh said to Shirley Ellis, "Why can't we give Hill a waiver for the Chaplain position and Wooten a waiver for the Records positions just as we did for the Librarian position."

8. I witnessed Darryl Wooten acting in the capacity of Records Manager in 2005. Wooten acted until he received the training and/or received a waiver to meet the minimum qualification of the Records Manager position after Pat Davis went from full-time employment as Records Manager to a contract position to oversee records. CCA later promoted Wooten to Records Manager in 2007.

9. I spoke to Katie Cameron about training, paid by CCA that she received in order to act as the Disciplinary Hearing Officer when she was still a counselor.

10. During 2009-2010, I have also witnessed white employees; Mr. Yancey, Katie Cameron, Tim Wheaton, Troy Carey, and Darryl Wooten, being given training, acting in positions, and being promoted into positions without regard to the EEO, CCA's posting policy, accepting applications, or interviewing other candidates.

11. During 2008-2009, in my capacity as a department head and by attending meetings, I have personal knowledge of white employees receiving less or no discipline for similar and greater violations of CCA policies than black employees as listed below:

   a) Tim Wheaton, Unit Manager, white male, was continuously accused of harassment by Erika Moye, Tamika Coley, and Pamela King (black females). Wheaton also physically assaulted inmates and a white female, Officer Knowles-Golden. All of these complaints were reviewed by Warden Wells and management but Wheaton was not terminated.

   b) In 2007, I spoke with Fred Hewlett, white male, while we were both members of the Disturbance Control Team (DCT), and he told me that he had accidently fired a gun in a hospital, while on duty; however, he was not terminated. In 2010, Fred Hewlett also brought a vehicle on the back dock without following proper security procedures. Hewlett was suspended along with his supervisor, Captain Tim McNeil, white male, for this breach of security. However, Ms. Erika Moye allowed an inmate to enter an unsecured area within the facility, not outside the facility like Hewlett, but she was terminated for this similar incident which was a

2

lesser breach of security.

c) As Safety Manager, I have personal knowledge of Sergeant Mickey Best, white male, wrecking the facility bus and employees' vehicles; however, he was not terminated or drug tested. A black male, Officer Kinsey, wrecked a perimeter truck, was subjected to a drug test which came back negative, however, he was still terminated.

d) I have personal knowledge of Troy Carey, Former Chief of Security, white male, being allowed to transfer in lieu of termination for falsification of documentation; however, black employees like Pamela King and Bobby Thompson who made similar integrity errors were not given the opportunity to transfer in lieu of termination.

e) Leon Newsome, black male, allowed two female officers to go on a Medical run (both weapons certified) which is not a violation of policy and had been a common practice at CCA; however he was suspended and demoted because his supervisors stated he violated an unknown policy. Captain Ross, white male supervisor, sent two officers without weapon certification {a major security violation} on a Medical run; however, he was not suspended, terminated, or demoted. Officer Lin Gwee reported Mickey Best, white male, for allowing an inmate to leave the facility in sweatpants which is a violation of policy and also a more serious breach of security than Moye or Newsome's violations; however, he was not terminated or demoted.

12. In early 2009, I witnessed Jackson and S. Pooler, former Human Resource Manager, having a conversation in CCA's parking lot. Pooler assured Jackson that she was working on getting a waiver to have Jackson restored to the position of Librarian.

13. Throughout 2008 and 2009, on several occasions, I have personally carried boxes of paperwork that Jackson indicated was work that she was completing at home to her vehicle.

14. In September or October of 2009, due to my capacity as Safety Manager at the facility, it was reported to me that Jackson had to be driven to her doctor by Daniel Martin after Jackson's blood pressure was taken by a CCA medical staff member and reported as dangerously high after an encounter with Orsolits.

3

15. A month after filing her November 2009 grievance, Jackson complained to me that staff members had advised her that they were avoiding her after Orsolits' harassment because they feared retaliation for associating with her.

16. In approximately December 2009, Jackson informed me that Chief Spires had advised her that Orsolits had directed him to remove the officer from the library. She was noticeable upset, so I assured her that an officer was required on that post.

17. In February 2010, I witnessed Jackson coming to work to drop off some work she had done from home to McLendon, Principal. I could see that she was very upset and I asked her what was wrong. Jackson informed me that Orsolits had ordered Ms. McLendon to have her sign a memo stating that she was not authorized to work from home even though she had been given permission by Ms. McLendon and completing tasks from home at the direction of Ms. McLendon.

18. While Jackson was on stress leave from CCA, Jackson asked that I deliver a grievance to CCA. Leon Newsome and I took the grievance to the Human Resource department. Pooler refused to take the grievance and she advised that we give it to Mr. Bird. I informed Pooler that Mr. Bird was the subject of the grievance. Pooler then agreed to take the grievance and warned Leon Newsome and myself that we may be retaliated against if we continued to associate with Jackson.

**FURTHER AFFIANT SAYETH NOT.**

_____     _____
Dated                                         James Hill, Jr.

**STATE OF GEORGIA**
**COUNTY OF** Telfair

Sworn and subscribed to before me this ___ day of December, 2013. Such person did take an oath and produced satisfactory identification.

_____
Notary Public [SEAL]

My Commission Expires:

4